UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. PIERCE DIVISION
CASE NO.: 2:21-cv-14123

JOHNNY EALY,
Plaintiff,
vs.
JOHN FINNEGAN, individually and in his capacity as an Indian River County Sheriff's Department Office police officer,

Defendant.
________________________________/

LOCATION: Remote Audio-Video Communication

DATE: August 18, 2021
TIME: 1:00 p.m. - 4:15 p.m.

DEPOSITION OF JOHNNY EALY

Taken before Estela Valle, Stenographic Reporter, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above case.



APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
OBRONT COREY, PLLC
One Bayfront Tower
100 South Biscayne Boulevard
Suite 800
Miami, Florida 33131
BY: Curt Obront, Esquire

ON BEHALF OF THE DEFENDANT:
PURDY, JOLLY, GIUFFREDA, BARRANCO & JISA, P.A.
2455 East Sunrise Boulevard
Suite 1216
Fort Lauderdale, Florida 33304
BY: Harrison Joss, Esquire

I N D E X
EXAMINATION


Johnny Ealy

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Joss | 3 | | | |

EXHIBITS FOR IDENTIFICATION

| DEFENDANT'S | | PAGE |
|---|---|---|
| 1 | Complaint | 7 |
| 2 | Interrogatories | 7 |
| 3 | Picture (7802 Lockwood Drive) | 47 |




Thereupon,
JOHNNY EALY
was called as a witness and, having been first duly sworn, was examined and testified as follows:
THE WITNESS: Yes, ma'am.
DIRECT EXAMINATION
BY MR. JOSS:
Q. Good afternoon, Mr. -- is it Johnny Ealy? Am I pronouncing that correct?
A. Yes, sir.
Q. Good afternoon. How you doing?
Can you hear me all right, Mr. Ealy?
A. Yeah, I can hear you.
Q. Okay. So because everything is being recorded, not necessarily a video recording. While there is a video recording, it's for the court reporter.
A. Yes, sir.
Q. Everything that we say is being transcribed. So if I ask you a question and you don't understand it or it's not clear, it doesn't come through, you know, there's some break up with it, let me know. Okay?
A. I'll let my lawyer answer that for me, sir.



Q. Excuse me?
A. I'll let my lawyer answer that for me if I don't understand it.
Q. You don't understand what?
A. If you ask me a certain thing, I don't -- don't understand what you saying, I'll let me lawyer understand -- interpretate with you with that. That's what I'm saying. He's right here, right beside me.
Q. Your lawyer -- so this is a deposition. Have you ever given a deposition before?
A. No, sir.
Q. Okay. Would you like me to explain to you what you a deposition is?
MR. OBRONT: Well, I explained it to him, and I'm just going to do it.
Johnny, what he's saying is, he's going to ask you the questions and you just answer the questions as best as you can.
THE WITNESS: Yes, sir.
MR. OBRONT: If you don't remember something, don't try and guess.
THE WITNESS: Okay.



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 5

MR. OBRONT: Just answer to the best of your ability. I can't answer for you because this is your deposition. That's what he's trying to say, which is the case in every deposition.
THE WITNESS: All right.
MR. OBRONT: Remember we talked about this is a question and answer --
THE WITNESS: Yes, sir.
MR. OBRONT: He's going to ask you about what happened, and so on and so forth. If you just answer. Don't guess. And if you don't know something, you don't know it, but if you do, just answer.
THE WITNESS: I'll explain to you the best I can.
MR. OBRONT: That's it. There you go. Thank you, Johnny.
Okay. All right. Thank you.
MR. JOSS:
Q. Right. So because you've never provided deposition testimony before, I'm just going to go over ground rules. As your attorney just told you, Mr. Obront, it's a question,

Page 6

answer session. You know, you brought a civil lawsuit against John Finnegan and -- excuse me, and I believe an official capacity claim as well against the Sheriff. The lawsuit -- because you're the plaintiff, everything is being recorded, what I need you to do is don't say uh-huh or uh-uh. You need to affirmatively say yes, no, I don't know, whatever it is, so that it's all of record. Okay?
A. Yes, sir.
Q. Okay. That being said, have you ever -- I know you answered some questions in interrogatories that were provided by the defense in this case. There's also the complaint. Those are the two documents that I'm going to be relying on for the deposition primarily, your responses in those.
Have you had an opportunity to review anything in this case prior to this deposition?
A. No, sir.
Q. Okay. You haven't reviewed the civil lawsuit, the complaint that was filed on your behalf?
A. No, sir.

Page 7

Q. Okay. The responses to defendant's interrogatories that were answered, have you reviewed those?
A. No, sir.
Q. Okay.
MR. JOSS: So what I'm going to do just from the outset, Mr. Obront, I've already provided the court reporter with the complaint, which is going to be marked as defense one, and plaintiff's answers to defendant's interrogatories, which I'm going to refer to as defense two going forward. Okay?
MR. OBRONT. Okay. That's fine. Perfect. Thank you.
(Thereupon, Defendant's Exhibit No. 1 and Exhibit No. 2 were marked for identification.)
BY MR. JOSS:
Q. So Mr. Ealy, I just want to start. Because you've never given a deposition before, you understand that you were sworn under oath?
A. Yes, sir.
Q. Okay. And what's your understanding of that, being sworn under oath?

Page 8

A. Anything that you say can be used against you.
Q. Okay. Well, to put it in the most simple terms, you being sworn under oath and you testifying under oath just means that you're telling the truth as you recall the events. You're not embellishing. If you don't remember something, you know, don't fill in gaps that you don't recall or you don't know. Just testify as truthfully as possible. Okay?
A. Yes, sir.
Q. Okay. So I know that -- before going on the record, it was indicated that you had some medical issues. Are you feeling okay today?
A. I feel all right.
Q. Okay. Are you on any medications? As you sit here today, have you taken anything for any medical issues that you have?
A. What you mean by medication?
Q. Sorry?
A. What you mean by medication, what I'm on?
Q. Are you currently prescribed any medications by a physician?



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 9

MR. OBRONT: He's asking if you're taking any medicine?

THE WITNESS: Only medication I'm taking, sir, is for my HIV I had. What I got. That's it.

BY MR. JOSS:

Q. Okay. What are those medications?

A. I take medication for my heart. I take a water pill to take the swelling down for the injury I got. Take the swelling down on my legs and my feet. If I don't, they'll swell up big, which I need surgery done on my back as I speak. I got two herniated discs knocked outta place.

Q. Do you know the names of the medications that you're on?

A. Oh, I ain't got it right with me. My doctor -- Mr. Curt can get a hold of my doctor. He can tell him everything I take.

Q. What's the name of your doctor?

A. I can't recall the name of no water pills or them other pills I take for my heart. The one I take for my heart is Forisles [sic] something like -- some kind of -- it slow the heart down. It don't stop it from hurting now.

Page 10

It just slow it down.

The other pill I take for my -- water pill for my feet and my leg, it take the water -- I mean, the swelling down, I can't recall the name of that. Now, Mr. Curt get a hold of my doctor, he can explain everything to him. My primary doctor and my heart doctor.

Q. Okay. So how many doctors do you have total?

A. How many doctors do I have?

Q. That you actively visit?

A. I got my heart doctor and I got my primary doctor.

Q. So two doctors?

A. Uh-huh.

Q. And you don't recall their names right now?

A. Huh?

Q. You don't recall the names of those doctors?

MR. OBRONT: He wants to know if you remember the name of those two doctors.

THE WITNESS: Oh, my primary doctor named Dr. Jerald Ferone [sic]. My heart doctor name is Dr. -- oh, Lord, I can't

Page 11

recall his name. I might have it in my wallet. Hold up. He got a funny last name.

MR. OBRONT: I'm just looking at his Interrogatories, No. 5, I see a Dr. Sophia --

THE WITNESS: My heart doctor is Dr. Shamarak [sic] or Shamrak [sic], something like that, up there in Vero Beach where that wellness and fitness at. That's where his office at. He's a young doctor. He ain't been on, just started there. But that's his name. He do my heart for me.

BY MR. JOSS:

Q. Could you spell that for me?

A. I can't spell it. I don't have the card.

Q. Okay. But it's not Dr. Sophia Ahmed?

A. Huh?

Q. It's not -- the names you just mentioned, that's not doctor --

A. Uh-uh. It's Shamarak up in Vero Beach. Not Sophia, Shamarak. Where the

Page 12

Cleveland Clinic at, medical thing, Whole Center, there's a wellness and fitness. That's where I go at.

Q. So what I'm looking at is your answers to defendant's interrogatories, No. 5. I can pull it up for you if you'd like and screen share.

A. Wait, wait. Which doctor you talking about, Sophia?

MR. OBRONT: Actually, I'm looking at 6, it says Cleveland Clinic Health and Wellness Center. Is that the one you mean?

THE WITNESS: Yeah, Cleveland Center Wellness and Fitness. That's it.

MR. OBRONT: I see it. It's on No. 6. I see it there.

BY MR. JOSS:

Q. You had mentioned the primary care doctor before.

A. His name is Gerald Ferone.

Q. How do I spell that?

THE WITNESS: Spell Ferone for him.

MR. OBRONT: Say the name again?

THE WITNESS: Gerald Ferone.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

MR. OBRONT: Gerald?
THE WITNESS: Yeah. He got -- what that thing called? Whole Family Health Center up there in Vero Beach.
MR. OBRONT: You said the last name is Ferone with an F, like Frank?
THE WITNESS: Gerald Ferone.
MR. OBRONT: Gerald?
THE WITNESS: Uh-huh.
MR. OBRONT: Ferone?
THE WITNESS: Ferone, yeah.
MR. OBRONT: Sounds like F-E-R-O-N-E, but I'm just spelling it phonetically.
THE WITNESS: I got to go see him tomorrow. I'll just get my --
THE COURT: You can get that?
THE WITNESS: -- get his name and get my sister to fax it down to Mr. Curt.
MR. OBRONT: Mary has that?
THE WITNESS: Uh-huh.
MR. OBRONT: His sister has it. He'll get it.
THE WITNESS: I go see my primary doctor tomorrow, sir.
BY MR. JOSS:



Q. Okay. And the primary doctor is located at 725 North U.S. Highway 1 in Fort Pierce? That's the Whole Family Health Center.
A. No, no, no. Indian River County. Gerald Ferone.
Q. Gerald Ferone. Okay. Is that --
A. It's the same company, but he in Vero Beach. Indian River County.
Q. It's the Whole Family Health Center, though?
A. Right, right. Yes, sir. That's it.
Q. And that's your primary care physician?
A. Yeah. Right. He is my primary.
Q. Okay. And you mentioned another name that you can't recall, but you're going to, I guess, supplement to us?
A. Which one you talking about?
Q. Well, you mentioned --
MR. OBRONT: Ferone, Gerald Ferone.
THE WITNESS: Gerald Ferone, yeah, that's the name.
BY MR. JOSS:
Q. Okay. You had mentioned that there



were two doctors that you're --
A. There's Gerald Ferone, and my heart doctor name is Shamarak. Shamrak or something. I gotta get the card. When I get home, I'll get my sister to fax it to Mr. Curt. I don't have that on me.
Q. Okay. A heart doctor, Shamrak?
A. Dr. Shamrak, that's it. Yeah, Shamrak.
Q. Was that listed -- have you previously provided that doctor or disclosed that doctor in discovery?
A. Did I do what?
MR. OBRONT: I don't see it on my list.
THE WITNESS: No, no, no, no.
MR. OBRONT: Yeah. I don't see it on my list. It's the heart doctor. I don't see it.
THE WITNESS: No. He's just do the heart. That's it. He's a heart specialist.
BY MR. JOSS:
Q. The heart's an important organ. But for now we'll refer to that doctor as Dr.



Shamrak, the heart specialist. The cardiologist.
A. Yeah. That's what he do. That's what he do.
Q. Okay. And those are the only two doctors that you're actively seeing as we sit here today?
A. I see them every three months.
Q. Okay. Any other doctors that you're actively seeing?
A. I got my eyes doctor, but he ain't got nothing to do about my injuries or nothing.
Q. He doesn't have -- the eye doctor doesn't have anything to do with what?
A. He don't have nothing to do about my injuries, no. He don't have nothing to do with that.
Q. And the eye doctor is for glaucoma?
A. Huh? Run that by me again?
Q. Am I understanding that the eye doctor that you see is for -- you see him for or her for glaucoma?
A. I see him about my eyes. My eyes.
Q. Okay. What's wrong with your eyes?
A. He the one that told me that I got



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 17

cataracts on my eyes. I gotta have cataract surgery done.
MR. OBRONT: And by the way, I must've misspoke. I said glaucoma surgery, pardon me, at the beginning before we started. It's cataract surgery.
THE WITNESS: I don't have glaucoma. I have cataract surgery.
MR. OBRONT: Cataract.
THE WITNESS: Right. My eyes.
MR. OBRONT: I said glaucoma. I meant to say cataract. That was my fault.
THE WITNESS: Not glaucoma.
MR. OBRONT: I got it. Okay.
BY MR. JOSS:
Q. Okay. Just clearing that up. I just want to know. How long have you had HIV or been diagnosed?
A. Since 2001.
Q. And have you seen the same primary physician since 2001?
A. Yes, sir, I have.
Q. Okay. And that was Dr. Gerald

Page 18

Ferone?
A. No. In 2001, when I got in a little trouble Indian River County, the nurse at the jailhouse, Indian River County jailhouse, told me that I had HIV. And when I got outta prison in 2006, I started seeing Dr. Andrea Bell Coleman (phonetic). She worked at a hospice in Vero Beach now with Cleveland Clinic -- before Cleveland Clinic. She still there. She the doctor, when you see her, you getting ready to die. Andrea Bell Coleman.
Q. Okay. But the facility that you've been treated at is Cleveland Clinic Health and Wellness in Vero Beach, Florida?
A. Right, right, right. When you go to jail or prison, they got medication. They got good doctors. They treat you for that, yeah.
When I got out, they put me to them people, though.
Q. And you've been --
A. Which the name used to be AIDS Research Treatment Center, then later on they changed it the to Whole Family Health Center. Whole Family Health Center bought AIDS Research Treatment Center out. They merged them out. So

Page 19

Whole Family Health Center do that now. Indian River County and St. Lucie County.
Q. Okay. And the -- I'm just trying to get this all sorted because you did list that -- the Cleveland Clinic as a treatment facility, but you've been treated there since, you stated, 2001?
A. No. Not no Cleveland Clinic, no. No, man.
Q. Okay.
A. No. I got in trouble in 2001. I didn't know I had HIV until I went to the Indian River County Jail where I got in trouble at in Vero Beach. Indian River County. You got me?
Q. Why did you go to jail in 2001?
MR. OBRONT: I'm going to object to that, but you can answer. Go ahead. You can answer.
BY MR. JOSS:
Q. You can answer it.
A. Excuse me, sir, are we doing a case about Mr. John Finnegan?
Q. Are you asking me a question or Mr. Obront, your attorney?
MR. OBRONT: Just answer the

Page 20

question and I have objected.
THE WITNESS: 2001 -- I told you what happened. I don't have to keep repeating that over and over, sir.
BY MR. JOSS:
Q. I didn't hear anything that happened in 2001, in terms of --
A. Well, that don't have nothing to do with what we talking about now. See, I was diagnosed with HIV. That's what I'm telling you.
Q. Okay. Why were you --
A. That's what I'm explaining to you.
Q. -- in 2001?
A. I was being treated for my HIV with Dr. Ferone I'm telling you. Whole Family Health Center.
Q. That's not the question I just asked, Mr. Ealy, respectfully. You have to answer the question. You're under oath, as you stated, and as --
A. What I'm saying -- I understand what you saying. You keep asking me the same thing over and over. You saying I have to keep doing it. That's what I'm saying.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 21

Q. Okay.
A. I'm telling you what it is, if you listen.
Q. Okay. You were incarcerated for what in 2001?
MR. OBRONT: Objection; form, relevance as to --
THE WITNESS: Huh?
MR. OBRONT: When I make an objection, it's just for the record. Unless I tell you not to answer, you could --
THE WITNESS: Uh-huh.
MR. OBRONT: -- you should still answer. You don't have to pay attention to my objection.
THE WITNESS: Okay.
MR. OBRONT: I'm just doing that for the record.
THE WITNESS: All right, sir.
MR. OBRONT: He wants to know what was the charge, if you remember, in 2001? What were you charged with, if you recall?
THE WITNESS: Selling, possession of

Page 22

cocaine.
BY MR. JOSS:
Q. Okay. How long were you in jail for as a result of that criminal charge, if at all?
MR. OBRONT: Same objection. You can answer.
THE WITNESS: CTS, sir.
BY MR. JOSS:
Q. So the arrest for possession of cocaine resulted in a conviction?
A. Just CTS I told you.
Q. Okay. What -- you served six years for possession of cocaine in 2001.
A. That's right.
Q. Okay.
A. 2001, I got out 2006. Six years.
MR. OBRONT: I think it's five but whatever. Okay. Just doing the math.
BY MR. JOSS:
Q. All right. And it was while you were incarcerated that you found out that you had HIV?
A. Yeah. They told me to the county jail. Indian River County Jail. Yes. Yes.
Q. Okay. So backpedaling a little bit

Page 23

here, have you ever been sued before?
A. What?
Q. Have you ever been sued before, you personally in a lawsuit?
A. No. No, sir.
Q. Have you ever sued anybody else before?
A. Who?
Q. Have you, Mr. John Ealy, have you ever sued anybody else before?
A. I ain't sued nobody.
Q. Okay. So this is the first civil lawsuit you have ever been involved in?
A. Yes, sir.
Q. Okay. I promise you, Mr. Ealy, the questions I'm asking, if anything is privileged or confidential, your attorney, he knows what he's doing, he's not going to let me delve into any of that, and I'm not going to try to.
The purpose of this deposition is the only opportunity for me to ask you questions, and you're under obligation to answer them. I know you take offense to some of the questions, but I mean no offense by them. Okay?
A. Uh-huh.

Page 24

Q. So moving forward, you stated that you didn't do anything to prepare for this deposition, you didn't review any record or any reports; is that correct?
A. Prepare for it?
Q. Excuse me?
A. What you said, prepared for it?
Q. Right. Did you -- you previously stated that you didn't review your complaint and you didn't review any records; is that correct? You didn't do anything to prepare for this deposition?
A. No, sir.
Q. Okay. Are you in possession of any photographs that you intend to use in this case to prove your claims?
THE WITNESS: What he saying, I didn't understand?
MR. OBRONT: He asked you if you have any photographs that you have possession of regarding this case?
THE WITNESS: No, sir.
BY MR. JOSS:
Q. Okay. There's no photographs? No photographs were taken of you for the injuries



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 25

that you sustained in January of 2017?
A. I got -- my cousin took my sister phone and took pictures, but they can't pull them up on the cell phone. That's an old phone, phone back in 2017. They can't pull -- what you call that thing, Mr. Curt? They try to pull it up, it won't come up?
MR. OBRONT: Cell phone?
THE WITNESS: Yeah. Try to pull that thing up, whatever you call it. I don't know about that. I ain't never had no cell phone now. They tried to pull up the pictures he took of my elbow and my knees and other stuff all busted up.
BY MR. JOSS:
Q. Okay. So --
A. We took pictures, but we can't find the thing on the phone, sir. We can pull it up, we can e-mail that to you. Have my lawyer e-mail it to you, but we don't have it. Not at this present moment right now.
Q. Okay. That's all I'm asking. We don't have any photographs of your injuries from 2017?

Page 26

A. No, we don't. We don't. I'm telling you we took it, but we can't -- the phone went out of service, and we tried to pull it up, but we can't pull it up what we took. We took pictures of it back then.
Q. Are there any videos from the --
A. No, there's no video, sir. No video. No, sir.
Q. Okay. Do you have any other aliases or any other names that you go by other than Johnny Arness Ealy?
A. Just Johnny Ealy, sir.
Q. Okay. And I know you showed your ID at the beginning of the deposition when you were sworn under oath, but I didn't see it clearly. What's your current address?
A. Where I live at now?
Q. Correct.
A. Or when the incident happened?
THE REPORTER: I'm sorry, what was the answer?
MR. OBRONT: Yeah. He wanted to know if he wants his current address or the address at the time of the incident?
THE WITNESS: You want the address

Page 27

when the incident happened?
BY MR. JOSS:
Q. No. Well, why don't you give me the address you were living at in 2017 -- in January of 2017?
A. 7802 Lockwood Drive, Fort Pierce, Florida 34951.
Q. Okay. And where are you currently residing?
A. Where I live at now?
Q. Correct.
A. I live next door. 7706 Lockwood Drive, Fort Pierce, Florida 34951.
Q. Okay. So it's -- the only difference in the address is the 7802 versus 7706?
A. Right. My mother had the house at the time. Then after the incident, the house went in foreclosure. We was telling Mr. Curt about it. She no longer have that house. The bank took that from my mom. Where is that under investigation?
Q. I didn't hear the last thing you said. It was something about an investigation?
A. See, my mother going through PNC

Page 28

Bank.
Q. Okay.
A. She wasn't late on her payments or nothing. They just sold the house out from under the lady. She had a probate lawyer working on it, and the lawyer out of Vero. I can't recall his name. Right by the courthouse. He been doing that for years up in Vero beach. He's a good probate lawyer. They sold the house out from under my mother. February 2016, right, Mr. Curt?
MR. OBRONT: Uh-huh.
BY MR. JOSS:
Q. All right. I was going to ask you about, you know, your education, some of your background, but I want to streamline the deposition as much as possible. And your lawyer, he had mentioned that you're not -- you're no longer making a claim for lost wages in this case; is that correct?
MR. OBRONT: Yes, that's correct. For the record, and before the depo, I said I would stipulate on the record that we are not moving forward with a lost wage claim. Yes, sir. That's



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 29

correct.
BY MR. JOSS:
Q. Okay. So I'm going to do my best to skip over, you know, your work history, so on and so forth.
Tell me about -- I guess, where were you born. Were you born and raised in Indian River?
A. No. I was born in St. Lucie County.
Q. Okay. And my understanding is your date of birth is October --
A. 10/6/62.
Q. Okay. And have you ever lived anywhere else other than St. Lucie County?
A. What's that?
MR. OBRONT: Have you lived anywhere else other than --
THE WITNESS: Oh, my dad's mom bought a place in -- back in '75. Indian River County. Up there.
Q. Okay. Other than Indian River --
A. Don't nobody live on it, because we tore down the trailer. We have empty land on there.
Q. Okay. Other than Indian River

Page 30

County and St. Lucie County, both counties in Florida, have you lived anywhere else?
A. No, sir.
Q. Okay. Looking at Defense Exhibit No. 2 and if at any point you need to see it that's your answers to interrogatories. Okay?
I notice that there are some witnesses listed, and you mentioned that there might by some witnesses in this case that are your family. Let's start with your mother since you mentioned her earlier. What's her name?
A. Catherine G. Ealy.
Q. Catherine?
A. Uh-huh.
Q. Did you say G?
A. Middle initial G, last name E-A-L-Y, like mine. Ealy.
Q. And does she still live with you?
A. I live with her. That's where I stay at right now.
Q. Pardon me. You live with her currently at the 77 --
A. I lived with her when we was at 7802 Lockwood Drive. Now I live with her at 7706 Lockwood Drive.

Page 31

Q. Okay. Right. So was there ever a time in your life that you did not live with her?
A. I stay with my mom all awhile.
Q. Okay. Your whole life you've lived with your mom?
A. My mom and my dad, yes.
Q. Okay. In 2017, January of 2017 when this incident took place, was your father present as well?
A. No. My dad passed away in '07, man.
Q. Okay. Sorry to hear that.
Do you have any significant others, spouses that you're married to, anybody else in your life?
A. No. I've been single all my life, sir.
Q. Okay.
A. Been single all my life. Don't have no wife.
Q. In 2017, who was living at the 7802 Lockwood Drive address?
A. My mother lived there. My mother own that.
Q. Okay. It was just you and your

Page 32

mother?
A. Yes.
Q. Okay. Do you recall if your -- sorry. Strike that.
Do you have a son?
A. My son name Christopher Deshaun O'Neal.
Q. Okay. Christopher O'Neal, did he live there at that time?
A. No, he wasn't. No. Christopher -- my mom raised Christopher from the age of two years old. He got 11 to 12, his mom was in Vero Beach, which is Pat O'Neal, came and had DCF to come and get him, and he been -- he finished growing up in Vero Beach. He ain't been to my momma house ever since. He used to come down and visit his grandma, but not staying there. When he was a little boy, he stayed with my mom.
Q. So Christopher --
A. When he got 11 to 12 years old, his mother got with DCF and took custody of him, and she finished raising him up.
Q. What's his mother's name?
A. Patricia O'Neal.
Q. And when was Christopher born?



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

A. Huh?
Q. What's Christopher's birthdate?
A. His birthday?
Q. Right. How old is Christopher?
A. Right now he's 33. His birthday is January the 3rd, 1987.
Q. Okay. So he's about 33 years old?
A. Yeah, I told you that. 33.
Q. Sorry. I didn't hear you.
At the time of the incident in 2017, you said he was not living at the 7802 Lockwood Drive --
A. No, he wasn't. No, he wasn't.
Q. Okay.
A. No, he wasn't.
Q. But he would visit --
A. I told you he live in Indian River County with his mother. He come down and visit his grandma, he goes back up there Indian River County where he stay at. That's what I'm telling you. Now, do you comprehend?
Q. Yes, I do.
A. Okay. Okay.
Q. Was he visiting you in January of 2017?



A. He come down on a Wednesday, which was the 20 -- January the -- what day they arrested me, Mr. Curt? The 19th or the 18th?
MR. OBRONT: The 19th.
THE WITNESS: Okay. He came down the day before, the 18th, which is a Wednesday. The next day, John Finnegan come down to Indian River County, down where I live at, which I didn't know what was going on in the other county up there. I didn't. And then I tried to explain it to him, he act like he couldn't comprehend or he didn't want to hear it, so it just got blown outta proportion.
The man come in my home looking for Chris. I said, "Sir, he don't live here." And, boy, I wish I wouldn't have said that. One thing led to another.
BY MR. JOSS:
Q. Okay. So besides visiting that 7802 Lockwood Drive home, he would not live there. He didn't keep any possessions there?
A. What's that?
What he saying, Mr. Curt?



MR. OBRONT: I think he wants you to maybe rephrase it in a little bit more of a simplistic manner, because it was a little complicated the way he asked it.
Could you ask it in like a little simpler way?
MR. JOSS: Sure. Sure.
MR. OBRONT: Thank you. Yeah.
He's going to ask it again.
BY MR. JOSS:
Q. Mr. Ealy, if you're confused by a question of mine --that happens all the time -- just tell me I don't understand your question. That's perfectly fine, and I'll rephrase it. Okay?
A. Uh-huh.
Q. The question was, would Christopher periodically stay as an overnight guest at your home at 7802 Lockwood Drive back in January of 2017?
A. No, sir. I told you that. No. No, sir.
Q. Okay. He would just come and visit --
A. He come down every -- listen to me.



He come down every blue moon and see his grandmother, talk with me a little bit, see my sister, his aunt, and he goes back to Vero Beach where his mother at. That's all he do.
Q. Okay. Is 7802 Lockwood Drive a single-family home?
A. Do we still have that home?
Q. No. Is that a -- is it an apartment? Is it a home?
A. No. No, sir. That's a home.
Q. Okay.
A. My mother bought two homes. She bought that house for her, and the other house she bought for my paraplegic brother. 7706 where we live at now.
Q. Okay.
A. He no longer living. He died in 2018.
Q. Yeah. What I'm asking is, you would describe it as a single-family home? It's one-story?
A. No, no, no, no, no. My mother owned that home. She do not own it no more. The home next door, my brother William B. Ealy own that. He no longer living. He was a paraplegic.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

That's what I'm explaining to you.
Q. Okay. I understand that --
A. Hold up. 2017, February, Valentine's Day, PNC Bank sold that house out from under my mother. We were making payments on that home. My mom was not behind on her payment. Some kind of way they sold the house out from under my mother and put the thing in foreclosure. They under investigation about that right now. That's what I'm telling you. Not my mother, PNC Bank.
Like that time, Wells Fargo Bank were taking people home whenever they couldn't pay for it. We weren't behind on payments on our house, and they just up and took it. That's what I'm telling you.
Q. Okay. I'm asking you to describe the home for me, if I'm looking at it from the street?
A. Okay. At the time, that home was yellow. My mom house, 7802, was yellow. The other house was green like it is now, lime green. We no longer have that house. The other people who bought it, they paint the house gray.
Q. Let me stop you there for a moment.



The yellow house you're referring to is the 7802 Lockwood Drive home, right?
A. Yes, sir. What you see on your photo. Yes, sir.
Q. Okay. Because we don't have any photos in this case, I'm trying to put myself in the vantage point of somebody like yourself, a witness, right, who was there at the time because I'm not. So the --
A. No, my son -- no, my son wasn't there. The witness was James Reddick. What Scott last name is?
Mr. Curt got the other White dude name. It was two White dudes. We stay in a White neighborhood where we at. His last name was -- what's his last name, Mr. Curt?
MR. OBRONT: It's on the response, counsel. James Reddick.
THE WITNESS: Scott, what's his last name?
MR. OBRONT: Artman. Artman.
THE WITNESS: Artman. He'll tell you what it is. I can't pronounce his last name that good. They seen everything.



BY MR. JOSS:
Q. Okay. But what I'm saying is, the 7802 home in Lockwood, that's a yellow house. It has a driveway?
A. Yes, both houses got driveways.
Q. Okay.
A. It got a black fence around it.
Q. Does it have a garage?
A. Huh?
Q. At the time, in 2017, January of 2017, did that 7802 Lockwood home have a garage?
A. Yeah, it got a garage. Both houses got garages on it, sir.
Q. Okay. Was it a circular driveway or a straight driveway?
A. A straight driveway. He come right off the road and walk right up there.
Q. Okay.
A. We got roll back -- we had -- what that guy name in Vero? Adam Fences to put our fence down. They got them roll gates. Roll on a track. Both of them like that. My mother house and my brother house. You got me now?
Q. If I was to photograph the 7802 Lockwood home today, would it look any different



than it did in January of 2017?
A. Well, somebody bought the house. Some Latino people bought it. The guy that did the house for the guy that own it, paint the house gray. It's not yellow no more, sir. Then they cut a lot of shrubbage out the yard. So, yeah, it looks different. They had the yard remodeled. The house been painted gray. It's not yellow no more. The people that own it now. That's what I'm telling you.
Q. Other than painting it, did the new owners repave the driveway or expand the property at all?
A. Well, at that time the driveway was gray. The guy that own it now, he had the driveway a little wider, going out toward the road where the cover pipe broke across the driveway at. That's the only difference he did, and he had rock put around the tree. All the shrubbage and stuff me and my mother done put there, he cut a lot of it down and had it dug up.
Q. Okay. So in 2017 --
A. He got rid of a lot. He got a couple trees, not like it was when we had it.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 41

Q. In January of 2017, the 7802 home would have been somewhat overgrown as you're describing it?
A. No, no, no, no.
MR. OBRONT: He's saying that they took out some of the landscaping.
THE WITNESS: The landscaping, like the shrubbery and stuff. You understand what I'm saying?
BY MR. JOSS:
Q. I'm trying to. I'm trying to get you to basically describe the property for me so that I can get an understanding of what it looked like on the day of the incident, in January --
MR. OBRONT: He wants you to describe if there's any change --
THE WITNESS: I'm telling him now if he understand. I'm going over it like a tape recorder, man. I'm not being rude, but you need to listen me.
We had shrubbage in the yard. You know what shrubbage is? Landscaping.
BY MR. JOSS:
A. Okay. I mean, is it clusia? Is it

Page 42

ficus? Is it a mango tree? What do you mean by shrubbage?
A. No, no, no, no, no. Hedges, sir. Hedges.
Q. Okay.
A. Hedges and flowers. Now you understand what I'm talking about?
Q. Yeah. How big is this home?
A. Okay. The people that -- listen. The people that own it now had all that dug out. That's what I'm telling you.
Q. I'm not talking about what it looks like now. I'm talking about what it looked like in January 19 of 2017.
A. The house was yellow.
Q. The 7802 Lockwood Drive home.
A. The house was yellow. We had a hedge go by the driveway, on each side of the driveway. We had flowers in the front going along the trees by the road. That's how it looked. What you see on that video -- picture -- I mean, whatever they took picture of, that's how it look. The house was yellow.
Now you come there, it don't look like that 'cause the house been painted gray.

Page 43

That's what I'm explaining to you. Everything done been organized different. You comprehend?
Q. I understand what you're saying. What I'm driving at is I don't care about what it looks like now, because that's not as important to me as what it looked like on the date that you encountered --
A. I just explained it to you.
Q. -- Deputy Finnegan --
A. I just told you.
Q. Okay.
A. Let me finish. I just explained and told you how it looked back then. If they took pictures of it, that's how it look.
Q. Okay. I'm going to --
A. That's what I'm explaining to you.
Q. I'm going to try and do a screen share and see if I can show you --
A. I know how it look.
MR. OBRONT: He's going to show you on the screen here.
THE WITNESS: Okay.
MR. OBRONT: Yeah. Hang on. Just watch the screen, and he's going to show you a picture.

Page 44

BY MR. JOSS:
Q. Do you see the screen?
A. I can hardly see it 'cause I got cataracts on my eyes, man. You gotta let Mr. Curt look at that.
MR. OBRONT: And there's something blocking here --
THE WITNESS: Take that block off it.
MR. OBRONT: "By staying in this meeting, you consent to being recorded." Okay. Got it. There was something -- Okay. He can see it now.
Is that the house there?
THE WITNESS: Yeah, that's it. I told you that.
MR. OBRONT: Okay. He sees it now.
BY MR. JOSS:
Q. Okay. And this is yellow, right?
A. Yeah, back then.
Q. Right. But no longer does it look like this?
A. No, sir. Somebody bought the house and they painted it yellow, and they had the whole thing remodeled.



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 45

Q. Okay. Aside from --
A. They even did the yard different.
Q. Aside from --
A. What you see there, that's how it looked back then when we had it 'cause I'm the one that kept the landscaping up on it, doing the yard, hedges, everything.
Q. Right. But aside from the paint that -- I don't care about what it looks like now. Is this a fair and accurate representation of what your home looked like, 7802 Lockwood Drive, in January of 2017?
A. Yes, sir.
Q. Okay.
A. But that's my brother house right next door to it. You see that van there, in the other yard?
Q. This where --
A. See that van right there in the other yard right there?
Q. Right.
A. That's my brother house next door to it. That's where we live at now.
Q. Okay.
A. The green house, where the van is.

Page 46

Right there.
Q. Okay. And that's 7706?
A. 6, uh-huh. That's where we stay at now.
Q. Okay. But --
MR. OBRONT: Counsel, I'm sorry, is that Exhibit 3, the photo?
MR. JOSS: Sorry?
MR. OBRONT: Exhibit 3. Is that three, because I think one and two were the interrogatories and the complaint. So is that your three? Just I'm keeping a record off
MR. JOSS: Yeah. Yeah. I'm just trying to confirm that this is the home as it looked on the date of the incident.
THE WITNESS: Yes, sir.
MR. JOSS: This will be printed and marked as defense three that I'll supplement to the file.
MR. OBRONT: Okay. Perfect.
THE WITNESS: Correct. Correct. Correct.
MR. OBRONT: Okay.

Page 47

(Thereupon, Defendant's Exhibit No. 3 was marked for identification.)
BY MR. OBRONT:
Q. So that's all I wanted to kind of paint that picture. Okay?
A. Thank you. Correct. Uh-huh.
Q. Thank you for helping me out there. Walk me through the events. I know you briefly covered them, but walk me through the events as the occurred on January 19th, 2017.
MR. OBRONT: I think it was the 19th. You said the 20th, but I believe it's the 19th.
MR. JOSS: No. January 19th of 2017.
MR. OBRONT: Yeah, the 19th. Okay.
THE WITNESS: Correct.
BY MR. JOSS:
Q. Okay. So you were living at 7802 Lockwood Drive in Fort Pierce Florida, right?
A. Yes, sir. Correct.
Q. Okay. Walk me through what happened. What time of day was it that you encountered Deputy Finnegan?
A. Okay. Before Finnegan and them come, my neighbor across the street named Ray

Page 48

Gunyon [sic] and Kenny Gunyon [sic], I went and help them cut the tree on the top of their mother house. They live right across the street from us.
When I got through with them, I went and got the mail out my brother mailbox in front of 7706, went to my mother mailbox in front of 7802, went and -- my mother yard, we got a walkway, I put it across there, me and my sister, Mary, to get to my brother house, went and check on my brother. He's a paraplegic. Paralyzed. Can't move. Me and my sister took care of him.
When I came out of his house, going back to my mom house which is 7802, John Finnegan and St. Lucie County Sheriff Department pull up in unmarked cars, jumped out with black U.S. Marshall vests like the SWAT team, whatever you call it.
Q. Okay. So let me stop you right there. What time of day was this? Do you recall?
A. They was unmarked cars like Chrysler 300, SUVs, whatever thing like they have, the County have. You know, those SUV-type they got?



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 49

Yeah. I think they Ford. The Chrysler 300 is a Dodge -- a Chrysler, Dodge, whatever it is. There wasn't no green and white cruisers. It was unmarked cars and all of them pull up there.
Q. Okay. I'm not asking what they were driving. What time of day was it that you were helping your -- you said you were helping your neighbor?
A. I got through -- when I got through with them it was around about 4:30 going on 5 o'clock, sir, when the incident happened. All this occurred I'm talking about.
Q. Right. Before that, you were across the street as you mentioned --
A. Across the street helping my neighbor cut the tree off the top of they house, because they help me on my yard, I help them in they yard over there. We all help each other on that street out there where I live at.
Q. I understand. I have the same dynamic in my neighborhood. Thank God. The neighbor -- you mentioned a name and I missed it. Who was that neighbor?
A. They stay across the street from my mom house. The brother that own the house name

Page 50

is Ray Gunyon. His other brother work with him name Kenny Gunyon.
Q. Do you know how to spell that?
A. Huh?
Q. Do you know how to spell their name, your neighbor's name, Ray Gunyon?
A. Ray. Raymond, R-A-Y-M-O-N-D, Raymond. Gunyon is G-A -- G -- Gunyon, G A R -- G-A-R-G-O-N [sic], something like that. Gunyon.
Q. Okay. I could try and spell it phonetically, like, Gunyon like a bunyon, like B-U-N-Y-O-N, Gunyon?
A. Uh-uh. Gunyon.
Q. Gunyon with a G.
A. G-A-R -- G -- G-A-R-G-O-N, Gunyon, something like that.
Q. Okay.
A. Now, the one that own the house name is Raymond Gunyon. The other brother stay with him name is Kenneth Gunyon. I was helping him cut the tree off the top of their house.
Q. Kenneth Gunyon?
A. Kenneth.
Q. Okay. Do you know if they own the property or they were renting?

Page 51

A. No. They own the property.
Q. Okay.
A. No. They own their property. It's 7703 where they live at, right across the street from us.
Q. Okay. And that was --
A. They address is 77 --
Q. You said that's 7703 Lockwood?
A. Yeah. Yeah. All of us on the same street.
Q. Right. So did -- were they outside when you encountered --
A. No. No, sir.
Q. -- Deputy Finnegan?
A. No. When the other neighbor came up -- I mean, when Kenneth came up, he was across the street. Mr. John Finnegan showed him and his mother pictures of my son on his cell phone, and he had a picture in his pocket or something, whatever he had.
Q. Okay. So as you're walking back to your home, you see Deputy Finnegan and he said -- he was adorned wearing U.S. Marshalls?
A. Yeah. They had on black outfits. He had on a black thing where they have the

Page 52

bullet proof vest, it had U.S. Marshall on it. Him and St. Lucie County. All of them had on black bullet proof vest outfits, camouflage boots, all that stuff. Them Army-looking boots they wear. Military, whatever you call it.
Q. Okay. They looked like they were wearing Army fatigues?
A. Huh?
Q. They looked like they were dressed for military; is that correct?
A. They looked -- you know how they do when they do a drug bust? A sting operation, a drug bust? That's how they were dressed up.
Q. Okay. You know, I wasn't there and you were, so I -- you know, I'm just going based on --
A. I'm explaining to the best I can, sir --
Q. Sure.
A. -- how they were dressed up. All of them dressed in all black.
Q. Had you encountered sheriff deputies with the Indian River County prior to this incident?
A. Did I encounter?



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 53

Q. Yeah. Have you had any involvement, whether it was an arrest or whether it was just, you know, calling them out, had you had any involvement --
A. Oh, you're talking about when they -- you talking about when they come down -- when he came down from Vero looking for my son?
Q. No. Before January 19th of 2017, had you had any other involvement --
A. No, no, no, no. Let me explain what happened. When he came up there -- listen to me now -- he come up, he said he looking for Christopher O'Neal. I said, "Sir, he do not stay here." He kept going on and on. I said, "Sir, he do not stay here." The man made me look I'm a liar.
If I tell you that, and I come to your house I'm looking for someone, and you say "Johnny, he don't stay here." What else can I do? Go by your word. That's it. Just plain and simple. Plain as day.
He making me look like I'm a liar. I'm telling him over and over "He do not live here, sir. He do not live here." And one thing led to another and just blowed out of

Page 54

proportion. That's what I'm telling you. They didn't have no search warrant or nothing.
When you come at people like that outstanding warrant, you say you got a search warrant paper. I ain't seen that fail yet. He have a search warrant, I'd a let him search the house. No problem with it.
Every officer I see -- I've been around -- they have a search warrant. They get it from the judge. This guy here did not have no search warrant. That's what I'm explaining to you. At all.
Q. Before January of 2017, when was the last search warrant you had seen?
A. We never had no search warrant. We never had none where we at.
Q. Okay.
A. I'm talking about I've been around other people house I've seen a search warrant where they come and they want to search their house. That's what I'm telling you.
Q. When was the last --
A. Me, myself, I never had that done to me.
Q. Okay. Before January of 2017, when

Page 55

was the last time that you had seen a search warrant because you were around somebody that was the subject --
A. Oh, that been a long time, man. Good Lord, back in the '80s. Back in '80 -- good God, '85, '86, '87, somewhere in there. Yeah. That's some years back. Decades, centuries, whatever you call it.
Q. Okay. So before January of 2017, when was your last arrest?
MR. OBRONT: Objection.
THE WITNESS: My last arrest?
BY MR. JOSS:
Q. Right. What year was it?
A. Oh, my last arrest was 2008.
Q. And what was that for and --
A. 2008 --
MR. OBRONT: Let him finish his question. You answered it was 2008.
THE WITNESS: Go ahead.
MR. OBRONT: He was asking you a question. Let him finish.
BY MR. JOSS:
Q. I'm asking -- your last arrest was in 2008, you said, before this 2017 incident.

Page 56

Where was that?
A. In Vero Beach. Indian River County.
Q. Okay. Indian River County?
A. Uh-huh.
Q. Was that the sheriff's office that arrested you?
A. Yes, it was.
Q. Do you recall what they looked like? What they were wearing?
A. Regular, green uniform.
Q. Okay. What I would characterize as a Class B type uniform. It's not a blue police officer uniform?
A. No, no, no. The regular uniform. The green uniform they wear.
Q. The green sheriff's --
A. Green sheriff's, yes, sir. Yes, sir. Correct.
Q. Green fatigues is normally what they would be wearing under those circumstances.
A. No, no, no, no, no. The regular uniform they wear, the pants and shirt. Their boots were camouflage. That's what they were wearing in 2008.
Q. In 2008, they were wearing green or



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 57

black?
A. Green pants with green shirt.
Q. Okay.
A. I'm telling you what it is.
Q. Right. In that 2008 arrest, what was that for?
A. Huh?
Q. The arrest in 2008, what was that for?
A. Burglary of a structure.
Q. Okay. So would you -- is it fair to say that the uniforms that these deputies were wearing were markedly different than your --
A. In January of 2017?
Q. Yes, in January of 2017.
A. Yes, they was. Yes, yes, yes.
Q. Okay. Because it said U.S. Marshalls and they were wearing black?
A. Right. They had on regular officer -- C.O officer [sic], red and green uniform, right, back in '08.
Q. Now, did they identify themselves as law enforcement?
A. Who that? 2017?
Q. Yes. Sorry. In January of 2017,

Page 58

they were wearing --
A. They got U.S. Marshall on their vest. That tells you what they was right there. They regular officers, but when get an outstanding warrant, they come at you or with a outstanding warrant crime, they put on their black camouflage stuff, U.S. Marshall which is federal.
Q. Okay. Why would they have a federal -- was it a federal arrest warrant that they told you or a search warrant?
A. No, a regular warrant. It just had an outstanding one.
Q. Okay.
A. He messed around and shot a guy out there with -- I'm telling you now. Let me finish.
Q. Who messed around and shot a guy? Are you talking about your son?
Excuse me, Mr. Ealy?
THE COURT REPORTER: He may be frozen.
THE WITNESS: Yeah, it's possible.
(Thereupon, there were technical difficulties, after which the deposition

Page 59

continued as follows:)
MR. JOSS: Okay. They've got the mute button on for the record.
Mr. Ealy, if you could take the mute button off.
BY MR. JOSS:
Q. Okay. Before we got disconnected or the connection froze or dropped --
MR. JOSS: Are we still on record?
THE COURT REPORTER: Yes.
MR. JOSS: Okay.
BY MR. JOSS:
Q. Mr. Ealy, you said he messed around and shot somebody. Who were you referring to?
MR. OBRONT: Objection. Now you can answer, so go ahead.
THE WITNESS: Tell him?
MR. OBRONT: Yeah, go ahead. I objected, but you can answer unless I tell you no to.
THE WITNESS: Okay. What happened, they claim my son shot a guy up there in Gifford. That's what John Finnegan was telling me and my mother.
Like I said, I can't be in two

Page 60

places at one time. I don't know what the man was doing.
BY MR. JOSS:
Q. Right.
A. I don't know what went on in Indian River County. I stay in St. Lucie County. That's what I'm telling you, sir.
They come down just looking for my son. I don't know what's going on or what's what. That be like I'm way here in Miami and something happened way up there in Palm Beach. I can't be in two places at one time.
Q. So --
A. I had nothing to do with what that boy did. That's what I'm telling you.
Q. I understand that you have nothing to do with what your son did. And when you say "that boy," we're talking about Christopher O'Neal?
A. Yeah. No, John Finnegan. The one you representing. Whoever, I guess, what you doing this for. Yeah.
Q. Okay.
A. He came up from my driveway, when he first come up, I was yelling "get the hell out



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 61

the yard." I hollered like four or five times. They steady getting in there. They jumped over the fence, trying to get all on top of my mom house and everything, going on the other people yard.

Who gone hide somebody when they done did a crime? Me and my mom, my sister, none of us, we didn't know what went on up there in Vero. This man surprise me when he came down there. As a matter of fact, we didn't know what was going on in Vero.

And be honest with you, I'm not being funny or rude or anything, the thing here, he had no business coming down there looking for nobody, because we didn't do no crime. That's what I'm trying to got at. But yet, still I got my stuck in the process. That's what I can't understand.

Q. So he --

A. I'm not upset about it. I'm just speaking my point of view. That's wrong what they did. I got messed up for something I didn't know what the hell was going on. That's what I'm talking about. You don't do nobody like that, man.

Page 62

Q. But when you say --

A. I mean, let me come in your house -- hold on. Let me come to your residence right now where you stay at and jump on you and do something I had no business doing. I'm wrong, man. I'm wrong like two left shoes.

I mean right is right, wrong is wrong, now. You don't jump on people by the color of they skin. I didn't have nothing to do with what my son did. This man went off on me for no reason. Disrespect me and my mother both.

My mother 85 years old, man. They cussing and stuff in front of my mom. I don't appreciate that. I told the judge that. I told Judge Sweet that. I didn't like that, man. I ain't gone disrespect nobody and they mother.

My mother always say have respect for old people. Don't care what color, if they Black, White, whatever. That is wrong what he did. I don't know what he telling you. I'm telling you the fact what happened. My neighbors were there. They were here, they would tell you the same thing. That's what I'm trying to explain to you.

Page 63

I'm not being rude. I don't like what he did, man. I mean, that's wrong. I got a thing put on my record for no reason. A federal law enforcement officer. Something that should've been reported. He came down there aggressive will hell in him. Got mad because they couldn't get my son. If my son probably would've been there, they probably would've shot him down. You don't want nobody gunning hurting your children up. I didn't know what he did. I ain't gone lie to you, sir.

Let one of your children do something you don't know about, the cop come there and gun him down. I mean, you'll go insane about that, man. You'll lose it.

Q. I just want to keep us focused on, you know, on the narrative of kind of what you witnessed. I'm not asking you to, you know, say what you couldn't have known because, obviously, you don't know what your son was up to?

A. I didn't know what was going on. That's what I'll telling you now. I'm explaining the best I know how.

Q. And I'm not asking you to speculate about that. I'm only asking you to testify

Page 64

about what you know.

MR. OBRONT: If I could just interject. Johnny, he's just asking what happened. Just tell him what happened. You came back, you went to get the mail.

THE WITNESS: When I came from across the street, sir, helping my neighbor, I told you I went and got the mail out my brother mailbox, went to my mother mailbox, went to my brother house which is next door, 7706, checked on my brother. He's a paraplegic in a bed. He can't move. We have a Hoyer to pick him up. He dead and gone now. I always go check on him every day.

BY MR. JOSS:

Q. Let me stop you there.

A. Me and my sister.

Q. I'm not trying to interrupt you.

A. My sister live with him. Huh?

Q. I'm not trying to interrupt you. I gotta stop you periodically so that I can follow you. Okay?

You were getting mail from --



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

A. My brother mailbox.
Q. -- your mail box and --
A. 7706.
Q. -- another person's mail box?
A. My brother mailbox. 7706.
Q. Okay. Your brother --
A. Hold up. I went to my mother mailbox which is 7802 right on the same street. Went in my mother yard.
Q. What's your brother's name?
A. Went in my mother yard, went to my brother's house, went to go check and see on him. He's paraplegic. He can't move, now. Paralyzed. Came out, checked on him, come back to my mother house, crossed the walkway we got. When I got on my mother driveway, they whipped up in the road. John Finnegan came out the driveway, rolled the gate back.
Q. Okay.
A. He's asking me, "Where is Chris?"
I said, "What is you talking about, man?"
They asked me again, "Where is Chris?" They asked me like five or six times like a tape recorder. I said this man -- I said



this man make me feel like I'm telling a lie. You don't do nobody like that.
If I come to your house right now and I ask you, you say Johnny, he not here. I can't get mad at you and go off and doing things I ain't got no business doing. That what he did. One thing led to another one.
He bumped me, I lightly pushed -- I roll off, lightly push him. I messed up when I turned my back. He run up behind me, picked me up, bam right on the driveway. Bust my elbow up, my knee, everything. Blood all over the mail. Blood all over the bench all in the driveway and the garage.
My mom came out the door that going to the garage later on hearing the dog barking. My mom came up and said "What the tell going on? What y'all doing hurting my baby up. They got me down in restraints, in handcuffs. Him and Paul Pierce [sic]. Paul Pierce work for the St. Lucie County Sheriff's Department. All of them had on U.S. Marshall vests, sir.
MR. OBRONT: For the record --
BY MR. JOSS:
Q. Let me just backtrack so I can



follow you, okay.
A. Huh?
Q. I want to understand everything you're saying, so from time to time I may stop you just so that I can follow everything you're saying. Okay?
A. Yes, sir.
Q. So you said you went to your brother's house to get mail from his mailbox. What's your brother's name?
A. William B. Ealy.
Q. William B. Ealy?
A. William.
Q. Got it. Okay.
A. W-I-L-L-I-A-M.
Q. Thank you. This was around 4:30, 5 o'clock after you were done with the neighbors?
A. Yes, sir.
Q. You got mail from --
A. January 19, 2017.
Q. Okay.
A. Yes, sir.
Q. You got mail from your brother who was living at the 77 --
A. 06.



Q. -- 06 address.
A. Lockwood Drive.
Q. Right. That's adjacent to the address -- the 7802 Lockwood Drive --
A. Right.
Q. -- address?
A. Right.
Q. Then --
A. If I don't get the mail, my sister go out there and get the mail out of both mailboxes, because my mom, she old, can't hardly walk that good. My brother, he's a paraplegic which he died in 2018. He's no longer living.
Q. Okay. Your brother died in 2018. I'm sorry to hear that.
A. Huh?
Q. I said I'm sorry to hear that William died in 2018.
A. Yes, sir, he died.
Q. What's your sister's name?
A. Mary E. Ealy.
Q. How do I spell her first name?
A. M-A-R-Y, Mary.
Q. Okay.
A. Middle initial E. Last name,



Jeannie Reporting www.jeanniereporting.com Your Wish Is Our Job! 305-577-1705

Page 69

E-A-L-Y, like mine.
Q. Where was she living at the time?
A. 7706.
Q. So she was living with William adjacent to --
A. Oh, she been staying with William a good while, man. She take care of William until he died.
Q. Okay. But on January 17th, 2017, she was living --
A. Mary wasn't there. Mary was in Indian River County. She wasn't home. Was nobody home but me and my mother. Me and my mother, my sister dog we take care of, and my brother. The one that died, William. That's all who was home. My mother was in her house asleep. William was in his house watching TV.
Q. Okay.
A. They went in his house pointing guns in his face which that wrong.
Q. So your mother -- I'm sorry, what was her name again?
A. Catherine G. Ealy. Middle initial G.
Q. Catherine --

Page 70

A. Her first name start with a C.
Q. When -- as you were walking across, I guess, the hedges from your brother's house to your mother's house, Catherine, on January 17th, 2017, you encountered Deputy Finnegan; is that correct?
A. Right. He came up on the driveway.
Q. Okay. He came up on the driveway. Did he have his weapon drawn?
A. No.
Q. Did any of the other deputies have their weapons drawn?
A. They had their guns out, went around the house. They had pistols, AKs, and rifles, pump shotguns. Yeah.
Q. These were all deputies wearing or these were all law enforcement officers --
A. They wearing black uniforms camouflage --
Q. -- identifying themselves --
A. -- with the U.S. Marshall vests on, bullet proof vests.
Q. Right. They were all identifying themselves as Federal U.S. Marshalls?
A Yeah, including John Finnegan. He

Page 71

had on camouflage black -- a U.S. Marshall vest, with camouflage shirt and pants.
Q. How many deputies were present, if you remember?
A. Oh, Lord. Good God. It had to be like seven or eight of them. They came all in unmarked cars.
Q. You said they all came on your mother's yard?
A. Huh?
Q. I couldn't hear what you just said. Did you say they all --
A. All of them came in unmarked cars, not the green and white cruisers, the unmarked cars. The cars with tinted windows and arrows on, like the car detectives and stuff drive -- be driving.
Q. Okay. But
A. Right. That's what I'm talking about. They called them unmarked cars.
Q. But you had no misconceptions about whether or not they were Federal U.S. Marshalls?
A. To be honest with you, sir, I don't know your name, I ain't know what the hell going on. It just scared me so bad. It happened so

Page 72

fast. Like somebody just run in your house right now with guns and you don't know if they gone shoot you or not. That's how they did me. I ain't know what was going on. Then they got up on me and I seen what it was. It happened so fast, boy. Whoo. I don't want to go through that no more. Oh, no. I ain't want no heart attack.
Q. But Deputy Finnegan didn't approach you with a weapon drawn, did he?
A. No, he didn't have nothing in his hand. He had it in a holster.
Q. Okay.
A. I'm glad he didn't have it in his hand. He probably would've shot me if he did have it in his hand. He was mad and angry. I ain't know what was going on, man. I really didn't.
Q. Okay. Did any of the other deputies have their weapons drawn or --
A. I told you, yes, they did have it out. They had it out when they got out the car. Everything.
Q. They had their weapons pointed at you?



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 73

A. I'm gone tell you now. Better listen. Pistol, pump shotgun, AK, rifle. That's what they had.
Q. Okay. Were they holding them or were they training them at you?
A. No, no, no, no. They came over the fence. They already had their mind made what they gone do when they got there. That's what I'm telling you.
Q. They came over the fence. Was it from the north or the south of the property?
A. They came in my mom yard. Went over the whole property. Went around both houses. The other people neighbor house, next door, went around they house. Jumping all over the fence like the Army boys do, military boys.
Q. Okay. You said there was approximately seven to eight of them, but the first one you encountered was Deputy Finnegan?
A. Yeah. The rest of them, I ain't know who them people was. Said they got a warrant saying St. Lucie County Sheriff's Department, when Finnegan got his thing saying Indian River Sheriff's Department.
Q. And Deputy Finnegan, you stated he

Page 74

asked you where is Chris --
A. Christopher O'Neal.
Q. -- Christopher O'Neal?
A. Uh-huh.
Q. And he asked you that five or six times?
A. Yeah, like a tape recorder, man.
Q. Okay. And then you said it all got blown out of proportion from there?
A. Yeah, yeah, yeah. Yes, sir, it did.
Q. Okay. And how did it get blown out of proportion?
A. I'm telling him, "Man, I do not know where that guy is. He don't live here." And I guess he probably figure in his mind -- I'm just saying, he probably figure he telling me a lie or something, so -- yeah. I'ma tell you something. Don't think I'm talking crazy or nothing. You and the Judge both. A lot of White officers come at Black people, they get aggressive. They talking about their life being fair and all that there. Look at the stuff be on TV come on Channel 12, CNN News, all that other stuff, a lot of Blacks get shot down hurt for nothing, man. I'm not no aggressive person.

Page 75

I never had no record of jumping on no police. Never, ever.
This thing here should've been avoided, man. That's all I can say. I told the Judge, "Judge" -- he really got really upset by the Judge speaking in that court in St. Lucie County.
Q. Which Judge?
A. I don't like what I'm hearing. I said it happened. I ain't never had nothing, and I got in all that trouble in Indian River County, never put my hand on a police fighting. Anything they ask me to do, I do it,inside the jailhouse, outside on the street. Never had a fight or try to grab a gun or nothing. For what? I wouldn't be here talking to you. They'd a killed me. That man, he just -- I don't know. Whoo.
Q. So if I'm understanding you correctly, at some point you told Judge Sweet that --
A. He had to go in front of Judge Sweet. My lawyer kept me at 18 months. They were trying to give me five years for something I didn't do. These people come out here and

Page 76

jumped on me. That's what I'm telling you. Came in my yard and jumped on me for no reason.
I got out of prison 2011. I've been seven years clean, man. And this here jump one me like I was telling my lawyer, Mr. Curt.
The Judge said, "What you said, Mr. Ealy?" I said, "I've been seven years clean, your Honor." Had my own lawn service. Everything. Not bothering nobody. Minding my own business and this here happened.
I mean, the devil visit, man. You can go about your business and people just come in your yard, aggravate you, and do crazy mischief. There should be a law about that, man. There should be.
Q. Okay. Let me --
A. You trying to -- and stuff just keep on messing with you. That don't make no sense, man. It don't. I just can't get that. I can't.
Q. Let me backtrack --
A. I'm just speaking my point of view.
Q. And I appreciate your candor. I just, you know -- because everything is being recorded, I'm trying to get just a, you know,



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 77

concise narrative of your version of the events that took place, right? So he -- by "he," I mean Deputy Finnegan dressed in black with his Federal --
A. Camouflage.
Q. -- U.S Marshall -- camouflage black U.S. Marshall's clothing on --
A. He had a bullet proof vest.
Q. -- you and him are --
A. Yeah, that vest was bullet proof.
Q. You and him are how far apart from one another --
A. Huh?
Q. -- when you first interacted with him?
A. How far we was apart?
Q. Yeah. Were you close enough that you could touch one another?
A. No. We were like me and my lawyer right there, Mr. Curt. See Mr. Curt right there.
MR. OBRONT: For the record, about --
THE WITNESS: Where he at, that's where we was apart.

Page 78

MR. OBRONT: You can turn the computer around. I'll say we're probably four or five feet right now.
THE WITNESS: About four or five feet. Probably that far apart, yeah. Where Mr. Curt sitting at right there.
BY MR. JOSS:
Q. Okay. So you and Deputy Finnegan are about four or five feet apart when he starts asking you where Christopher O'Neal is. Did he say why he was looking for Christopher O'Neal?
A. Say it again, sir?
Q. Did Deputy Finnegan, at any point in time, explain why he was looking for Christopher O'Neal?
A. No, he did not tell me until me and him had that little dispute. He put me in handcuffs, in restraints, him and Deputy Paul Pierce. My mom come out the door, came out the garage -- the door that come out the door to the garage, and my mom asked him, "What's going on?" Then Deputy John Finnegan said, "We looking for Christopher."
Momma said, "What you looking for Christopher for?" He shot a guy in Indian River

Page 79

County.
Momma said, "What that got to do with me and my son here. Y'all got my son all hurt up in handcuffs, in restraints." Well, we figure -- my mom said, "No, he not down here. He don't live down here." That's all my mom told him. And, boy, they went in a rage cursing going on. "If we see him, we gone shoot him in the damn head," and all kind of stuff. You don't tell nobody about shooting they people in the head like that. How you like it if I shoot your child in the head?
Q. Wait. Let me stop you there for a second. I know you're shaking your head and, you know, you're frustrated, but I'm just trying to --
A. I'm not frustrated. I'm not frustrated.
Q. Okay.
A. I'm not frustrated. I'm just speaking my point of view. I'm not frustrated.
Q. All right. You're holding your head as if you're upset, which I understand.
A. No. I'm hurt, man. I'm hurt at what they did to me. It's wrong. That's what I

Page 80

got my head down for. I'm not frustrated. I'm just hurt.
Q. You're hurt by the fact --
A. That's why I got water in my eyes, 'cause it's wrong what they did. That's why I got my head down.
Q. When you say you're hurt, are you talking about emotionally or physically?
A. I'm hurt physical. It hurts what they did to me 'cause that could've been avoided. That's what I'm telling you, if you comprehend what I'm saying. All of that could've been avoided.
Q. How were you hurt physically?
A. How I'm hurt physically?
Q. Correct.
A. I got two herniated discs knocked out my back, man. I can hardly walk. I'm using a walker.
Q. Are you currently using a walker?
A. I've been paralyzed in the bed for three years behind that incident. I'm just getting where I can walk. I can hardly walk good now. I got a walker --
Q. How did you get to Mr. --



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 81

A. My doctor prescribed that for me.
Q. How did you get to Mr. Obront's office today?
A. How did I what?
Q. How did you get to the office that you're currently sitting in today? Did you ambulate there on a wheelchair?
A. My sister brought me here.
Q. Okay. Did she carry you?
A. My sister brought me down here from Fort Pierce.
Q. Did you come in a wheelchair?
A. I got a walker. You know what a walker is? One of those things you walk behind.
Q. Yeah, I know what a walker is.
A. Them things what the old people have.
Q. So you're --
THE WITNESS: Show him that thing?
MR. OBRONT: You can swivel it around to show him.
THE WITNESS: See that walker? See that thing right there? See that walker?
MR. JOSS: Yeah, I see it.
BY MR. JOSS:

Page 82

Q. So that's a metal -- what I'm looking at is a metal walker with hands -- two handles and --
A. What's that? Yeah, it got handles on it.
MR. OBRONT: Two handle bars and a brake on each one.
THE WITNESS: It got handles and brakes on it, yeah.
MR. OBRONT: Kind of like a cart.
BY MR. JOSS:
Q. Okay. You're not in a wheelchair, though?
A. No.
Q. Okay.
A. I was in a wheelchair earlier. Yeah.
Q. How long were you in a wheelchair?
A. I was in one earlier. The three years I was paralyzed, I couldn't get out the bed. Yes.
Q. What years were you in a wheelchair for?
A. Huh?
Q. If today's date is August 18th, 2021

Page 83

--
A. Okay.
Q. You were not --
A. Okay.
Q. You were not in a wheelchair --
A. When the incident -- listen. When the incident happened 2017, by August -- July or August of 2017, my body start deteriorating. I start getting pain in my back. I could hardly get off the toilet straight. I could hardly walk straight. I had to hold on to things. I walked like a baby when they trying to crawl and when they trying to walk. I had to hold on to things. I'm losing my balance. That's what I'm saying.
I got so bad, they had to push me around in a wheelchair. I got so bad all the yards I had, I had to give them yards away on account of the injury. I got paralyzed, sir. That's what I'm telling you.
Q. In August of 2017, you started using a wheelchair?
A. Right. The last of 2017, around July or August. That's what I'm telling you.
Q. Okay. When did you stop using a

Page 84

wheelchair?
A. Around -- around the 18th -- I mean, February the 18th of 2018. I came to Ms. Curt in a wheelchair.
Q. Okay.
A. And I showed Mr. Curt.
Q. What was the diagnosis that put you in a wheelchair?
A. Huh?
Q. What was the diagnosis that put you in a wheelchair?
A. Diagnosis?
Q. Right. You stated that you had two --
A. I'm not diagnosed. What Mr. Finnegan did to me put me in a wheelchair. That's what I'm telling you.
Can you comprehend?
Q. I'm trying to. You weren't put in a wheelchair immediately, right?
A. Whoo. Lord have mercy. I'm telling you, man, I've been in a wheelchair for three years, laying in a bed paralyzed. People got to help me get up, get up and lay down, all that kind of stuff. When I have got to go, they have



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

to help me get out the bed and stuff.
I ain't got to lie. I got people right here now in line in open court and witness and show you what they had to do for me. That's what I'm telling you. I'm just getting up now where I can handle myself. And I can't handle myself now if I didn't have that little walker there. That's what I'm telling you.
Q. Let's narrow down exactly what happened to you. You said that things got heated between you and Officer Finnegan, and at some point you and -- excuse me, not officer, Deputy Finnegan -- I'm trying to follow what you had been telling me.
You said, "Sir, he does not live here." And you repeated that over and over again, right?
A. Oh, about my son?
Q. Correct. When he was asking you --
A. Yeah, yeah. I told you that.
Q. January 19th of 2017, Officer Finnegan appeared on your home address of 7802 Lockwood Drive, asked you where your son was, and --
A. That's right. Uh-huh.



Q. -- and you said "Sir, he does not live here" over and over. Is that what you said.
A. Yes, sir. Correct.
Q. Okay. What was the next thing that happened?
A. I asked him -- he kept hollering "W need to search the house." I plain out talked out loud like I do now, "Do you have a search warrant?"
"No, I don't have no search warrant. We is the warrant."
"Well, if you ain't got no search warrant, you ain't coming into this house."
"Did the Judge give you a thing?"
He didn't say nothing about no judge or nothing. He took it upon himself he gone come in the house.
Q. But -- okay.
A. You don't do that, boy. Uh-uh. No, no. Uh-uh. I seen somebody do that back in '87 or '92 that happened. And when the Judge got on that case, it messed that county up. Indian River County. That's when Tim Novak was the Sheriff. Yeah. He shoot that down. Yeah.



Q. So officer --
A. You got to have a search warrant from a Judge, legally, black and white copy, to come in somebody house. You ain't got that, you can't walk in nobody house like that. They gone sue you, man. That be a class action -- I mean, a civil suit -- lawsuit. You can't do that without a piece of paper. You won't let nobody walk in your house right now without a search warrant.
Q. Okay. Mr. Ealy, so going back, he -- by "he" I mean Deputy Finnegan, asked you on January 19th of 2017, he asked you if they could -- if, what, the U.S. Marshalls could search your home, and you said no?
A. And I told him to show me a search warrant.
Q. Okay.
A. And he couldn't come with none. That's what I'm telling you.
Q. So you told him to show you a search warrant?
A. That's right. Show me one.
Q. Did he show you any?
A. He didn't have nothing. Now he



might have some bogus mess he made up now. I'm telling you. And I'll get in wide open court and say it in front of the Judge again. Lie. They didn't have no thing then. I mean, back then. They might have one now that they done made up.
MR. OBRONT: Try to just answer the question. He asked you if they had a search warrant?
THE WITNESS: No. I told him, no, they did not have a none, Mr. Curt. That's what I told him.
MR. OBRONT: Wait for the next question, otherwise we'll be here all day.
THE WITNESS: Okay. Move on to the next point, sir. What you getting at.
BY MR. JOSS:
Q. So he said -- your testimony is that he stated that he did not have a search warrant. Did he tell you that he had an arrest warrant?
A. Arrest warrant?
Q. Yeah.
A. Did he say that?
Q. Did he tell you that he had an



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 89

arrest warrant for your son?
A. No, he did not tell me that right then when he came up. When they got me arrested and restrained, my mom -- me, my mom and him, and Paul Pierce was sitting in our garage -- my momma garage. You understand and comprehend?
Q. I'm trying to.
A. You comprehend what I'm saying?
Q. Your mother was inside the home when he first -- when Deputy Finnegan first --
A. Right.
Q. -- approached you, right?
A. When he come up. The dog was barking so bad --
Q. Was the garage door open or closed?
A. Hold up. The dog was barking so bad, my mother got up. When she come out the door going to -- come out the house going to the garage, they had me in restraints. Him and Paul Pierce. I'm down on the ground with handcuffs on.
Q. Okay. By the time --
A. Momma asked him -- hold up. Momma asked him, "What y'all got my son in handcuffs for?"

Page 90

"Well, he put his hands on me, Ms. Ealy."
"Momma said, "He put his hands on you? What you first doing down here, man?"
He said, "We got a warrant for Christopher O'Neal."
Momma said, "What Christopher did?" Then he told momma that he shot a guy in Indian River County.
Momma said, "What that got to do with me and my son down here." And, man, he went in a rage. I don't know what he told you.
Q. By the time --
A. He done told you something bogus 'cause he got you believing that. That's why you asking me stuff over and over. I ain't trying to be rude with you. I done dealt with stuff like this before, man.
Q. I'm sorry?
A. If you listen what I'm telling you, I'm telling you what happened. You asking me the same thing over and over and over trying to cross me. That's what you trying to do. I'm not nobody fool. I'm 58 years old. I'm nobody fool.

Page 91

Q. What, in your mind, is it you think I'm trying to do 'cause I could tell that you're somewhat frustrated with me. What is it that you think I'm trying to do?
A. I'm not frustrated. You asking me the same question over and over, and I explained to you yes or no. Now we need to keep moving on. That's what I'm telling you.
Q. Well, you're not actually saying yes or no. You're giving me a rather lengthy kind of narrative.
A. Did he ask for an arrest warrant?
Q. I'm trying to break it down.
A. Did he say he had an arrest warrant? No. He said he had a warrant for my son. He didn't tell me he had an arrest warrant. That's what I'm telling you. No. The answer is no.
Q. Okay. So he didn't say that he had an arrest warrant. At some point were expletives exchanged?
A. He did not say he had a arrest warrant. He said he had a warrant for my son.
Q. That's not my question. The question is, at some point did you exchange expletives with Deputy Finnegan? Did you tell

Page 92

him to get the fuck off the property or something to that effect I thought I heard earlier?
A. Get the fuck off my property?
Q. Correct.
A. I told him to get the hell -- get they behind off my property. But that is my mom property. They got no business coming there without a warrant. They got no business coming in the property, period. If that's what you want to hear.
Q. I want to hear what you experienced.
A. You let somebody walk on your property without a warrant? Just bogart themself in your house? Yes or no? Answer that. Would you let them do that? Yes or no?
Q. Yeah, I would.
A. Huh?
Q. Yeah, I would. If they had a search warrant for a murder suspect, I would.
A. Right. I'm talking about they show you a thing, would you let them come in there?
Q. Okay. So I'm asking you questions here, all right. It's not my deposition. I just want to --



Jeannie Reporting www.jeanniereporting.com
Your Wish Is Our Job! 305-577-1705

Page 93

A. All right. Hold on. I'm asking you a question.
Q. I want to follow up.
A. I'm not being smart. I'm asking you a question. If they show you a search warrant, would you let them come in your house? Yes or no? Yes or no?
A. Sir, I get that you're upset. I just want to get through the deposition. I think we can probably get through it if you would just, you know, kind of narrow your responses and let me follow up with what it is that you say, because you said quite a bit. Okay?
So by the time your mother, Catherine, came outside, you were already in handcuffs; is that correct?
A. I'm in restraints, the handcuffs, correct.
Q. Okay. And you were on the ground; is that correct?
A. Correct.
Q. Okay. Before you were placed in handcuffs, Deputy Finnegan asked you if he could go inside the house to search for your son,

Page 94

Christopher O'Neal, right?
A. And I told him no, show me a search warrant. That's what I told him. And I'll say it again in wide open court in front of everybody. No. That's what I said.
Is that what you want to hear? I'm telling it to your face, no.
Q. Okay. So how did it come to be --
A. That's what you want to hear.
MR. OBRONT: There's no question pending. Wait for the question.
BY MR. JOSS:
Q. How did it come to be that hands were placed on anybody?
A. Say what?
MR. OBRONT: How was there contact? He's asking you what happened between you --
THE WITNESS: I told you he grabbed and bumped me, and I was walking away, pushed him trying to get away from him. Said let me go get mom up. Didn't I say that, Mr. Curt? Yes or no?
MR. OBRONT: Go ahead. Keep going. Just answer his question.

Page 95

THE WITNESS: And he gone run up behind me, pick me up and body slam me. I guess, he probably tell y'all he was feeling scared for his life. I'm not gone hurt the damn man, go get no gun, all that. I'm gone get mom up, bring her out there and see what's going on. That's all I wanted.
BY MR. JOSS:
Q. Can I just follow up with you for just a moment. You said he bumped you?
A. Yeah, he bumped me.
Q. Okay. You're standing -- put me where you are on January 19th of 2017. You're standing facing this deputy and you're facing the street?
A. You standing right here like me and you are right now face to face.
Q. Right.
A. Like me and you talking.
Q. You're on the driveway, right?
A. Yeah. On the driveway, yeah.
Q. Okay. Is the garage door open or closed?
A. Hold up. Let me finish. You know

Page 96

how the garage door be up? I'm trying to get in there to go get my mom, see what's going on. He wouldn't let me get in the house. That's what I'm telling you.
Q. You're facing him, you're having this interaction. He --
A. Correct. Correct. Correct.
Q. He's facing the house.
A. Correct.
Q. You're facing the street?
A. Correct. Correct. Move on. Move on. Correct. Yeah.
Q. At some point, did you point your finger at his face or wave --
A. No, I did not point no finger at his face. No. He told you that?
Q. I'm reading just background narratives.
A. What --
Q. I'm asking you --
A. Sir, sir, sir, listen to me. I'm going to be through with this here. I'm tired of going back and forth with it. What they wrote is a false arrest. They put lies to make it stick. Him and Paul Pierce. Now you write



Jeannie Reporting www.jeanniereporting.com
Your Wish Is Our Job! 305-577-1705

that down and show that to the Judge. They put lies to make it stick. All that stuff they hollering that I did, I did not do it.
They put lies on that arrest affidavit to make it stick. A false arrest they call it. Setting people up. They come and get my son, they figure oh hell, we'll get the father. That's what I'm telling you.
Q. Are you making a claim for false arrest?
A. Say that again?
Q. Are you making a claim that you were falsely arrested?
A. Yeah.
Q. Okay.
A. This man put his hands on me, and I just bumped and pushed him and rolled away from him, trying to get in the house, get my mother to come back and see what was going on. He's going to run behind me, pick me up, mess me all up. Hurt my back and everything and put the lie on me. When he come in the yard from the beginning with hell in him. Aggressive.
I know y'all gone believe a cop word over me 'cause he got a badge. I know how the



law go.
Q. That's not how the law works. I'm taking your deposition --
A. And first of all, I'm gone say this here -- I'm not being rude or nothing. I'm going to tell you this in front of that Judge. A lot of them White cops is racist. They don't like Black people. When they come up to a Black person, they be aggressive with them which that wrong. That's what they fighting at in Washington D.C. now if you watch the news. The Justice Department.
A lot of cops -- listen. A lot of cops in the police department and Justice Department getting sued about that. Joe Biden don't like that, man. They're getting sued right now.
Q. Is it your position that --
A. There's two sides to a coin. This man trying to make me look like I'm a scapegoat.
Q. Is it your position --
A. He the one that a scapegoat.
Q. Is it your position that the deputies that arrested you are biased against



you because you're African American?
A. Yeah, they violent [sic]. Yeah. And they been doing it. I got rumors from Whites, Latino and Blacks they been doing that. They didn't just start. They been doing it. Don't let them put all them lies on me like I'm a scapegoat.
Q. Did they --
A. I'll tell John Finnegan to his face. He ain't no angel. I don't care about he White. I don't care about he got that badge. I'm human just like he is. I shit and bleed just like him. And I'm not getting violent. I'm just telling you how I feel about it.
Q. Okay.
A. I'm tired of you asking me stuff over and over, which I know you got to do it, but it don't make sense. This man don't tell what he did.
Q. Did you state that --
A. Don't you sit there and lie for him, now. Because you'll get messed up in the process too. Don't you do that, now.
Q. Did you state that --
A. Don't you do that. I'm telling you



what happened.
Q. Did you state to Deputy Finnegan that he was targeting you because you were African American on January 19th, 2017?
A. They come out and looking for my son. What he got mad about, I told him to get the hell out the yard. That's all I told him. And if my neighbor was here right now in front of you in the flesh, I tell you he'll say the same thing. I told him to get the hell out the yard. That's all I said.
Q. How did --
A. Now, all that other mess he said, is a lie. I'll tell him in front of his face. I don't care who be around. I don't care if there be 100 cops. All that mess, I'll say it in front all their faces is a lie. L-I-E, a lie, or L-I-Y, a lie.
Q. How did Deputy Finnegan close the distance between you and himself from four to five feet to, as you mentioned, bump you?
A. The man right up on me on my face, man.
Q. Okay. So that's what I'm trying to get.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 101

A. The man come in my face. So what I supposed to do. The man bumped me right in my face.
Q. You guys, at some point, were -- the distance --
A. Ain't nobody come to his face. He come in my face. What kind of lie he told you? I'm asking you. Tell me what happened now?
Q. Sir, I'm not under oath. I'm asking you questions that --
MR. OBRONT: Just answer the questions as best you can.
BY MR. JOSS:
Q. You know, we can get through this relatively quickly if you would just -- I'm not trying to manipulate you. I'm just trying to get the facts as you know them to be --
A. I told you the truth. Correct.
Q. -- on January 19th of 2017.
A. Correct.
Q. Give me a little leeway to follow up with the questions that I have. Because you've given so much information, I have to follow up on it. Okay?
Is that fair?

Page 102

A. I told you that man come in my face. Now, I ain't gonna say no more about it. Correct. Up in my face.
Q. Okay. Your back is to the garage. He, Deputy Finnegan, on January 19th, 2017 -- and I have to keep repeating this because we get off track, and I want to make sure the record is clear -- he approaches you and closes the distance that was originally four to five feet; is that correct?
A. Correct.
Q. Okay. So at that point, what was being said? Was that the point at which he was repeatedly saying where is Christopher --
A. O'Neal.
Q. -- O'Neal?
A. Go ahead and talk.
Q. Okay. Is that what he was saying?
A. Yeah, that's what he was saying. Correct.
Q. Okay. So he's asking you that repeatedly as he's walking towards you?
A. Uh-huh.
Q. Is that is a yes or a no?
A. Yes.

Page 103

Q. At some point you stated that he's in your face. How far away was he from you?
A. He was right here like this thing in my face right now. That thing you talking to me at.
MR. OBRONT: For the record, about six inches to one foot.
THE WITNESS: Say that again, Mr. Curt?
MR. OBRONT: I said about six inches to one foot.
THE WITNESS: Six inches or whatever you call it. Right in my face.
MR. OBRONT: That's how far away he was.
THE WITNESS: Yeah, right in my face. I wish I had a video so I could show it to you, so you could see what I would be telling you in that room.
BY MR. JOSS:
Q. So he gets about six inches from your face?
A. Yeah.
MR. OBRONT: Six inches to a foot.
THE WITNESS: Six inches to a foot, man, in my face.
BY MR. JOSS:
Q. And what happened then?
A. I told him -- I don't -- he pushed me, man. He pushed me, came up on me.
Q. You're gesturing with your forearm, for the record.
A. He come up -- look at my chest. See my chest here?
Q. I see it.
A. See my chest? He walked up on me like that there, pushed me. I took my arm and tried to push away from him. I messed up when I turned my back from here to you. He ran behind me and picked me up and threw me on the concrete, hurt my arm and stuff up. That's what I'm telling you.
Q. Okay. Let me follow up with that. Thank you.
So he bumped you with his chest when he walked up to you?
A. Yeah. Yes, he did. He put the first lick. That's what I'm telling you. Yes.
Q. That's all I'm trying to understand. Is how the physical contact initiated. He



Jeannie Reporting www.jeanniereporting.com
Your Wish Is Our Job! 305-577-1705

Page 105

bumped you with his chest?
A. He started it, right. Yes.
Q. And then --
A. Yes, he did.
Q. And then, as you just testified, you used your shoulder or your elbow to create space?
A. This part right here, tried to push away from him.
MR. OBRONT: For the record, his hand to his arm -- forearm.
THE WITNESS: My forearm trying to push away from him, sir. That's what I'm telling you.
BY MR. JOSS:
Q. You're showing me your left forearm, you pushed off of him to create space.
A. Right.
Q. And when I turned my back, he ran up behind me and picked me up and slammed me on the driveway on the concrete, and hurt me up. Bust my elbow, my knee and everything. Knocked my back out of place.
Q. Okay.
A. Yeah, he did it.

Page 106

Q. So were there any words exchanged that you remember specifically?
A. I just told him, I told you earlier, he not going in the house unless he show me a search warrant. That was it. Ain't no more words. Said just like that.
Q. Okay.
A. Now, what he told you, I don't know nothing about it. It didn't come out my mouth. That's what I'm saying.
MR. OBRONT: Never mind what he told you.
BY MR. JOSS:
Q. Okay. And that's --
A. That's all he said, yes. Correct.
Q. Okay. So you said you're not coming in the house --
A. Unless you show me a search warrant.
Q. At that point, you created space or you raised your forearm?
A. No, he pushed me.
Q. Right.
A. He bumped me.
Q. I'm saying, after he bumped you, you said --

Page 107

A. Then I push him away, not trying to knock him down, now.
Q. Right.
A. He put all that mess in the arrest affidavit which is a lie.
Hold up Mr. Curt, let me tell it 'cause I was there. I know who it is. What he did, and I tried to -- let me go on out and get momma, see what's going on. I guess he figure I'ma go get a gun or something and come back and try to hurt him. I ain't gone hurt no cop, man.
Q. Did he say --
A. To be honest with you, sir, I don't know your name, I don't like being bothered with cops. I don't deal with cops, period. I'm here because of this. Me and you could be brothers. You a cop, I don't wanna associate with you. That's what I'm telling you. And I don't hate them. I don't deal with cops, period, man. I don't. That's for the record.
Q. I can understand that you don't like cops.
A. I don't deal with cops, period. No matter what color he is.
Q. Okay. You know, I don't have an

Page 108

opinion one way or another about that. I just want -- I'm just trying to get to the --
A. Right. I understand what you're saying. I'm just being straight up. I don't deal with cops, period.
Q. -- break it down, if you remember. I'm not saying you remember every single detail, but did he something to you to the effect of don't move or stop, or did he give any commands to you?
A. No. He just was on a man hunt. He was gone bogart himself in. That's what I'm telling you.
Q. Okay. So after --
A. Somebody walk up on -- hold on. Let me finish talking. Somebody walk up on you, you trying to talk to them, what that is? Bogarting, right, Mr. Curt? You can't get around it no matter what color they is.
I come to you right now, you and your wife standing there, I'm just gone bogart you and go in your house. You can take something and bust me in my head or anything, man. I brought that on myself.
Q. Are you saying bogart?



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 109

A. I'm a law enforcement officer or not.
Q. Are you saying bogart?
A. That's what it is. Bogarting. He did it. Neighbors seen him, I'm telling you. They was standing there looking.
Q. What do you mean by bogart?
A. He gone bogart himself in the house. Gone bully himself off in there.
Q. Okay. You mean -- so by bogart you mean bully?
A. Explain to him what I'm trying to say, Mr. Curt. You know about law. Explain it to the man. I'm trying to tell him. He's like he don't understand me. Explain it to him.
MR. OBRONT: Yeah. I think --
THE WITNESS: No. Turn around. Explain it to him. I'm tired of talking to this guy, man. I done said it over and over.
MR. OBRONT: I wasn't sure if it was bogard or Bogart, but -- you mean like Humphrey Bogart?
THE WITNESS: Bogart mean you bogart yourself in somebody house. Trying to

Page 110

manhandle. That's what I'm trying.
MR. OBRONT: Okay. Yeah. Bully, I guess.
THE WITNESS: Bully. That's what I'm telling you. I'm trying to explain it to you over and over.
MR. OBRONT: I wasn't sure of the term, but I think it means bully.
THE WITNESS: That's what I'm trying explain. I ain't trying to be funny. Just listen to what I'm telling you.
BY MR. JOSS:
Q. Mr. Ealy, I promise you, I'm not trying to be deprecating. I'm just trying to understand exactly what you're saying?
A. He bumped me, so that's bullying and bogarting. He bullied his way in there. That's what I'm telling you.
Q. Okay. When you say bogart, I understand you now to mean bully; is that right?
A. Bullying, bullying. Just move on. Bullying, bullying. Yes.
Q. So you felt at that point that he was bullying you to get inside the house?
A. He was bullying me. I know what he

Page 111

was doing.
Q. Okay. So your testimony is that he was bullying you to get inside the house to search for your son?
A. Listen to what I'm saying, sir.
Q. Okay.
A. People have told me -- what I'm telling you. Please listen to me. I'll say the same thing in open court. People told me that man been doing that to people, Blacks and Whites. He railroading, bullying, doing a lot of stuff, and get away with it. He been doing it, sir.
Q. Who told you --
A. This ain't his first time.
Q. Who told you that Deputy Finnegan --
A. Oh, there's a lot of guys told me. I ain't gone call their names. A lot of guys told me. Stay in Indian River County. Say he been doing that. I don't know what he telling you, and the Judge, and other people, he been doing that.
Q. Do you know --
A. This ain't his first rodeo. He been doing that as soon as he got that badge, and

Page 112

they made him a captain. Got hire rank. He figure he can throw his weight around.
Q. Okay. So you have witnesses that you know of that have testified, or not testified, but have told you that Mr. --
A. I'm not gone --
Q. -- Deputy Finnegan --
A. I got people told me. I ain't gone get them come in be a witness or nothing. I got people just told me. I'm telling you.
Q. Did you know --
A. He been doing this here.
Q. Did you know this before meeting Deputy Finnegan?
A. No.
Q. Had you ever met him prior to --
A. I never met that man in my life. That's what I'm telling you. Never saw him.
Q. Had you ever met him after or had encounters with him after --
A. No.
Q. -- January 19th of 2017?
A. No. I never seen him in my life. First time I seen him.
Q. Let me finish my question before you



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 113

answer, please, for the record.
A. Okay.
Q. So just to be clear, you haven't met him since January 19th of 2017?
A. No.
Q. And that includes the criminal case that came about from this incident?
A. That's the first time I seen him I told you.
Q. Okay. But after January 19th of 2017, you didn't see him again --
A. No.
Q. -- in court?
A. I never seen him no more, no. No. That's what I'm telling you. No.
Q. He didn't come in and testify as a witness?
A. No.
Q. Okay. Did your attorney file a motion to dismiss in that case, like a stand your ground motion?
A. You have to ask him that.
MR. OBRONT: Yeah. I don't know who his attorney was in that case. He doesn't know.

Page 114

BY MR. JOSS:
Q. Okay. Do you remember who your attorney was?
A. When? You talking about the attorney I got now?
Q. No, the attorney in your criminal case from that day --
A. Oh, the guy that represented me, that was Edward Moore. He was a defensive lawyer.
Q. Okay. Do you know if he filed any motions to stand your grand?
A. I don't know what he filed, sir. You gotta ask him that. I don't know.
Q. Okay. You told me that you had stated the same thing here today to Judge Sweet in your criminal case, right?
A. Uh-huh.
Q. That you were bullied?
A. That I was bullied to Judge Sweet?
Q. Yeah. So you told me earlier, if I'm not mistaken, that you told Judge Sweet that you didn't like --
A. No. I told Judge Sweet -- let-- my lawyer said leave that alone. Man, you talk to

Page 115

him.
MR. OBRONT: I think there's some confusion.
Joss, are you talking about the Judge in the criminal case or maybe I'm confused now.
MR. JOSS: Yeah, I'm talking --
BY MR. JOSS:
Q. I'm assuming that Judge Sweet was the Judge in your criminal case that came about from the battery on a law enforcement?
MR. OBRONT: I got it. No. He had no conversations, that I know of, with Judge Sweet. Only the lawyer's talking for him. He didn't talk to Judge Sweet.
Okay. All right. Let's move on here.
Judge Sweet, he's the criminal Judge, right?
THE WITNESS: Right. Right.
MR. OBRONT: The lawyer spoke to Judge Sweet, not him.
THE WITNESS: The lawyer talked to him. I didn't talk to the Judge. Go ahead. Move on.

Page 116

BY MR. JOSS:
Q. Okay. You testified earlier that you told Judge Sweet that you didn't like what Mr. or Deputy Finnegan did.
A. No. My lawyer told Judge Sweet that.
Q. Okay. You didn't testify --
A. My lawyer, Edward Moore? Huh?
Q. You didn't testify in open court?
A. No. I didn't testify in no open court. We never had an open court. Only thing he did was sentence me. Found me guilty for battery on an officer. That's what I got sentenced for. I didn't testify nothing. Who told you something like that? Huh?
Q. You said that at the beginning of the deposition.
A. I said my lawyer told him that behind my back. I didn't know nothing about it. That was Mosier. Look on the arrest report. You asking the same thing over.
I'm getting frustrated with this, man.
Q. Did you ever --
A. Ask the same thing over, and I'm



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 117

telling you to move on with it.
Q. All right. Did you ever testify --
A. Don't be asking me the same thing. You done said it. Move on. I ain't said nothing. Don't put no words in my mouth I didn't say. Don't do that.
Q. Stop interrupting me.
A. I really don't like that. I really don't.
Q. Okay. And I don't like being interrupted. I think I've given you a lot of leeway here to -- you know, to give me your version of the events, and I mean -- I'm just trying to get your version of the events down, and the follow up to it. But, I mean, if you're going to fight me on everything, we can suspend the deposition.
A. I'm not gone fight you on nothing. I'm just telling you quit asking me the same question over and over. That's all I'm asking you.
MR. OBRONT: Yeah. Let's everybody take a deep breath.
THE WITNESS: We done said it. Move on.

Page 118

MR. OBRONT: Listen to the question, and just answer the question.
THE WITNESS: That's all I'm asking. Move on.
BY MR. JOSS:
Q. The question was, did you testify at all at your criminal case, that's Case No. 2017-CF-00176?
A. No.
Q. Okay. You didn't give any testimony when you resolved your case?
A. No.
Q. So you didn't plead your case out?
A. My lawyer plead for me. He plead no contest after a motion.
Q. When did he plead no contest?
A. When I got ready to get sentenced. My lawyer plead that for me. I didn't plea it.
Q. The criminal Judge in Case No. 2017-CF-00176 didn't go over a plea colloquy with you? You weren't sworn under oath?
A. He told me -- yes, he told me what was going on. I told him, yes. He told me they placed me guilty. That's what he told me. My lawyer plead for me. I did not

Page 119

plea guilty or none of that. My lawyer signed the thing. That's what I'm telling you. I didn't sign nothing.
Q. You didn't sign a plea colloquy?
A. Yes, I signed the thing. He had me to sign it.
Q. Okay.
A. The lawyer plead me that for me. If you listen to what I'm telling you, yes.
Q. But you just said you didn't sign anything, and then you said you did.
A. When you got a defensive lawyer, they tell you what to do, what not to do. He said, "Johnny, I'ma put" -- "make you sign a --" what you call that?
Q. A plea deal?
MR. OBRONT: No contest?
THE WITNESS: What you said?
MR. OBRONT: I said no contest.
THE WITNESS: No contest, yeah. That's what he told me to sign right after a motion.
BY MR. JOSS:
Q. Okay. Do you remember when you plead no contest?

Page 120

A. The day I got sentenced. When that was?
MR. OBRONT: If you don't remember the date, just say --
THE WITNESS: I don't remember the date, man. Call and ask my lawyer. I don't know about that, man. I don't. You asking too many things.
BY MR. JOSS:
Q. Do you remember what the sentence was?
A. What?
Q. You plead no contest to what? Battery on a law enforcement --
A. No, I don't remember what the sentence was. No, no, no. Ask my lawyer. I don't know. Ask him. No.
Q. Okay. Do you remember what you plead no contest to? What was the criminal charge?
A. Battery on law officer, whatever you call it.
Q. Battery on a law enforcement officer?
A. That's all I know.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Q. Okay. Battery on which law enforcement officer?
A. Whoever that was. That's all I know.
Q. I didn't understand what you just said.
A. Battery on a law enforcement officer, whatever you call it. Battery on a officer.
Q. Okay. Which officer?
A. They just got on the arrest affidavit battery on a officer. It don't matter which officer.
Q. Okay. You don't recall if it was Deputy Finnegan?
A. I'm going by what the paperwork got. Yes. Don't ask me which officer. I'm just talking about what they got on me.
Q. So it's safe to assume that whatever you plead out to is accurate?
A. Yes, I guess. Whatever you talking about. You talk so fast.
Q. I mean, if you don't understand what I'm saying, just let me know.
A. I wish you would move on, sir, to



the next thing, please.
Q. Okay. Who else witnessed the interaction between yourself and Deputy Finnegan, other than --
A. Who the witness?
Q. -- yourself and Deputy Finnegan?
A. Who the witness?
Q. Correct.
A. I told you James Reddick and Scott -- what his last name is?
MR. OBRONT: It's on the paper.
THE WITNESS: It's on the paper. My lawyer got it. He'll tell you. Yeah. They seen it.
BY MR. JOSS:
Q. Who's James Reddick?
A. James Reddick, my neighbor. James Reddick. Reddick. Whatever his name is.
Q. James Reddick? And what is it that he witnessed?
Well, let me ask you this: How do you know he witnessed anything if you don't know what he witnessed?
A. If you would listen, sir, I explained you a thousand times over and over. I



talk loud. I know you can understand me. When the incident happened, they were right there and seen it. And I ain't got to say no more. Yes. Both of them seen it. Yes.
MR. OBRONT: I think what he said was they were standing there so they could see.
THE WITNESS: They standing there and seen everything.
BY MR. JOSS:
Q. Where were they standing?
A. You're asking the same thing over and over. You're getting like John Finnegan. Over and over and I'm getting blue in the face frustrated. You driving me nuts with it. You acting like I'm crazy. I don't told you what happened. You keep asking the same thing over and over.
Q. I'm asking pretty straight forward questions. Where was --
A. I answered you, yes.
Q. Where was James Reddick standing?
A. In the road.
Q. In the road? How far away was he?
A. I don't know how far that is, man.



Q. Okay. What was the other witness you mentioned?
A. 50 feet, 100 feet, whatever it was. They seen it. Both of them standing in the road about 50 feet away. 50 feet or 100 feet. Somewhere in there. That's all I know.
Q. Okay. Have you talked to James Reddick about this case?
A. No, I didn't.
Q. What other witnesses were present besides James Reddick, yourself, and John Finnegan?
A. I told you the other guy came with James Reddick, his name was Scott.
Q. You listed that in Defense 2 as Scott Artman?
A. No. I didn't say none to him. But he seen it. Both of them seen it.
Q. Have you discussed this case at all with Scott Artman?
A. No.
Q. Okay. How do you know that he saw anything?
A. Huh?
Q. How do you know that he witnessed



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

the events?
A. They was standing in the road and seen it, like I'm looking at you on this thing here.
Why you keep asking the same thing over and over. That's what gets me. Don't do that. I done told you what's going on.
MR. OBRONT: You answered the question. It's okay.
THE WITNESS: Take this damn shit, man. Shit, man. king at me like crazy mother fucking shit, man. I don't like that shit. I don't give a damn. I'll let this shit go. I don't like that. Don't do that. You should be talking for me. You sitting there with your mouth closed. Done do that, man. Shit. I wouldn't do you like that as a lawyer.
BY MR. JOSS:
Q. Okay. I can't see the witness right now.
THE WITNESS: Tell him to move on, Mr. Curt.
MR. OBRONT: Yeah. Let's just take a short recess.



MR. JOSS: Okay. What do you want to do, like ten minutes?
(Thereupon, there was a brief recess had, after which the deposition continued as follows:)
BY MR. JOSS:
Q. All right. I believe where we last left off I was asking you about the witnesses that you've listed in this case under Defense 2, and we left off with Scott Artman.
Mr. Ealy, how do you know Scott Artman?
A. Huh? Say it again.
Q. How do you know Scott Artman?
A. How I know him?
Q. How do you know him?
A. He my neighbor. He my neighbor.
Q. Okay. For how long has he been your neighbor?
A. Oh, several years.
Q. Okay. Did you ever discuss this case with him?
A. No.
Q. Okay. How is it that he became listed as a witness in this case?



A. Huh? Let me strike that question.
MR. OBRONT: Yeah. Objection to asked and answered. Isn't he the second witness he told you about twice that was standing 50 to 100 feet away.
THE WITNESS: They was 100 feet and away from the house down the road. Him and James Reddick seen the whole thing. I done told you that. Let's move on.
BY MR. JOSS:
Q. We got a little derailed, so I'm trying to --
A. Let's move on with that, sir. You done explained that over and over.
MR. OBRONT: Just wait for the next question.
BY MR. JOSS:
Q. Did Mr. Artman write any statements regarding this incident?
A. Mr. Who?
Q. Mr. Scott --
A. Reddick? Did he write any statement?
Q. Did he write down any statement memorializing what he witnessed?



A. I don't know about that. I'm telling you straight up, in front of the Judge, I don't know. You gotta ask him that.
Q. Okay. Does he still live on Lockwood Drive?
A. Yes, he does. Yes, he does. Yes. He still live there, yeah.
Q. Okay. Our testimony here today is that you've never discussed this case with him?
A. No.
Q. An the next witness listed is Catherine Ealy. That's your mother?
A. Huh?
Q. Catherine Ealy, that's --
A. That's my mother, man. I told you that.
Q. I know that's your mother. Did she provide any statements in this case?
A. No.
Q. Did she provide any statements in the criminal matter, the 2017-CF --
A. No.
Q. -- 00176 --
A. No.
Q. -- case.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

A. No.
Q. Okay. Did she make any statements to any of the deputies on scene when she came out and you were detained?
A. No. She just asked him why they arrest me for, and John Finnegan and Paul Pierce told her that I put my hands on him, which he put his hands on me.
Q. Okay. So when --
(Thereupon, the court reporter sought clarification from the witness, after which the deposition continued as follows:)
BY MR. JOSS:
Q. I think it's listed in Defense 2 on -- I'm not sure which page this is, but it's Officer P.H Pearson. Is that who you're referring to?
A. Yeah.
Q. P-E-A-R-S-O-N?
A. Yeah. He work for St. Lucie County Sheriff's Department. Pearson, Pierce, whatever his name is.
Pearson, yeah. That's who I'm talking about.



THE REPORTER: Thank you.
THE WITNESS: Thank you, your Honor[sic].
BY MR. JOSS:
Q. So Officer Pearson, when did he come on scene, before or after --
A. Him and Finnegan came at the same time. When me and Finnegan was going through the dispute, he went around the back of the house. When he came back around the house, Finnegan had me down in handcuffs, down on my knees.
Q. Okay. So he came around the home, and you saw him after you were detained in handcuffs?
A. Oof Lord. I'ma say it loud as I talk. Y'all can't understand or something wrong with y'all. I'm not trying to be rude.
When Paul Pearson came around my mother house to the front, from the back around to the front -- I know I talk loud. I know you gone understand me -- John Finnegan had me in handcuffs. That's what I'm telling you.
Q. Okay. So Officer Pearson didn't witness the physical interaction between you and



Deputy Finnegan?
A. No. No. John Finnegan told him what happened.
Q. Okay. So he didn't witness any of the chest bump or the shove or I think you describe it as a bear hug?
A. No. No.
Q. Okay. I want to talk about the actual what you described as a battery that John Finnegan committed against you.
The battery --
A. No, no, no, no, no. Hold up. Hold up. John Finnegan -- if my mother was here right now, she'd tell you -- he wasn't going to press no charges. Paul Pierce pressed the charges. He called the sergeant -- sergeant. He the one that placed me -- told that man to put me in jail. John Finnegan wasn't gone lock me up. Paul Pierce is the one who locked me up.
Q. You're talking about the criminal case in 2017-CF-00176, right, the battery on law enforcement?
A. Explain it to him, Mr. Curt. Explain it to him, Mr. Curt.
MR. OBRONT: Yeah. Could you ask



your the question.
THE WITNESS: Explain it to him.
MR. OBRONT: No, no. You answered. It's okay.
THE WITNESS: I just told him what time it is.
BY MR. JOSS:
Q. Okay. So what I'm asking is, Pearson wrote up the report -- did Pearson write up the report that led to the criminal --
MR. OBRONT: If you know. And if you don't know --
BY MR. JOSS:
Q. -- battery on a law enforcement officer?
THE WITNESS: What you saying?
MR. OBRONT: Unless you show him the report, I don't think -- he's looking perplexed. I don't think he knows what report --
THE WITNESS: We don't know nothing about the report, sir. We don't know nothing about that.
BY MR. JOSS:
Q. Well, you just testified that



Jeannie Reporting www.jeanniereporting.com
Your Wish Is Our Job! 305-577-1705

Page 133

Pearson --
A. Pearson placed me in jail. Pearson the one that put me in jail. Paul Pearson, Pierce, whatever his name is.
Q. Okay. He placed you in what, a police vehicle?
A. Indian River -- St. Lucie County Jail. Look at the arrest affidavit, man.
Q. Okay. So describe the acts that Deputy Finnegan did as you turned your back away and you were walking towards the garage?
MR. OBRONT: He asked you what happened after you turned around and you were walking towards the garage, what did Finnegan do?
THE WITNESS: I told you he ran behind me and picked me up. Why you keep -- oh, Lord.
BY MR. JOSS:
Q. Okay. So he ran behind you --
MR. OBRONT: Yeah. You know, counsel --
THE WITNESS: Don't, don't. Straighten him out, counsel. I can't. I done explained to that man about 50

Page 134

times. He act like he --
MR. OBRONT: Counsel, according --
THE WITNESS: Don't do that. I done told you about that, man. He wrote everything he got.
MR. OBRONT: Yeah. Counsel, on my notes I have about --
THE WITNESS: Talk to him. Don't talk to me. Talk to him.
MR. OBRONT: After he --
THE WITNESS: I ain't gone keep going through that.
MR. OBRONT: After he turned around, he picked him up and slammed him to the ground.
THE WITNESS: I told you what time it is. Damn. That don't make no sense there.
MR. OBRONT: It was asked and answered several times.
MR. JOSS: I'm not looking at anybody right now, for the record. I'm just looking at a wall.
THE WITNESS: I done told you stop asking the same question about 30

Page 135

minutes earlier.
MR. JOSS: Mr. Ealy is now off the screen, for the record. He's refusing to answer the question. I'm trying to follow up.
MR. OBRONT: Oh, yeah. He can't see you because you turned your chair.
MR. JOSS: I mean, the record is completely disjointed because Mr. Ealy continues to go on a rant. Then he refuses to allow me to follow up with questions about what he just said.
I mean, I don't think I'm being unreasonable Mr. Obront. If you want we can suspend the deposition if he's refusing to answer questions and I'll certify.
MR. OBRONT: No, he's not refusing. He's not refusing. We're trying to -- counsel, honestly, we would really just like to get through this. So just answer the question as best you can.
THE WITNESS: Didn't I tell you -- hold up. Didn't I --
MR. OBRONT: Just -- He asked --

Page 136

after you turned around and walked towards the garage, the question is what exactly --
THE WITNESS: I told you about 30 minutes earlier, when I turned around and walked away John Finnegan run behind me, picked me up and slammed me on the ground. Didn't I tell you that? Yes or no?
MR. OBRONT: Okay. That's the answer. Go ahead.
THE WITNESS: Don't keep asking the same thing, man. I told you that. Yes. Don't keep asking that. You don't ask that. Why you keep asking me the same thing for?
BY MR. JOSS:
Q. How far away --
A. That don't make no sense.
Q. How many steps did you take between the time --
THE WITNESS: Sir. Excuse me, sir. What your name is? What's your name, sir?
MR. JOSS: It's Mr. Joss.



Jeannie Reporting www.jeanniereporting.com
Your Wish Is Our Job! 305-577-1705

Page 137

THE WITNESS: What's your name? Huh?
MR. JOSS: It's Mr. Joss.
BY MR. JOSS:
Q. Mr. Ealy, how many steps --
A. Mr. Joss, move on. We done went through that. We won't keep going through that.
Q. Okay. You know what --
A. Move on, Mr. Joss.
Q. You're not going to tell me to move on.
A. You done asked that question about a thousand times. I done gave you the answer. I know the Judge heard it as loud as I talk. Move on, Mr. Joss.
Q. Mr. Ealy, you're refusing to answer my questions, you've muddled --
A. Move on, Mr. Joss.
Q. You've muddled and obfuscated the deposition to the extent it's probably extremely disjointed. The tempo of the deposition has been thrown off. And if you're going to continue to obstruct the cadence of the depo, then I'm going to suspend this, and we can take it up with the Court.
This is taking much longer than it

Page 138

should.
MR. OBRONT: Yeah. If you -- we want to get through this. He asked you a different question, if you listen carefully. I don't think you heard.
He said, how many steps did you take before he grabbed you, picked you up, and slammed you to the ground?
THE WITNESS: Run him through this thing here, Mr. Curt.
MR. JOSS: Okay. At this point --
MR. OBRONT: How many steps did you take?
THE WITNESS: One step -- about one or two steps away, the man ran behind me, picked me up and slammed me on the driveway.
BY MR. JOSS:
Q. Okay. So --
A. Now move on with that. You keep asking me the same thing over and over.
MR. OBRONT: Wait for the next question.
BY MR. JOSS:
Q. For accuracy of the record, you took

Page 139

one step, and he picked you up and slammed you down; is that correct?
A. Yeah, with my back turned.
Q. Okay. When he picked you up, did he use one arm or two arms?
A. Two arms, man. Ran up behind me and picked me up like you pick somebody up and slam them down. You know how them officers do. You done seen it on TV.
Q. Okay.
A. That what he did.
Q. Did he grab you by your shoulders or by your waist?
A. Grabbed me around my thing -- my arms here, man.
THE WITNESS: Explain it to him, Mr. Curt, what it is. You a lawyer. Tell him what time it is.
BY MR. JOSS:
Q. He grabbed -- so Deputy Finnegan grabbed you --
THE WITNESS: Tell him what time it is.
MR. OBRONT: Answer the question.
BY MR. JOSS:

Page 140

Q. Stop moving the camera so --
A. Didn't I tell you he grabbed me around the -- damn it. Goddamn it. Shit. Asking me the same damn thing. He grabbed me around the damn arms. Fucker. Shit. I ain't gone pay for this shit, man. I'm about to grab you around your arm. Grab you around your arm, man.
Goddamn. What else you want me to explain?
Q. Mr. Ealy, you're cursing at me. You're --
A. He grabbed me around my arm, Mr. Joss. Picked me up and slammed me down. Grab your whole body, pick you up and slam you down from behind. That's what I'm telling you.
You asking the same thing. Don't do that, man. I done told you. Damn. I get right in court and tell you the same thing. You think I'm lying to you? Don't do that.
Q. Okay.
A. You make a preacher curse, man. Don't keep doing that.
Q. Preacher curls [sic]?
A. You asking me the same thing. I



Jeannie Reporting www.jeanniereporting.com
Your Wish Is Our Job! 305-577-1705

Page 141

don't told you over and over.
MR. OBRONT: Wait for the next question.
BY MR. JOSS:
Q. So Mr. Ealy, he picked you up.
A. Move on.
Q. How many feet -- when Mr. -- or, excuse me, Deputy Finnegan picked you up, how many feet up off the ground --
A. Two feet. Two feet. Two. Two. That's what I'm saying. Two.
Q. Okay. He picked you up two feet and did he --
A. I moved two feet away from him. He picked he up in the air and slammed me down.
Q. Okay. Did he slam you --
A. That's what I'm telling you.
Q. Did he slam you on your torso?
A. He slammed me down on my face. I had to put my arm out to keep from busting my head up. My right arm. That's what he did.
Q. So your testimony is that Deputy Finnegan walked up behind you after one -- after you took one step --
A. And picked me up and slapped me

Page 142

down.
Q. Can I finish my question? He picked you up, you were lifted two feet off the ground, and then he slammed you head first into the ground?
A. He picked me up about that high Mr. -- how high that is, Mr. Curt?
MR. OBRONT: For the record, about, I would say three feet.
THE WITNESS: Huh? Speak up loud where he can hear you.
MR. OBRONT: I would say, for the record, three feet he's indicating with his right arm to the ground.
THE WITNESS: You heard him? Did you hear him?
MR. JOSS: I did not.
THE WITNESS: Say it again.
MR. JOSS: He's also not testifying. It's your testimony, sir.
MR. OBRONT: No. I said, for the record, he indicated approximately three feet if you could see him on the screen.
MR. JOSS: Okay.
MR. OBRONT: Yeah. That's what I

Page 143

said.
THE WITNESS: That's for the record.
BY MR. JOSS:
Q. The question is, were you thrown head first or were you thrown on to your torso?
A. I put my right arm down. I had the mail in my hand I told you, my right hand. If I wouldn't have put my right arm down, he'd a bust my whole head and face up. I wouldn't be here talking to you. That's for the record.
Q. So he picked you up and he slammed you on your right side?
A. Down, forward, man.
Q. What?
A. He slammed me down, forward, Mr. Joss. Let me explain to you. I want you to quit asking me the same question, now, 'cause I'm getting aggravated with this here.
If somebody slam you down, you put your arm out to keep from getting your head and face bust up? Right or wrong? Huh? From behind. Yes or no?
Q. What are you testifying? Are you saying that he picked you up two feet and slammed you down face forward or --

Page 144

A. He picked me up like three feet up in the air, three or four feet, and slammed me down on the driveway on the concrete.
Q. Okay.
A. With my face down.
Q. With your face down?
A. I put both arms down. My right arm kept me from busting my head and my face up. That's what I'm trying to explain to you. You asking the same thing over and over.
Q. I'm just trying to get --
A. Stop doing that. I'll tell you what time it is. Yes.
Q. -- the testimony clearly. It was in the form of a bear hug type of -- he held you like with both of his arms wrapped around you?
A. A bear hug. That's what you call it. A bear hug. That's what they call it. Yeah.
Q. Okay.
A. That's what I'm trying to explain to you.
Q. And did you both fall forward?
A. He picked me up and slammed me down. What can I do with my foot up in the air? I'm



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 145

out of balance.
Q. Do you remember if Deputy Finnegan fell forward with you?
A. Did he what? What he saying, Mr. Curt?
MR. OBRONT: He asked you if Deputy Finnegan fell forward with you when you --
THE WITNESS: He fell down on back of me, man. I fell down first. He came behind me.
BY MR. JOSS:
Q. Okay.
A. I didn't fall on him. He fell on me.
Q. He fell on top of you?
A. On the back of me. From my back here.
Q. Right. And you're gesturing toward --
A. My chest and everything on the ground. Yeah.
Q. Okay. At that point, did he take his handcuffs and cuff you? What happened?
A. No. When I tried to get up, he said

Page 146

"Get on your fucking knees and put your hands behind your back." That's what he hollered.
Q. Did you try to get up?
A. No, I ain't get up. I stayed on my knees, put my hands behind my back, I lay on down. He put the handcuffs on.
Q. Then what happened?
A. Then he got me up. Now I'm laying down when my mom came out the door. My momma said, "What y'all doing jumping on my son?"
"He put his hands on me."
My mom said, "You had to hurt him up like that?" My elbow busted up. My right elbow. My right knee busted up.
Q. Okay. I think we're almost through this. Help me out here.
So after he tackles, you're both on the ground, he puts you in handcuffs, stands you up; is that correct?
A. Yeah, him and Paul Pierce -- Pearson, whatever his name is.
Q. And when he stood you up --
A. They place me on my momma bench in her garage. We got a bench we sit on. You know what a bench look like?

Page 147

Q. Yeah. So there's --
A. Yeah.
Q. So the garage door was open?
A. The garage was up.
Q. It was up?
A. It was up to the door to go to the house.
Q. And your mother came out because of the commotion?
A. She was sitting in the chair looking at it.
Q. Okay. And she saw you in handcuffs at that point. What, flanked by --
A. Yes, sir. Yes.
Q. And you were flanked by Deputy Pearson an Deputy Finnegan?
A. Yes, sir. Yes.
Q. Okay. And you said your right elbow and your right knee were injured?
A. Bust up, yes, sir.
Q. Okay. What do you mean by busted up?
A. Oh, bust the skin. You see all the blood and everything. Both of them got infected.

Page 148

Q. What were you wearing?
A. Huh?
Q. What were you wearing, if you remember.
A. I was wearing blue jeans and a black shirt like I got on now.
Q. Okay.
A. And the man bust my right elbow up and my right knee. The dungarees I had, had a big old hole in it where the knee part at. Where the right knee was, Mr. Joss. Whatever his name is.
Q. Sorry?
A. What your name, Mr. Joss?
Q. Yeah.
A. Yeah.
Q. So at that point they explained to your mother that they're looking for your son, Mr. O'Neal?
A. Yes, sir. Yes.
Q. Okay. Were you, then, placed by Deputy Pearson into the patrol vehicle?
A. No. They sat me in the back. We talked in the garage, me, him, and my mother, about a good I'd say about 20 or 30 minutes.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 149

Then, after that, him and John Finnegan left out of there. They took the handcuffs off me. I'm sitting on the bench talking to my momma. They walk out to their cruiser. Them, John Finnegan and Officer Paul Pearson, got on the back of Officer Harris car, Officer Harris, a Black officer, they got that little old laptop thing like sitting in front of me and wrote a false report affidavit. They told him what to put on there.
Q. Okay. So --
A. Which is a false arrest and they made it stick.
Q. So as you're sitting in the garage, Deputy Finnegan and --
A. And then --
Q. Hold on. Let me just backtrack a little bit because you say quite a bit, which is fine, but I need to clear it up. This is -- I'm not trying to by repetitive. I'm just trying to follow up with what you've just told me.
A. Okay. Mr. Joss --
Q. Let me --
A. Hold on. Let me explain.
Q. Give me a chance. Give me a chance.

Page 150

A. When they got through talking --
Q. We can move through this rather quickly.
A. When they got through talking to me and my mother, they walked out the garage, out in the road where the car -- the cruiser, you got me?
Q. Right. I understand. So --
A. Okay. Listen now. They got Officer Harris, which is a Black officer, they got on the trunk of the car with a little laptop, whatever you call them things, they came up in a cop car to write their affidavit thing up with it, which is arrest thing, whatever you call it. They told him what to say and put on there. He did it. They told him what to put on there. You understand me?
Q. Okay. So you're in the garbage for about 20 to 30 minutes before Officer Harris arrives, right?
A. Officer -- all of them came at the same time. That's what I'm explaining to you. All of them officers came at the same time when they first drive up on the premises --
Q. Okay. So Officer Harris --

Page 151

A. At the residence.
Q. -- was there the whole time?
A. When all of them first arrived up about 4:30 5 o'clock, all of them came on the premises at the same time. Officer Harris, Officer Pierce, Officer Finnegan. All of them. I can't call the rest of them names. All of them came in my yard at the same time. You got me?
Q. Okay. Did you --
A. Like me, you, and Mr. Curt, all of us come in the door here at the same time.
Q. Did you list Officer Harris as a witness?
A. Officer Harris work for them. He ain't gone go against them. You know that.
Q. That's not the question. The question is --
A. Come on, Mr. Joss. My God. You been doing this lawyer thing a long time. He a law officer like them. He ain't gone go against them. You know that. You shouldn't be asking me that.
Q. That's not the question. The question is --

Page 152

A. If we get him in live court in Fort Pierce right now he gone say, "No, I didn't do that." He gone save his job and save his ass. Come on, man. You ain't got to make me do all this here. You know what he gone say. Officers lie for other officers, man. You might find a got officer every now and then that tell the truth. You don't find it every day.
Q. Isn't Officer Harris Black?
A. Mr. Joss, I've been in this world 58 years. You think I'm going to sit here and tell you a lie, man?
A. I'm not saying you're lying. I'm asking you why you think --
A. I'm telling you. You have to listen.
Q. -- Officer Harris is lying.
A. Let me finish. Yeah. He'll sit there and lie for Paul Pierce and John Finnegan. He work with Paul Pierce. Paul Pierce is his sergeant. That's what I'm telling you. Yeah, he'll lie for them.
Q. Is Officer Pearson African American and Black?
A. Officer Pearson is Officer Harris



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 153

sergeant.
Q. Okay. The questions was, is he African American, Officer Pearson?
MR. OBRONT: He asked if Officer Pearson was African American?
THE WITNESS: No, he a white dude.
BY MR. JOSS:
Q. Okay. But Officer Harris is a Black dude?
A. Right.
Q. Okay. Officer Harris, was he listed in any of your discovery disclosures to date?
A. Do he know what happened?
Q. Have you listed Officer Harris as a witness in this case?
A. To the witness?
Q. You stated he was there the whole time?
A. Oof.
Q. Have you listed him as a witness?
A. He's not gone witness for me. He's an officer. just a regular criminal thing to him, man. Don't do that, Mr. Joss. He ain't gone do that. No. He not a witness for me. No.

Page 154

Q. So the answer is, no, you have not listed him as a witness?
MR. OBRONT: Objection. It's obvious he doesn't understand what listing him as a witness means. The, you know, witness list for disclosures will speak for themselves if he's there or not there. But he, obviously, doesn't know. He's just testifying as to what he recalls.
MR. JOSS: I completely understand that. You could say I don't know, but he's saying --
MR. OBRONT: Just say it.
THE WITNESS: No, no, no. I don't know.
MR. JOSS: He's testifying that he knows this officer being present --
MR. OBRONT: Okay. He just said I --
MR. JOSS: -- at the time of the incident.
THE WITNESS: I don't know.
MR. JOSS: And he described him as a Black male, right?

Page 155

THE WITNESS: I don't know.
BY MR. JOSS:
Q. So your testimony is no longer that Officer Harris was present?
MR. OBRONT: No. He said, "I don't know"
THE WITNESS: I don't know.
MR. OBRONT: -- as to whether he was listed as a witness.
BY MR. JOSS:
Q. Do you know if Officer Harris is a Black male?
A. Yeah. He's a Black guy, yes.
Q. Okay. Do you know what department he works for?
A. Huh?
Q. Do you know what department Officer Harris works for?
A. He works for the St. Lucie County Sheriff's Department. Him and Paul Pierce work together. Paul Pierce is Officer Harris sergeant.
Now do you understand that?
Q. The injuries that you sustained, were they visible on January 19th, 2017?

Page 156

MR. OBRONT: Did you understand the question? By "visible" he means, can you see the injuries on your --
THE WITNESS: Yes, he could. Yes, he could. Yes.
BY MR. JOSS:
Q. Where was the injury to your right arm?
A. On my elbow I told you.
Q. Okay. Was it bleeding profusely?
A. Yeah. It was bust open bleeding, yes. My right elbow and my right knee. Both of them were bleeding.
Q. Were you given any medical treatment on scene?
A. No. I didn't get no medical treatment, no. When they took me to the county jail, no, I didn't get no medical treatment, no. When I got bond out of jail, I went to the hospital and I got treatment.
Q. Did you request medical treatment?
A. Huh?
Q. Did you request medical treatment when you were --
A. Yes, I did, and they refused it.



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 157

Q. Who refused you?
THE WITNESS: I told you we had a case there.
Yeah, they refused it. The nurse, I don't know her name, she refused it. I told her let me see the doctor that night. The next night I got bond out. She refused it.
BY MR. JOSS:
Q. Who refused --
A. I don't know her name. Call --you gotta get a hold of St. Lucie County Sheriff's Department. Ask what that nurse name is. The one that do the medical thing. I don't know her name. She got rude with me. "You ain't seeing no doctor," blah, blah, blah. I just walked out. I didn't have time for that.
Q. So you asked Deputy Finnegan or Deputy Pearson for --
A. I asked that lady could I see a doctor. Not Officer Pierce, not Officer Harris. I asked the nurse that work in the jailhouse, sir. That's what I'm telling you.
Q. You're talking about the intake jail nurse?

Page 158

THE WITNESS: What he said?
MR. OBRONT: He said --
THE WITNESS: Talk.
MR. OBRONT: He asked if you're talking about the nurse that does the intake?
THE WITNESS: The nurse -- when they put me in jail, I asked the nurse could I see the doctor when I was incarcerated.
BY MR. JOSS:
Q. Okay. You didn't ask --
A. That's what I'm telling you.
Q. You didn't ask Deputy Finnegan for treatment?
A. Huh?
MR. OBRONT: No. He already answered that.
BY MR. JOSS:
Q. You didn't ask Officer Finnegan for treatment?
A. No. I asked him? No. No. No.
MR. OBRONT: He said he didn't.
THE WITNESS: No. Neither one of them gone send me to no hospital. No.

Page 159

BY MR. JOSS:
BY MR. JOSS:
Q. Okay. And you said you bonded out the next day?
A. Yes.
Q. So that would've been January 20th, 2017?
A. Yes.
Q. And where did you receive treatment?
A. St. Lucie Hospital, Fort Pierce Regional.
Q. And do you recall who your medical provider was on January 20th, 2017? Whether it was a physician or the specific --
A. She denied me seeing a doctor that night when I got put in the 19th. I bond out the next day, I asked to see a doctor, they wouldn't let me see a doctor. I got denied twice.
Q. Okay.
A. That's what you call medical neglect, whatever you call it.
Q. Okay. But you bonded out -- you were only in custody for 24 hours?
A. Yeah.

Page 160

Q. Okay. Were you ever rearrested?
A. My cousin bond me out 9 o'clock the next morning. I didn't get out of jail about 2:15 or 2:20 that day -- the next day.
Q. Okay. It said that -- in your -- I think in your arrest report, it says that you had 46 days credit for time served. Where did that number come from?
A. What's that?
Q. Were you ever rearrested in 2017 for a warrant or anything else?
A. No. I told you that. No.
Q. So the only arrest was on January --
A. What happened between me and Finnegan, yeah. That's it. There ain't no more arrest.
Q. Okay. So you only spent less than 24 hours in jail?
A. Yeah. I got bond -- I went to jail that night and got bond out the next day. 9 o'clock that morning. I didn't get out till 2:15 or 2:20 that day. That Friday.
Q. Okay. So assuming you got put into jail around 6:30, 7 o'clock, based on --
A. Yeah, something like that. Yeah.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 161

Yeah.
Q. -- based on the timeline you've given me --
A. Yeah.
Q. -- you bonded out around 2:30 or 3:00 the next day?
A. Yeah. We got bond out 9 o'clock, but they didn't let me out till about 2:20 or 2:15, somewhere in there. Yeah
Q. Okay. Anddid you ever file any complaints or grievances against Deputy Finnegan?
A. No, sir.
Q. Why didn't you file any --
A. I didn't --
Q. -- complaints or grievances?
A. I didn't file anything in 2017. I wait till the next year, then I file a complaint against Deputy Finnegan.
Q. Your testimony is that you did file a complaint against Deputy Finnegan on January 20th of 2017?
A. No, 2018. The next year, not 2017.
Q. The next year?
A. Mr. Joss, don't put those words in

Page 162

my mouth. Listen what I'm telling you. Now, I can talk loud 'cause I know you can hear me. You and the Judge both.
I went the next year and filed a complaint. I couldn't find a lawyer right then. I found Mr. Curt later on.
Q. I'm not talking about a lawsuit.
MR. OBRONT: Any conversations you had with me or any other lawyer, he doesn't want to ask you about that.
THE WITNESS: Listen what Mr. Curt say.
MR. OBRONT: No, no. He knows. Any conversations with any other counsel or me --
MR. JOSS: I'm not asking you. That's privileged information.
MR. OBRONT: He just wants to know if you personally filed any complaint?
THE WITNESS: No, no, no, no. Move on. No.
MR. OBRONT: Just to clarify, he said he didn't file any complaints against -- at anytime.
THE WITNESS: No complaint 2017.

Page 163

No. No. No. Move on.
BY MR. JOSS:
Q. You didn't request an internal affairs investigation in this case?
A. No. No.
Q. Why not?
A. Huh?
Q. Is there a reason that you did not do that?
A. No.
Q. Okay. I'm trying to wrap this up as quickly as I can. I just want to go over the injuries that you're alleging in the complaint which is defense one, and then hopefully we can wrap this up.
The main -- based on your testimony, the main source of the injury was the slam from Deputy Finnegan; is that correct?
A. Yes, sir.
Q. And what are your lasting injuries?
A. My wrapped injury?
Q. Are you alleging that you have permanent injuries as a result of that slam?
A. I got my elbow busted and my knee busted, and my back knocked out of place. Two

Page 164

herniated discs were knocked out of my back.
Q. Okay. Is that the basis for your application for supplemental security income?
A. No, that's it. That's what he did.
Q. Okay. Well, when did -- somehow we got, probably through discovery, a statement from the Social Security Administration stating that you're on supplemental security income. When did you first get placed on that? SSI.
A. That got anything to do with my case?
Q. It has something to do with your injuries.
A. Social Security and criminal things are two different things, man. That got anything to do with my case? You trying to get too personal Mr. Joss. Don't do that. That's not your concern. I'll say it in front of Judge. That's not your concern, now. You getting in people personal things. Don't do that.
We talking about what happened to me between me and John Finnegan. That's not for you to know about that Social Security now. You ain't got no business doing all that now.



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

Page 165

Q. Okay. So you're refusing --
A. I'll say it in front of your face. That's not -- I won't ask you about personal stuff like that.
Q. You're refusing to answer any questions about --
A. Social Security ain't got nothing to do with the criminal thing. Don't do that. Don't do that.
Q. Okay. So you're refusing --
A. I refuse to answer. Don't do that.
MR. OBRONT: No, you could answer when --
BY MR. JOSS:
Q. You're refusing to answer any questions about --
MR. OBRONT: -- started getting SSI --
THE WITNESS: That ain't got nothing to with that Mr. Curt.
MR. OBRONT: -- for the HIV. You can tell them. You've already talked about it.
It's a touchy subject, as you know, Mr. Joss, for obvious reasons, but you

Page 166

can go ahead --
THE WITNESS: I got my Social Security claim in '09. That's it. I told you what was wrong with me.
BY MR. JOSS:
Q. Are you refusing to answer questions -- I understand it's touchy, but this is a civil lawsuit. Everything about it is going to be touchy. I told you from the outset, I'm not trying to demean, embarrass or deprecate you in any way.
A. You not embarrassing me. I'm saying you're getting too personal. That's what I said.
MR. OBRONT: Okay.
THE WITNESS: You're not embarrassing me.
MR. OBRONT: We're almost through this. Let's just finish up.
BY MR. JOSS:
Q. Okay. Are you going to refuse to answer any questions about SSI?
MR. OBRONT: No. He just answered.
THE WITNESS: I just answered. I told you, yeah. I got my claim in '09,

Page 167

yeah. Social Security. SSI disability.
BY MR. JOSS:
Q. When did you apply for SSI?
A. When I what?
MR. OBRONT: When did you file the application, like --
THE WITNESS: Oh, I filed that in '06, man, when I got out of prison, man. I did six years. Yeah.
They don't give it to you right then. You gotta get a Social Security lawyer.
BY MR. JOSS:
Q. You filed for SSI in 2006. When were you approved?
A. '09. I can't tell with you which date it was. What date it was --
MR. OBRONT: And don't guess.
THE WITNESS: I mean, which month, but I know I got approved in '09.
MR. OBRONT: You don't need to guess on the exact date. Hold on. That's fine.
BY MR. JOSS:
Q. What was the basis for your

Page 168

application for SSI?
MR. OBRONT: He already testified to that.
THE WITNESS: I already testified to that, Mr. Joss.
MR. OBRONT: It was the HIV.
THE WITNESS: I already told you what time it was.
MR. BRONT: It was in 2006 when he got out of jail.
MR. JOSS: I didn't hear, so if you could proffer, for the record, what the basis was --
MR. OBRONT: Yeah. He testified already --
THE WITNESS: I testified that for the record. I already did.
MR. OBRONT: -- he was diagnosed with the HIV, then he made the application, and then in '09 or so he was approved. He has AIDS or HIV.
BY MR. JOSS:
Q. Was it based on a preexisting physical injury or some sort of mental injury?
THE WITNESS: HIV, Mr. Joss. I told



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

you what it was.
BY MR. JOSS:
Q. Okay.
A. You act like --
Q. I didn't --
A. Hold up. I explained to you I had HIV 2001 February or March. When I got out of prison, Jeb Bush was the governor in Florida at the time. His brother, George W. Bush, was the president of the United States. He helped me get my Social Security SSI. He knew I had HIV. You got HIV, hepatitis, mental or anything, they give you a Social Security check. You know that, man. Come on.
Q. I don't know that.
A. People got mental thing wrong with name, they give you Social Security check.
Q. Okay.
A. I got HIV. That's how I got it. I told you that.
Q. Thank you for clarifying that.
Does that include Medicaid?
A. Yes. They give you Medicaid, food stamps, all that. Yes.
Q. Okay.



Q. Which is low income they call it.
Q. Is it Medicaid Part A and Part B?
A. I don't know which Medicaid. I just get one of them gold cards. I don't know what it is.
Q. Do you pay any out of pocket expenses for your medical services?
A. Huh?
MR. OBRONT: Do you have to pay a co-pay or a deductible?
THE WITNESS: No, I don't pay no co-pay, no. No.
BY MR. JOSS:
Q. Okay. So when I'm looking at defense two, Paragraph 13 which states -- which asks please state each item of damage you claim you sustained as a result of the incident described in your complaint. Please list each category of damage, such as medical expenses or lost wages, and the total amount of damage claimed for each category.
You have listed there Indian River Hospital at $22,000 -- $22,946.51. Was that --
A. Right.
Q. Was that covered by Medicaid?



A. Right. I had to go to the hospital to get x-rays and everything. MRIs.
Q. Right. But was that covered?
A. Right. When I got injured, yeah.
Q. Okay. What about the Diagnostic Radiology Center at $7,148, was that covered by Medicaid?
A. Yeah. Yes.
Q. Okay. What about Dr. Sophia Ahmed for $1,077, was that covered by Medicaid?
A. Yes.
Q. What about Longwood Regional Medical Center at $4563, was that covered?
A. Yes.
Q. Okay. What about Ocean Chiropractic and Health Center at $1,100, was that covered?
A. Yes.
Q. Okay. Have you paid any out of pocket expenses for any of the medical treatment you've received as a result of this incident?
A. No.
Q. And I'm going to breeze through some of these because these are -- you're not making a lost wages claim.
So at Paragraph 16, Johnny Ealy Lawn



Service, approximately $100 monthly. That no longer applies, correct?
MR. OBRONT: Correct.
THE WITNESS: Correct.
BY MR. JOSS:
Q. Okay. And in Paragraph 17, the interrogatory asks whether or not you were suffering from physical infirmity, disability or sickness at the time of the incident described in the complaint. If so, what was the nature of the infirmity, disability or sickness?
The answer was plaintiff had been treating for various ailments prior to the incident, however, unrelated to the injuries sustained in this incident described in the complaint.
The various ailments that you're referring to, is that the HIV?
A. Yes.
Q. And the cataracts?
A. Yeah.
Q. Okay. Is there anything else that I'm missing. Any other ailments?
A. No. No.
Q. Okay. The last thing I'm hopefully



Jeannie Reporting Your Wish Is Our Job! www.jeanniereporting.com 305-577-1705

going to leave off here with is the injuries
that you contend are permanent. The severe back
injury, has that had a formal diagnosis?
A. I got MRI from a imaging -- Wilson Imaging. They did three MRIs on my elbow, my knee, and my back. Mr. Curt got all that in the record.
MR. OBRONT: Okay. He has all that. We sent it.
THE WITNESS: You got all that in black and white. And you got them discs, everything in black and white. Got all the evidence they need.
BY MR. JOSS:
Q. Okay.
A. I went to -- I had that lady in Port St. Lucie, they did an x-ray and stuff. MRI. Dr. Sophia, whatever her name is. And I did another thing on 25th. They sent me down there Port St. Lucie. I had to sit up in a chair because I couldn't lay in that thing. It was hurting too bad. They had to take x-rays.
Q. Okay.
A. They did all that. Yeah. And all of them said I need surgery. Ain't no getting



around I got to get surgery done.
Q. I'm going to allow Mr. -- I'm so sorry, Mr. Obront, to follow up with any questions he may have.
MR. OBRONT: Yeah. We don't have any questions, so we're all done. Thank you for coming down here. I know it was difficult for you. And he'll read --
MR. JOSS: Okay. Great.
MR. OBRONT: -- for the record. So everybody have a good day and I'll, you know, speak with you soon as a follow up.
MR. JOSS: Okay. Take care.
MR. OBRONT: Thank you, Madam Reporter.
MR. JOSS: Thank you, Madam Reporter. And thank you, Mr. Ealy.
THE WITNESS: Thank you.
MR. JOSS: So we're going to order. If you can just e-mail Christy the cost. Standard.

(Thereupon, the deposition was concluded at 4:15 p.m.)





CERTIFICATE OF OATH

STATE OF FLORIDA )
) SS.
COUNTY OF MIAMI-DADE )

I, the undersigned authority, certify that Johnny Ealy remotely appeared before me and was duly sworn.

WITNESS my hand and official seal this 13th day of September, 2021.

.

ESTELA L. VALLE
Notary Public State of Florida
Commission #GG 272204
Expiration Date: February 27,2023

.



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Page 177

CERTIFICATE OF SHORTHAND REPORTER

STATE OF FLORIDA )
)SS.
COUNTY OF MIAMI-DADE)

I, ESTELA VALLE, Stenographic Reporter, do hereby certify that I was authorized to and did stenographically report the deposition of Johnny Ealy; that a review of the transcript was requested; and that the foregoing transcript, Pages 1 through 175, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 13th day of September, 2021.

.

______________________
ESTELA L. VALLE
Shorthand Reporter

Page 178

.

TO: Johnny Ealy
C/O Obront Corey, PLLC
100 South Biscayne Boulevard
Suite 800
Miami, FL 33131

September 13, 2021

IN RE: EALY vs FINNEGAN
CASE NO: 2:21-cv-14123

Dear Mr. Ealy,

With reference to the examination of YOURSELF, deponent in the above-styled cause, taken on August 18, 2021 under oath, please be advised that the transcript of the Deposition has been transcribed and is awaiting your signature.

Please arrange to conclude this matter at your earliest convenience. We would suggest that you telephone this office and arrange an appointment suitable for all concerned.

However, if this has not been taken care of by September 13, 2021, we shall conclude the reading and signing of said deposition has been waived, and shall then proceed to file the original of the said transcript with the party who took the deposition, without further notice to any parties.

Sincerely,

.

______________________
ESTELA L. VALLE
Stenographic Reporter

cc: All Counsel of Record.

Page 179

ERRATA SHEET

F.R.C.P. RULE 1.310 PROVIDES IN PART:

(e)" ¦ Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them ¦"

PAGE/LINECHANGE/CORRECTION REASON

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

I, __________________, do hereby certify that I have read the foregoing transcript of my deposition, given on August 18, 2021, and that together with any additions or corrections made herein, it is true and correct.

______________________
Johnny Ealy

Page 180

JURAT PAGE

STATE OF _______________)
)SS.
COUNTY OF _______________)

I, hereby certify that I have read the foregoing transcript pages 1 to 175 and find the same to be true and accurate.

Any corrections made by me are set forth on the errata page attached hereto.

______________________
Johnny Ealy

Sworn to and subscribed before me on this, _____day of ____________, 2021.

__________________________
Notary Public in and for the
State of ___________ at Large.
My Commission expires:



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

A

**ability** 5:2
**above-styled** 178:10
**account** 83:19
**accuracy** 138:25
**accurate** 45:10 121:20 180:8
**act** 34:12 134:1 169:4
**acting** 123:16
**action** 87:6 177:17,18
**actively** 10:11 16:6,10
**acts** 133:9
**actual** 131:9
**Adam** 39:20
**additions** 179:20
**address** 26:16 26:23,24,25 27:4,15 31:22 51:7 68:1,4,6 85:22
**adjacent** 68:3 69:5
**Administration** 164:7
**adorned** 51:23
**advised** 178:11
**affairs** 163:4
**affidavit** 97:5 107:5 121:12 133:8 149:9 150:13
**affirmatively** 6:7
**African** 99:1 100:4 152:23 153:3,5
**afternoon** 3:8,11
**age** 32:11
**aggravate** 76:13
**aggravated** 143:18
**aggressive** 63:6 74:21,25 97:23 98:9
**ahead** 19:17 55:20 59:16,18 94:24 102:17 115:25 136:11 166:1
**Ahmed** 11:20 171:9
**AIDS** 18:21,24 168:21
**ailments** 172:13 172:17,23
**ain't** 9:17 11:12 16:11 23:11 25:11 32:15 54:5 62:17 63:11 66:6 71:24 72:4,7 72:17 73:20 75:10 85:2 86:13,14 87:4 90:16 99:10 101:6 102:2 106:5 107:11 110:10 111:15 111:18,24 112:8 117:4 123:3 134:11 140:5 146:4 151:16,21 152:4 153:23 157:15 160:15 164:25 165:7 165:19 173:25
**air** 141:15 144:2 144:25
**AK** 73:2
**AKs** 70:14
**aliases** 26:9
**alleging** 163:13 163:22
**allow** 135:11 174:2
**ambulate** 81:7
**American** 99:1 100:4 152:23 153:3,5
**amount** 170:20
**Anddid** 161:10
**Andrea** 18:6,11
**angel** 99:10
**angry** 72:16
**answer** 3:24 4:2 4:20 5:1,2,8,12 5:15 6:1 19:17 19:18,20,25 20:20 21:11,15 22:6 23:22 26:21 59:16,19 88:7 91:17 92:15 94:25 101:11 113:1 118:2 135:4,16 135:22 136:11 137:12,15 139:24 154:1 165:5,11,12,15 166:6,22 172:12
**answered** 6:12 7:2 55:19 123:21 125:8 127:3 132:3 134:20 158:18 166:23,24
**answers** 7:11 12:5 30:6
**anybody** 23:6,10 31:14 94:14 134:22
**anytime** 162:24
**apart** 77:11,16 77:25 78:5,9
**apartment** 36:9
**APPEARAN...** 2:1
**appeared** 85:22 176:6
**application** 164:3 167:6 168:1,20
**applies** 172:2
**apply** 167:3
**appointment** 178:14
**appreciate** 62:15 76:23
**approach** 72:9
**approached** 89:12
**approaches** 102:8
**approved** 167:15,20 168:21
**approximately** 73:18 142:22 172:1
**arm** 104:12,16 105:11 139:5 140:7,7,13 141:20,21 142:14 143:6,8 143:20 144:7 156:8
**arms** 139:5,6,15 140:5 144:7,16
**Army** 52:7 73:16
**Army-looking** 52:4
**Arness** 26:11
**arrange** 178:13 178:14
**arrest** 22:9 53:2 55:10,12,15,24 57:5,8 58:10 88:21,22 89:1 91:12,14,16,19 91:21 96:24 97:4,5,10 107:4 116:20 121:11 129:6 133:8 149:12 150:14 160:6 160:13,16
**arrested** 34:3 56:6 89:3 97:13 98:25
**arrived** 151:3
**arrives** 150:20
**arrows** 71:15
**Artman** 38:21 38:21,22 124:16,20 126:10,12,14 127:18
**aside** 45:1,3,8
**asked** 20:19 24:19 35:4 65:23,24 74:1 74:5 78:21 85:23 86:7 87:12,13 88:8 89:23,24 93:24 127:3 129:5 133:12 134:19 135:25 137:11 138:3 145:6 153:4 157:18 157:20,22 158:4,8,22 159:17
**asking** 9:1 19:23 20:23 23:16 25:23 36:19 37:17 49:5 55:21,24 63:18 63:24,25 64:3 65:20 78:10 85:19 90:16,21 91:5 92:23 93:1,4 94:17 96:20 99:16 101:8,9 102:21 116:21 117:3 117:19,20 118:3 120:8 123:12,17,19 125:5 126:8 132:8 134:25 136:12,14,15

138:21 140:4 140:17,25 143:17 144:10 151:22 152:14 162:16
**asks** 170:16 172:7
**asleep** 69:17
**ass** 152:3
**associate** 107:17
**assume** 121:19
**assuming** 115:9 160:23
**attached** 180:10
**attack** 72:8
**attention** 21:15
**attorney** 5:24 19:24 23:17 113:19,24 114:3,5,6 177:14,16
**Audio-Video** 1:13
**August** 1:14 82:25 83:7,8 83:21,24 178:11 179:19
**aunt** 36:3
**authority** 176:5
**authorized** 177:6
**avoided** 75:4 80:11,13
**awaiting** 178:12
**awhile** 31:4

**B**

**B** 36:24 56:12 67:11,12 170:2
**B-U-N-Y-O-N** 50:12
**baby** 66:18 83:12
**back** 9:12 25:5 26:5 29:19 33:19 35:19 36:3 39:19 43:13 44:20 45:5 48:15 51:21 55:5,5,7 57:21 64:5 65:14,18 66:10 80:18 83:9 86:21 87:11 88:4 96:23 97:19,21 102:4 104:14 105:19 105:23 107:10 116:19 130:9 130:10,20 133:10 139:3 145:9,17,17 146:2,5 148:23 149:5 163:25 164:1 173:2,6
**background** 28:16 96:17
**backpedaling** 22:25
**backtrack** 66:25 76:21 149:17
**bad** 71:25 83:16 83:17 89:14,17 173:22
**badge** 97:25 99:11 111:25
**balance** 83:14 145:1
**bam** 66:11
**bank** 27:21 28:1 37:4,11,12
**barking** 66:16 89:14,16
**BARRANCO** 2:7
**bars** 82:6
**based** 52:15 160:24 161:2 163:16 168:23
**basically** 41:12
**basis** 164:2 167:25 168:13
**battery** 115:11 116:13 120:14 120:21,23 121:1,7,8,12 131:9,11,21 132:14
**Bayfront** 2:3
**beach** 11:10,25 13:4 14:8 18:8 18:14 19:14 28:8 32:13,15 36:3 56:2 60:11
**bear** 131:6 144:15,17,18
**bed** 64:13 80:21 82:21 84:23 85:1
**beginning** 17:5 26:14 97:23 116:16
**behalf** 2:2,6 6:24
**believe** 6:3 47:12 97:24 126:7
**believing** 90:15
**Bell** 18:6,11
**bench** 66:13 146:23,24,25 149:3
**best** 4:20 5:1,17 29:3 52:17 63:23 101:12 135:22
**Better** 73:1
**biased** 98:25
**Biden** 98:15
**big** 9:12 42:8 148:10
**birth** 29:11
**birthdate** 33:2
**birthday** 33:3,5
**Biscayne** 2:3 178:4
**bit** 22:25 35:2 36:2 93:13 149:18,18
**black** 39:7 48:17 51:24,25 52:3 52:21 57:1,18 58:7 62:20 70:18 71:1 74:20 77:3,6 87:3 98:8,8 148:5 149:6 150:10 152:9 152:24 153:9 154:25 155:12 155:13 173:11 173:12
**Blacks** 74:24 99:4 111:10
**blah** 157:16,16 157:16
**bleed** 99:12
**bleeding** 156:10 156:11,13
**block** 44:8
**blocking** 44:7
**blood** 66:12,13 147:24
**blowed** 53:25
**blown** 34:14 74:9,11
**blue** 36:1 56:12 123:14 148:5
**body** 83:8 95:2 140:15
**bogard** 109:22
**bogart** 92:14 108:12,21,25 109:3,7,8,10 109:22,23,24 109:24 110:19
**bogarting** 108:18 109:4 110:17
**bogus** 88:1 90:14
**bond** 156:19 157:7 159:16 160:2,19,20 161:7
**bonded** 159:3,23 161:5
**boots** 52:4,4 56:23
**born** 29:7,7,9 32:25
**bothered** 107:14
**bothering** 76:9
**bought** 18:24 29:19 36:12,13 36:14 37:24 40:2,3 44:23
**Boulevard** 2:3,7 178:4
**box** 65:2,4
**boy** 32:18 34:18 60:15,18 72:6 79:7 86:20
**boys** 73:16,16
**brake** 82:7
**brakes** 82:9
**break** 3:23 91:13 108:6
**breath** 117:23
**breeze** 171:22
**brief** 126:3
**briefly** 47:8
**bring** 95:6
**broke** 40:17
**BRONT** 168:9
**brother** 36:14 36:24 39:23 45:15,22 48:6 48:10,11 49:25 50:1,19 64:10 64:11,13 65:1 65:5,6 67:23 68:12,14 69:15 169:9
**brother's** 65:10 65:12 67:9,10 70:3
**brothers** 107:16
**brought** 6:1

81:8,10 108:24
**bullet** 52:1,3 70:22 77:8,10
**bullied** 110:17 114:19,20
**bully** 109:9,11 110:2,4,8,20
**bullying** 110:16 110:21,21,22 110:22,24,25 111:3,11
**bump** 100:21 131:5
**bumped** 66:8 94:20 95:11,12 97:17 101:2 104:20 105:1 106:23,24 110:16
**bunyon** 50:11
**Burglary** 57:10
**Bush** 169:8,9
**business** 61:14 62:5 66:6 76:10,12 92:8 92:9 164:25
**bust** 52:12,13 66:11 105:21 108:23 143:8 143:21 147:20 147:23 148:8 156:11
**busted** 25:14 146:13,14 147:21 163:24 163:25
**busting** 141:20 144:8
**button** 59:3,5

**C**

**C** 70:1
**C.O** 57:20
**C/O** 178:4
**cadence** 137:22
**call** 25:6,10 48:19 52:5 55:8 97:6 103:13 111:18 119:15 120:6 120:22 121:8 144:17,18 150:12,14 151:7 157:11 159:21,22 170:1
**called** 3:3 13:3 71:20 131:16
**calling** 53:3
**camera** 140:1
**camouflage** 52:3 56:23 58:7 70:19 71:1,2 77:5,6
**candor** 76:23
**capacity** 1:8 6:3
**captain** 112:1
**car** 71:16 72:22 149:6 150:6,11 150:13
**card** 11:18 15:4
**cardiologist** 16:2
**cards** 170:4
**care** 12:19 14:13 43:4 45:9 48:13 62:19 69:7,14 99:10 99:11 100:15 100:15 174:14 178:15
**carefully** 138:5
**carry** 81:9
**cars** 48:17,23 49:4 71:7,13 71:15,15,20
**cart** 82:10
**case** 1:3,22 5:5 6:14,19 19:21 24:15,21 28:20 30:9 38:6 86:23 113:6,20 113:24 114:7 114:17 115:5 115:10 118:7,7 118:11,13,19 124:8,19 126:9 126:22,25 128:9,18,25 131:21 153:15 157:3 163:4 164:11,16 178:8
**cataract** 17:1,6 17:9,10,13
**cataracts** 17:1 44:4 172:20
**category** 170:19 170:21
**Catherine** 30:12 30:13 69:23,25 70:4 93:16 128:12,14
**cause** 42:25 44:3 45:5 80:5,10 90:15 91:2 97:25 107:7 143:17 162:2 178:10
**cc** 178:24
**cell** 25:4,8,12 51:18
**Center** 12:2,12 12:14 13:4 14:3,9 18:22 18:23,24,25 19:1 20:17 171:6,13,16
**centuries** 55:8
**certain** 4:5
**CERTIFICA...** 176:1 177:1
**certify** 135:17 176:5 177:6,13 179:17 180:6
**chair** 135:7 147:10 173:20
**chance** 149:25 149:25
**change** 41:17
**changed** 18:23
**changes** 179:2
**Channel** 74:23
**characterize** 56:11
**charge** 21:22 22:4 120:20
**charged** 21:23
**charges** 131:15 131:16
**check** 48:11 64:16 65:12 169:13,17
**checked** 64:12 65:14
**chest** 104:8,9,11 104:20 105:1 131:5 145:21
**child** 79:12
**children** 63:10 63:12
**Chiropractic** 171:15
**Chris** 34:17 65:20,24 74:1
**Christopher** 32:6,8,10,11 32:19,25 33:4 35:17 53:13 60:18 74:2,3 78:10,11,14,23 78:25 90:6,7 94:1 102:14
**Christopher's** 33:2
**Christy** 174:21
**Chrysler** 48:23 49:1,2
**circular** 39:14
**circumstances** 56:20
**civil** 6:1,23 23:12 87:7 166:7
**claim** 6:3 28:19 28:25 59:22 97:9,12 166:3 166:25 170:16 171:24
**claimed** 170:21
**claims** 24:16
**clarification** 129:11
**clarify** 162:22
**clarifying** 169:21
**class** 56:12 87:6
**clean** 76:4,7
**clear** 3:21 102:8 113:3 149:19
**clearing** 17:18
**clearly** 26:15 144:14
**Cleveland** 12:1 12:11,14 18:8 18:9,13 19:5,8
**Clinic** 12:1,11 18:8,9,13 19:5 19:8
**close** 77:17 100:19
**closed** 89:15 95:24 125:17
**closes** 102:8
**clothing** 77:7
**clusia** 41:25
**CNN** 74:23
**co-pay** 170:10 170:12
**cocaine** 22:1,10 22:13
**coin** 98:19
**Coleman** 18:7 18:11
**colloquy** 118:20 119:4
**color** 62:9,19 107:24 108:19
**come** 3:22 25:7 32:14,16 33:18

34:1,8,16 35:23,25 36:1 39:16 42:24 47:25 53:6,12 53:17 54:3,20 58:5 60:8,25 62:2,3 63:13 65:14 66:3 74:20,23 75:25 76:12 78:19,20 81:12 86:17 87:4,19 89:13 89:17,18 92:22 93:6 94:8,13 97:6,19,22 98:8 100:5 101:1,6,7 102:1 104:8 106:9 107:10 108:20 112:9 113:16 130:5 151:12,19 152:4 160:8 169:14
**coming** 61:14 86:14 92:8,9 106:16 174:7
**commands** 108:9
**Commission** 176:14 180:18
**committed** 131:10
**commotion** 147:9
**Communication** 1:13
**company** 14:7
**complaint** 2:17 6:15,23 7:9 24:9 46:11 161:18,21 162:5,19,25 163:13 170:18 172:10,16
**complaints** 161:11,16 162:23
**completely** 135:9 154:11
**complicated** 35:4
**comprehend** 33:21 34:13 43:2 80:12 84:18 89:6,8
**computer** 78:2
**concern** 164:18 164:19
**concerned** 178:14
**concise** 77:1
**conclude** 178:13 178:16
**concluded** 174:25
**concrete** 104:16 105:21 144:3
**confidential** 23:17
**confirm** 46:15
**confused** 35:11 115:6
**confusion** 115:3
**connected** 177:16
**connection** 59:8
**consent** 44:11
**contact** 94:16 104:25
**contend** 173:2
**contest** 118:15 118:16 119:17 119:19,20,25 120:13,19
**continue** 137:22
**continued** 59:1 126:5 129:12
**continues** 135:10
**convenience** 178:13
**conversations** 115:13 162:8 162:14
**conviction** 22:10
**cop** 63:13 97:24 107:11,17 150:13
**cops** 98:7,13,14 100:16 107:15 107:15,19,22 107:23 108:5
**copy** 87:3
**Corey** 2:2 178:4
**correct** 3:9 24:4 24:10 26:18 27:11 28:20,21 29:1 46:23,23 46:24 47:6,16 47:20 52:10 56:18 70:6 80:16 85:19 86:4 92:5 93:17,19,21,22 96:7,7,7,9,11 96:11,12 101:18,20 102:3,10,11,20 106:15 122:8 139:2 146:19 163:18 172:2,3 172:4 179:21
**correction** 179:3
**corrections** 179:20 180:9
**correctly** 75:20
**cost** 174:21
**could've** 80:10 80:13
**counsel** 38:18 46:6 133:22,24 134:2,6 135:20 162:14 177:14 177:16 178:24
**counties** 30:1
**county** 1:9 14:4 14:8 18:3,4 19:2,2,13,14 22:23,24 29:9 29:14,20 30:1 30:1 33:18,20 34:8,10 48:16 48:25 52:2,23 56:2,3 60:6,6 66:21 69:12 73:22 75:7,12 79:1 86:23,24 90:9 111:19 129:21 133:7 155:19 156:17 157:12 176:4 177:4 180:4
**couple** 40:25
**court** 1:1 3:17 7:8 13:16 58:21 59:10 75:6 85:3 88:2 94:4 111:9 113:13 116:9 116:11,11 129:10 137:24 140:19 152:1
**courthouse** 28:7
**cousin** 25:2 160:2
**cover** 40:17
**covered** 47:9 170:25 171:3,6 171:10,13,16
**crawl** 83:12
**crazy** 74:18 76:13 123:16 125:11
**create** 105:6,17
**created** 106:19
**credit** 160:7
**crime** 58:6 61:7 61:15
**criminal** 22:4 113:6 114:6,17 115:5,10,18 118:7,19 120:19 128:21 131:20 132:10 153:22 164:14 165:8
**cross** 2:14 90:23
**crossed** 65:15
**cruiser** 149:4 150:6
**cruisers** 49:3 71:14
**CTS** 22:7,11
**cuff** 145:24
**curls** 140:24
**current** 26:16 26:23
**currently** 8:24 27:8 30:22 80:20 81:6
**curse** 140:22
**cursing** 79:7 140:11
**Curt** 2:5 9:18 10:5 13:18 15:5 25:6 27:19 28:11 34:3,25 38:13 38:16 44:5 76:5 77:20,20 78:6 84:3,6 88:11 94:23 103:9 107:6 108:18 109:13 125:23 131:23 131:24 138:10 139:17 142:7 145:5 151:11 162:6,11 165:20 173:6
**cussing** 62:14
**custody** 32:21 159:24
**cut** 40:6,21 48:2 49:16 50:21

**D**

**D** 2:11
**D.C** 98:11

**dad** 31:7,11
**dad's** 29:18
**damage** 170:16 170:19,20
**damn** 79:9 95:5 125:10,13 134:17 140:3,4 140:5,18
**date** 1:14 29:11 43:7 46:16 82:25 120:4,6 153:12 167:17 167:17,22 176:15
**DATED** 177:19
**day** 34:2,6,7 37:4 41:14 47:22 48:21 49:6 53:21 64:16 88:15 114:7 120:1 152:8 159:4,17 160:4,4,20,22 161:6 174:11 176:10 177:19 180:15
**days** 160:7
**DCF** 32:13,21
**dead** 64:15
**deal** 107:15,19 107:23 108:5 119:16
**dealt** 90:17
**Dear** 178:9
**Decades** 55:7
**deductible** 170:10
**deep** 117:23
**Defendant** 1:10 2:6
**defendant's** 2:17 7:1,11,16 12:5 47:1
**defense** 6:14 7:10,12 30:4 46:20 124:15 126:9 129:15 163:14 170:15
**defensive** 114:9 119:12
**delve** 23:18
**demean** 166:10
**denied** 159:15 159:18
**department** 1:9 48:16 66:21 73:23,24 98:12 98:14,15 129:22 155:14 155:17,20 157:13
**depo** 28:22 137:22
**deponent** 178:10
**deposition** 1:17 1:22 4:11,11 4:15 5:3,5,23 6:16,20 7:21 23:20 24:3,12 26:14 28:17 58:25 92:24 93:9 98:3 116:17 117:17 126:4 129:12 135:15 137:19 137:20 174:24 177:7 178:11 178:16,18 179:19
**deprecate** 166:10
**deprecating** 110:14
**deputies** 52:22 57:12 70:11,16 71:3 72:19 98:25 129:3
**deputy** 43:9 47:23 51:14,22 70:5 72:9 73:19,25 77:3 78:8,13,18,22 85:13 87:12 89:10 91:25 93:24 95:15 100:2,19 102:5 111:16 112:7 112:14 116:4 121:15 122:3,6 131:1 133:10 139:20 141:8 141:22 145:2,6 147:15,16 148:22 149:15 157:18,19 158:14 161:11 161:19,21 163:18
**derailed** 127:11
**describe** 36:20 37:17 41:12,17 131:6 133:9
**described** 131:9 154:24 170:18 172:9,15
**describing** 41:3
**Deshaun** 32:6
**detail** 108:7
**detained** 129:4 130:14
**detectives** 71:16
**deteriorating** 83:8
**devil** 76:11
**diagnosed** 17:20 20:10 84:15 168:18
**diagnosis** 84:7 84:10,12 173:3
**Diagnostic** 171:5
**die** 18:11
**died** 36:17 68:13 68:14,18,19 69:8,15
**difference** 27:15 40:18
**different** 39:25 40:7 43:2 45:2 57:13 138:4 164:15
**difficult** 174:8
**difficulties** 58:25
**DIRECT** 2:14 3:6
**disability** 167:1 172:8,11
**disclosed** 15:11
**disclosures** 153:12 154:6
**disconnected** 59:7
**discovery** 15:12 153:12 164:6
**discs** 9:13 80:17 164:1 173:12
**discuss** 126:21
**discussed** 124:19 128:9
**disjointed** 135:9 137:20
**dismiss** 113:20
**dispute** 78:17 130:9
**disrespect** 62:11 62:17
**distance** 100:20 101:5 102:9
**DISTRICT** 1:1 1:1
**DIVISION** 1:2
**doctor** 9:18,19 9:20 10:6,7,7 10:12,13,23,25 11:7,12,23 12:8,20 13:24 14:1 15:3,7,11 15:12,18,25 16:11,13,18,21 18:10 81:1 157:6,16,21 158:9 159:15 159:17,18
**doctors** 10:8,10 10:14,20,22 15:1 16:6,9 18:17
**documents** 6:15
**Dodge** 49:2,2
**dog** 66:16 69:14 89:13,16
**doing** 3:11 19:21 20:24 21:18 22:18 23:18 28:8 45:6 60:2 60:22 62:5 66:5,6,18 90:4 99:3,4,5 111:1 111:10,11,12 111:20,22,25 112:12 140:23 144:12 146:10 151:20 164:25
**door** 27:12 36:24 45:16,22 64:12 66:15 73:14 78:19,20 78:20 89:15,18 95:23 96:1 146:9 147:3,6 151:12
**Dr** 10:24,25 11:5 11:7,19 15:8 15:25 17:25 18:6 20:16 171:9 173:18
**drawn** 70:9,12 72:10,20
**dressed** 52:9,13 52:20,21 77:3
**drive** 2:18 27:6 27:13 30:24,25 31:22 33:12 34:22 35:19 36:5 38:2 42:16 45:12 47:19 68:2,4 71:16 85:23 128:5 150:24

**driveway** 39:4 39:14,15,16 40:12,14,16,18 42:18,19 60:24 65:16,18 66:11 66:14 70:7,8 95:21,22 105:21 138:17 144:3
**driveways** 39:5
**driving** 43:4 49:6 71:17 123:15
**dropped** 59:8
**drug** 52:12,13
**dude** 38:13 153:6,9
**dudes** 38:14
**dug** 40:21 42:10
**duly** 3:4 176:7
**dungarees** 148:9
**dynamic** 49:21

**E**

**e** 2:11 68:21,25 179:2
**E-A-L-Y** 30:16 69:1
**e-mail** 25:20,21 174:21
**Ealy** 1:5,17 2:13 3:2,9,12 7:20 20:19 23:9,15 26:11,12 30:12 30:17 35:11 36:24 58:20 59:4,13 67:11 67:12 68:21 69:23 76:7 87:11 90:2 110:13 126:11 128:12,14 135:2,9 137:4 137:15 140:11 141:5 171:25 174:18 176:6 177:8 178:3,7 178:9 179:23 180:13
**earlier** 30:11 82:16,19 92:3 106:3 114:21 116:2 135:1 136:5
**earliest** 178:13
**East** 2:7
**education** 28:15
**Edward** 114:9 116:8
**effect** 92:2 108:8
**eight** 71:6 73:18
**elbow** 25:13 66:11 105:6,22 146:13,14 147:18 148:8 156:9,12 163:24 173:5
**embarrass** 166:10
**embarrassing** 166:12,17
**embellishing** 8:7
**emotionally** 80:8
**employee** 177:14,15
**empty** 29:23
**encounter** 52:25
**encountered** 43:7 47:23 51:12 52:22 70:5 73:19
**encounters** 112:20
**enforcement** 57:23 63:4 70:17 109:1 115:11 120:14 120:23 121:2,7 131:22 132:14
**entered** 179:3
**errata** 179:1 180:10
**Esquire** 2:5,9
**Estela** 1:19 176:13 177:5 177:22 178:22
**events** 8:6 47:8,9 77:1 117:13,14 125:1
**everybody** 94:5 117:22 174:11
**evidence** 173:13
**exact** 167:22
**exactly** 85:9 110:15 136:3
**examination** 2:12 3:6 178:10
**examined** 3:4
**exchange** 91:24
**exchanged** 91:20 106:1
**excuse** 4:1 6:2 19:21 24:6 58:20 85:12 136:22 141:8
**Exhibit** 7:16,17 30:4 46:7,9 47:1
**EXHIBITS** 2:16
**expand** 40:12
**expenses** 170:7 170:19 171:19
**experienced** 92:12
**Expiration** 176:15
**expires** 180:18
**explain** 4:14 5:16 10:6 34:12 53:10 62:25 78:14 109:12,13,15 109:18 110:5 110:10 131:23 131:24 132:2 139:16 140:10 143:16 144:9 144:21 149:24
**explained** 4:16 43:8,12 91:6 122:25 127:14 133:25 148:17 169:6
**explaining** 20:13 37:1 43:1,16 52:17 54:11 63:23 150:22
**expletives** 91:20 91:25
**extent** 137:19
**extremely** 137:19
**eye** 16:13,18,20
**eyes** 16:11,23,23 16:24 17:1,11 44:4 80:4

**F**

**F** 13:6
**F-E-R-O-N-E** 13:12
**F.R.C.P** 179:2
**face** 69:20 94:7 95:18,18 96:14 96:16 99:9 100:14,22 101:1,3,6,7 102:1,3 103:2 103:4,13,17,22 104:1 123:14 141:19 143:9 143:21,25 144:5,6,8 165:2
**faces** 100:17
**facility** 18:12 19:5
**facing** 95:15,15 96:5,8,10
**fact** 61:10 62:22 80:3
**facts** 101:17
**fail** 54:5
**fair** 45:10 57:11 74:22 101:25
**fall** 144:23 145:14
**false** 96:24 97:5 97:9 149:8,12
**falsely** 97:13
**family** 13:3 14:3 14:9 18:23,24 19:1 20:16 30:10
**far** 77:11,16 78:5 103:2,14 123:24,25 136:18
**Fargo** 37:12
**fast** 72:1,6 121:22
**father** 31:9 97:8
**fatigues** 52:7 56:19
**fault** 17:14
**fax** 13:18 15:5
**February** 28:10 37:3 84:3 169:7 176:15
**federal** 58:8,9 58:10 63:3 70:24 71:22 77:4
**feel** 8:16 66:1 99:14
**feeling** 8:14 95:4
**feet** 9:11 10:3 78:3,5,9 100:21 102:9 124:3,3,5,5,5 127:5,6 141:7 141:9,10,10,12 141:14 142:3,9 142:13,23 143:24 144:1,2
**fell** 145:3,7,9,10 145:14,16

**felt** 110:23
**fence** 39:7,21 61:3 73:7,10 73:15
**Fences** 39:20
**Ferone** 10:24 12:21,23,25 13:6,7,10,11 14:5,6,21,21 14:22 15:2 18:1 20:16
**ficus** 42:1
**fight** 75:15 117:16,18
**fighting** 75:12 98:10
**figure** 74:15,16 79:5 97:7 107:9 112:2
**file** 46:21 113:19 161:10,14,17 161:18,20 162:23 167:5 178:17
**filed** 1:22 6:23 114:11,13 162:4,19 167:7 167:14
**fill** 8:8
**financially** 177:17
**find** 25:18 152:6 152:8 162:5 180:7
**fine** 7:14 35:14 149:19 167:23
**finger** 96:14,15
**finish** 43:12 55:18,22 58:17 95:25 108:16 112:25 142:2 152:18 166:19
**finished** 32:14 32:22
**Finnegan** 1:8 6:2 19:22 34:7 43:9 47:23,24 48:16 51:14,17 51:22 59:23 60:20 65:17 70:5,25 72:9 73:19,23,25 77:3 78:8,13 78:22 84:16 85:11,13,22 87:12 89:10 91:25 93:24 99:9 100:2,19 102:5 111:16 112:7,14 116:4 121:15 122:4,6 123:13 124:12 129:6 130:7,8 130:11,22 131:1,2,10,13 131:18 133:10 133:15 136:6 139:20 141:8 141:23 145:2,7 147:16 149:1,4 149:15 151:6 152:19 157:18 158:14,20 160:15 161:12 161:19,21 163:18 164:23 178:7
**first** 3:3 23:12 60:25 68:22 70:1 73:19 77:14 89:10,10 90:4 98:4 104:23 111:15 111:24 112:24 113:8 142:4 143:5 145:10 150:24 151:3 164:9
**fitness** 11:10 12:2,15
**five** 22:17 61:1 65:24 74:5 75:24 78:3,4,9 100:21 102:9
**FL** 178:5
**flanked** 147:13 147:15
**flesh** 100:9
**Florida** 1:1,21 2:4,8 18:14 27:7,13 30:2 47:19 169:8 176:3,14 177:3
**flowers** 42:6,19
**focused** 63:16
**follow** 64:23 67:1,5 85:13 93:3,12 95:10 101:21,23 104:18 117:15 135:5,11 149:21 174:3 174:12
**follows** 3:4 59:1 126:5 129:13
**food** 169:23
**fool** 90:24,25
**foot** 103:7,11,24 103:25 144:25
**Ford** 49:1
**forearm** 104:6 105:11,12,16 106:20
**foreclosure** 27:19 37:9
**foregoing** 177:9 179:18 180:7
**Forisles** 9:23
**form** 21:6 144:15 179:2
**formal** 173:3
**Fort** 2:8 14:2 27:6,13 47:19 81:11 152:1 159:10
**forth** 5:12 29:5 96:23 180:10
**forward** 7:13 24:1 28:24 123:19 143:13 143:15,25 144:23 145:3,7
**found** 22:21 116:12 162:6
**four** 61:1 78:3,4 78:9 100:20 102:9 144:2
**Frank** 13:6
**Friday** 160:22
**front** 42:19 48:6 48:7 62:14 75:22 88:3 94:4 98:6 100:8,14,17 128:2 130:20 130:21 149:8 164:18 165:2
**froze** 59:8
**frozen** 58:22
**frustrated** 79:15 79:17,18,20,21 80:1 91:3,5 116:22 123:15
**FT** 1:2
**fuck** 92:1,4
**Fucker** 140:5
**fucking** 125:12 146:1
**funny** 11:2 61:13 110:10
**further** 177:13 178:18

**G**

**G** 30:12,15,16 50:8,8,14,15 69:23,24
**G-A** 50:8
**G-A-R** 50:15
**G-A-R-G-O-N** 50:9,15
**gaps** 8:8
**garage** 39:8,11 39:12 66:14,16 78:20,21 89:5 89:6,15,19 95:23 96:1 102:4 133:11 133:14 136:2 146:24 147:3,4 148:24 149:14 150:5
**garages** 39:13
**garbage** 150:18
**gate** 65:18
**gates** 39:21
**George** 169:9
**Gerald** 12:21,25 13:1,7,8 14:5,6 14:21,22 15:2 17:25
**gesturing** 104:6 145:19
**getting** 18:10 61:2 64:25 80:23 83:9 85:5 88:17 98:15,16 99:13 116:22 123:13 123:14 143:18 143:20 164:20 165:17 166:13 173:25
**GG** 176:14
**Gifford** 59:23
**GIUFFREDA** 2:7
**give** 27:3 75:24 83:18 86:15 101:21 108:9 117:12 118:10 125:13 149:25 149:25 167:10 169:13,17,23
**given** 4:11 7:21 101:23 117:11 156:14 161:3 179:4,19
**giving** 91:10
**glad** 72:14

**glaucoma** 16:18 16:22 17:4,8 17:12,15
**go** 5:19,24 12:3 13:14,23 18:15 19:15,17 26:10 42:18 53:20 55:20 59:16,18 63:14 64:15 65:12 66:5 68:10 72:6 75:22 76:12 84:25 93:25 94:22,24 95:5 96:2 98:1 102:17 107:8 107:10 108:22 115:24 118:20 125:14 135:10 136:11 147:6 151:16,21 163:12 166:1 171:1
**God** 49:21 55:6 71:5 151:19
**Goddamn** 140:3 140:9
**goes** 33:19 36:3
**going** 4:17,19 5:10,24 6:16 7:6,9,12,13 8:13 14:17 19:16 23:18,19 27:25 28:14 29:3 34:10 35:9 40:16 41:19 42:19 43:15,17,20,24 48:14 49:10 52:15 53:14 60:9 61:4,11 61:23 63:21 66:15,17 71:24 72:4,17 78:21 79:8 87:11 89:18,18 94:24 95:7 96:2,22 96:23 97:19,20 98:6 106:4 107:9 117:16 118:23 121:16 125:7 130:8 131:14 134:12 137:6,9,21,23 152:11 166:8 166:21 171:22 173:1 174:2,20
**gold** 170:4
**gonna** 102:2
**good** 3:8,11 18:17 28:9 38:24 55:5,6 68:12 69:7 71:5 80:24 148:25 174:11
**gotta** 15:4 17:1 44:4 64:23 114:14 128:3 157:12 167:11
**governor** 169:8
**grab** 75:15 139:12 140:6,7 140:14
**grabbed** 94:19 138:7 139:14 139:20,21 140:2,4,13
**grand** 114:12
**grandma** 32:17 33:19
**grandmother** 36:2
**gray** 37:24 40:5 40:8,15 42:25
**Great** 174:9
**green** 37:22,23 45:25 49:3 56:10,15,16,17 56:19,25 57:2 57:2,20 71:14
**grievances** 161:11,16
**ground** 5:24 89:20 93:20 113:21 134:15 136:8 138:8 141:9 142:3,5 142:14 145:22 146:18
**growing** 32:15
**guess** 4:24 5:13 14:18 29:6 60:21 70:3 74:15 95:3 107:9 110:3 121:21 167:18 167:21
**guest** 35:18
**guilty** 116:12 118:24 119:1
**gun** 63:13 75:15 95:5 107:10
**gunning** 63:9
**guns** 69:19 70:13 72:2
**Gunyon** 48:1,1 50:1,2,6,8,8,9 50:11,12,13,14 50:15,19,20,22
**guy** 39:20 40:3,4 40:15 54:10 58:15,18 59:22 74:14 78:25 90:8 109:19 114:8 124:13 155:13
**guys** 101:4 111:17,18

**H**

**hand** 72:12,15 72:16 75:12 105:11 143:7,7 176:9
**handcuffs** 66:19 78:18 79:4 89:20,24 93:17 93:18,24 130:11,15,23 145:24 146:6 146:18 147:12 149:2
**handle** 82:6 85:6 85:6
**handles** 82:3,4,8
**hands** 82:2 90:1 90:3 94:13 97:16 129:7,8 146:1,5,11
**Hang** 43:23
**happened** 5:11 20:3,6 26:19 27:1 47:22 49:11 53:11 59:21 60:11 62:22 64:4,5 71:25 72:5 75:10 76:10 83:7 85:10 86:6,22 90:21 94:17 100:1 101:8 104:3 123:2,17 131:3 133:13 145:24 146:7 153:13 160:14 164:22
**happens** 35:12
**Harris** 149:6,6 150:10,19,25 151:5,13,15 152:9,17,25 153:8,11,14 155:4,11,18,21 157:21
**Harrison** 2:9
**hate** 107:18
**he'll** 13:22 38:22 100:9 122:13 152:18,22 174:8
**head** 79:9,11,12 79:14,22 80:1 80:6 108:23 141:21 142:4 143:5,9,20 144:8
**Health** 12:11 13:3 14:3,9 18:13,23,24 19:1 20:16 171:16
**hear** 3:12,13 20:6 27:23 31:12 33:9 34:14 68:15,17 71:11 92:11,12 94:6,9 142:11 142:16 162:2 168:11
**heard** 92:2 137:13 138:5 142:15
**hearing** 66:16 75:9
**heart** 9:8,22,23 9:25 10:7,12 10:24 11:7,14 15:2,7,18,21 15:21 16:1 72:7
**heart's** 15:24
**heated** 85:11
**hedge** 42:18
**hedges** 42:3,4,6 45:7 70:3
**held** 144:15
**hell** 60:25 61:23 63:6 71:24 92:6 97:7,23 100:7,10
**help** 48:2 49:17 49:17,18 84:24 85:1 146:16
**helped** 169:10
**helping** 47:7 49:7,7,15 50:20 64:8
**hepatitis** 169:12
**hereto** 180:10
**herniated** 9:13

80:17 164:1
**hide** 61:6
**high** 142:6,7
**Highway** 14:2
**hire** 112:1
**history** 29:4
**HIV** 9:4 17:19 18:5 19:12 20:10,15 22:22 165:21 168:6 168:19,21,25 169:7,11,12,19 172:18
**hold** 9:18 10:5 11:2 37:3 62:3 65:7 83:11,13 89:16,23 93:1 95:25 107:6 108:15 131:12 131:12 135:24 149:17,24 157:12 167:22 169:6
**holding** 73:4 79:22
**hole** 148:10
**hollered** 61:1 146:2
**hollering** 86:7 97:3
**holster** 72:12
**home** 15:4 34:16 34:22 35:19 36:6,7,9,10,20 36:23,23 37:6 37:13,18,20 38:2 39:3,11 39:25 41:1 42:8,16 45:11 46:15 51:22 69:12,13,16 85:22 87:15 89:9 130:13
**homes** 36:12
**honest** 61:12 71:23 107:13
**honestly** 135:20
**Honor** 76:8
**Honor[sic** 130:3
**hopefully** 163:14 172:25
**hospice** 18:7
**hospital** 156:20 158:25 159:10 170:23 171:1
**hours** 159:24 160:18
**house** 27:17,18 27:20 28:4,9 32:16 36:13,13 37:4,7,15,21 37:22,23,24 38:1 39:3,23 39:23 40:2,4,5 40:8 42:15,17 42:23,25 44:14 44:23 45:15,22 45:25 48:3,10 48:14,15 49:16 49:25,25 50:18 50:21 53:18 54:7,19,21 61:4 62:2 64:11 65:12,15 66:3 67:9 69:16,17,19 70:3,4,14 72:1 73:14,15 86:8 86:14,18 87:4 87:5,9 89:18 92:15 93:6,25 96:3,8 97:18 106:4,17 108:22 109:8 109:25 110:24 111:3 127:7 130:10,10,20 147:7
**houses** 39:5,12 73:13
**Hoyer** 64:14
**hug** 131:6
144:15,17,18
**Huh** 10:18 11:21 16:19 21:8 33:1 39:9 50:4 52:8 57:7 64:21 67:2 68:16 71:10 77:13 82:24 84:9 92:18 116:8,15 124:24 126:13 127:1 128:13 137:1 142:10 143:21 148:2 155:16 156:22 158:16 163:7 170:8
**human** 99:11
**Humphrey** 109:23
**hunt** 108:11
**hurt** 74:24 79:4 79:24,24 80:2 80:3,7,9,14,15 95:5 97:21 104:16 105:21 107:11,11 146:12
**hurting** 9:25 63:9 66:18 173:22
**hurts** 80:9

**I**

**I'ma** 74:17 107:10 119:14 130:16
**ID** 26:13
**identification** 2:16 7:18 47:2
**identify** 57:22
**identifying** 70:20,23
**imaging** 173:4,5
**immediately** 84:20
**important** 15:24 43:6
**incarcerated** 21:4 22:21 158:10
**inches** 103:7,10 103:12,21,24 103:25
**incident** 26:19 26:24 27:1,18 31:9 33:10 41:14 46:17 49:11 52:24 55:25 80:22 83:6,7 113:7 123:2 127:19 154:22 170:17 171:20 172:9 172:14,15
**include** 169:22
**includes** 113:6
**including** 70:25
**income** 164:3,8 170:1
**Indian** 1:8 14:4 14:8 18:3,4 19:1,12,14 22:24 29:7,20 29:21,25 33:17 33:19 34:8 52:23 56:2,3 60:5 69:12 73:24 75:11 78:25 86:23 90:8 111:19 133:7 170:22
**indicated** 8:13 142:22
**indicating** 142:13
**individually** 1:8
**infected** 147:25
**infirmity** 172:8 172:11
**information** 101:23 162:17
**initial** 30:16 68:25 69:23
**initiated** 104:25
**injured** 147:19 171:4
**injuries** 16:12 16:16 24:25 25:24 155:24 156:3 163:13 163:20,23 164:13 172:14 173:1
**injury** 9:10 83:19 156:7 163:17,21 168:24,24 173:3
**insane** 63:14
**inside** 89:9 93:25 110:24 111:3
**intake** 157:24 158:6
**intend** 24:15
**interacted** 77:14
**interaction** 96:6 122:3 130:25
**interested** 177:17
**interject** 64:3
**internal** 163:3
**interpretate** 4:7
**interrogatories** 2:18 6:13 7:2 7:11 11:5 12:5 30:6 46:11
**interrogatory** 172:7
**interrupt** 64:20 64:22
**interrupted** 117:11
**interrupting** 117:7
**investigation** 27:22,24 37:9

163:4
**involved** 23:13
**involvement** 53:1,4,9
**issues** 8:14,19
**it,inside** 75:13
**item** 170:16

**J**

**jail** 18:16 19:13 19:15 22:3,24 22:24 131:18 133:2,3,8 156:18,19 157:24 158:8 160:3,18,19,24 168:10
**jailhouse** 18:4,4 75:14 157:22
**James** 38:11,18 122:9,16,17,17 122:19 123:22 124:7,11,14 127:8
**January** 25:1 27:4 31:8 33:6 33:24 34:2 35:19 39:10 40:1 41:1,15 42:14 45:12 47:10,14 53:8 54:13,25 55:9 57:14,15,25 67:20 69:9 70:4 85:21 87:13 95:14 100:4 101:19 102:5 112:22 113:4,10 155:25 159:6 159:13 160:13 161:21
**jeans** 148:5
**Jeb** 169:8
**Jerald** 10:24
**JISA** 2:7
**job** 152:3
**Joe** 98:15
**John** 1:8 6:2 19:22 23:9 34:7 48:15 51:17 59:23 60:20 65:17 70:25 78:22 99:9 123:13 124:11 129:6 130:22 131:2,9 131:13,18 136:6 149:1,4 152:19 164:23
**Johnny** 1:5,17 2:13 3:2,8 4:18 5:19 26:11,12 53:19 64:3 66:4 119:14 171:25 176:6 177:8 178:3 179:23 180:13
**JOLLY** 2:7
**Joss** 2:9,14 3:7 5:21 7:6,19 9:6 11:15 12:18 13:25 14:24 15:23 17:17 19:19 20:5 22:2,8,19 24:23 25:16 27:2 28:13 29:2 34:20 35:7,10 39:1 41:10,24 44:1 44:18 46:8,14 46:19 47:14,17 55:13,23 59:2 59:6,9,11,12 60:3 64:17 66:24 78:7 81:24,25 82:11 88:18 94:12 95:9 101:13 103:20 104:2 105:15 106:13 110:12 114:1 115:4,7,8 116:1 118:5 119:23 120:9 122:15 123:10 125:19 126:1,6 127:10,17 129:14 130:4 132:7,13,24 133:19 134:21 135:2,8 136:17 136:25,25 137:2,2,3,5,8 137:14,17 138:11,18,24 139:19,25 140:14 141:4 142:17,19,24 143:3,16 145:12 148:11 148:14 149:22 151:19 152:10 153:7,23 154:11,17,21 154:24 155:2 155:10 156:6 157:9 158:11 158:19 159:1,2 161:25 162:16 163:2 164:17 165:14,25 166:5,20 167:2 167:13,24 168:5,11,22,25 169:2 170:13 172:5 173:14 174:9,14,17,20
**judge** 54:10 62:15,16 74:19 75:5,5,6,8,20 75:22 76:6 86:15,16,22 87:3 88:3 97:1 98:6 111:21 114:16,20,22 114:24 115:5,9 115:10,14,15 115:18,19,22 115:24 116:3,5 118:19 128:2 137:13 162:3 164:19
**July** 83:7,24
**jump** 62:4,8 76:4
**jumped** 48:17 61:2 76:1,2
**jumping** 73:15 75:1 146:10
**JURAT** 180:1
**Justice** 98:12,14

**K**

**keep** 20:3,23,24 34:23 63:16 76:17 91:7 94:24 102:6 123:17 125:5 133:18 134:11 136:12,14,15 137:6 138:20 140:23 141:20 143:20
**keeping** 46:12
**Kenneth** 50:20 50:22,23 51:16
**Kenny** 48:1 50:2
**kept** 45:6 53:14 75:23 86:7 144:8
**killed** 75:17
**kind** 9:24 37:7 47:4 63:17 79:9 82:10 84:25 91:10 93:11 101:7
**king** 125:11
**knee** 66:12 105:22 146:14 147:19 148:9 148:10,11 156:12 163:24 173:6
**knees** 25:14 130:12 146:1,5
**knew** 169:11
**knock** 107:2
**knocked** 9:13 80:17 105:22 163:25 164:1
**know** 3:22,23 5:13,14 6:1,8 6:12 8:8,9,12 9:15 10:21 17:19 19:12 21:21 23:23 25:11 26:13,23 28:15 29:4 34:9 41:23 43:19 47:8 48:25 50:3,5 50:24 52:11,14 52:15 53:3 60:1,5,9 61:8 61:10,23 62:21 63:10,13,17,18 63:20,21,23 64:1 71:24,24 72:2,4,17 73:21 74:13 75:18 76:24,25 79:14,15 81:13 81:15 90:12 93:11 95:25 97:24,25 99:17 101:14,17 106:8 107:7,14 107:25 109:13 110:25 111:20 111:23 112:4 112:11,13 113:23,25 114:11,13,14 115:13 116:19 117:12 120:7 120:17,25 121:4,24 122:22,22

123:1,25 124:6 124:22,25 126:11,14,15 126:16 128:1,3 128:17 130:21 130:21 132:11 132:12,21,22 133:21 137:7 137:13 139:8 146:24 151:16 151:22 152:5 153:13 154:6,9 154:12,16,23 155:1,6,7,11 155:14,17 157:5,11,14 162:2,18 164:24 165:24 167:20 169:13 169:15 170:3,4 174:7,12
**known** 63:19
**knows** 23:17 132:19 154:18 162:13

**L**

**L** 176:13 177:22 178:22
**L-I-E** 100:17
**L-I-Y** 100:18
**lady** 28:5 157:20 173:16
**land** 29:23
**landscaping** 41:6,7,23 45:6
**laptop** 149:7 150:11
**Large** 1:21 180:18
**lasting** 163:20
**late** 28:3
**Latino** 40:3 99:4
**Lauderdale** 2:8
**law** 57:23 63:4 70:17 76:14 98:1,2 109:1 109:13 115:11 120:14,21,23 121:1,7 131:21 132:14 151:21
**lawn** 76:8 171:25
**lawsuit** 6:2,4,23 23:4,13 87:7 162:7 166:8
**lawyer** 3:24 4:2 4:7,10 25:20 28:5,6,9,18 75:23 76:5 77:19 114:10 114:25 115:21 115:23 116:5,8 116:18 118:14 118:18,25 119:1,8,12 120:6,16 122:13 125:18 139:17 151:20 162:5,9 167:12
**lawyer's** 115:14
**lay** 84:24 146:5 173:21
**laying** 84:23 146:8
**leave** 114:25 173:1
**led** 34:19 53:25 66:7 132:10
**leeway** 101:21 117:12
**left** 62:6 105:16 126:8,10 149:1
**leg** 10:3
**legally** 87:3
**legs** 9:11
**lengthy** 91:10
**Let's** 30:10 85:9 115:16 117:22 125:24 127:9 127:13 166:19
**let--** 114:24
**liar** 53:16,22
**lick** 104:23
**lie** 63:11 66:1 74:16 85:2 88:3 97:21 99:21 100:14 100:17,17,18 101:7 107:5 152:6,12,19,22
**lies** 96:24 97:2,4 99:6
**life** 31:2,5,15,16 31:19 74:21 95:4 112:17,23
**lifted** 142:3
**lightly** 66:8,9
**lime** 37:22
**line** 85:3
**list** 15:15,18 19:4 151:13 154:6 170:18
**listed** 15:10 30:8 124:15 126:9 126:25 128:11 129:15 153:11 153:14,20 154:2 155:9 170:22
**listen** 21:3 35:25 41:21 42:9 53:11 73:2 83:6 90:20 96:21 98:13 110:11 111:5,8 118:1 119:9 122:24 138:4 150:9 152:16 162:1,11
**listing** 154:5
**little** 18:2 22:25 32:18 35:2,4,5 36:2 40:16 78:17 85:7 101:21 127:11 149:7,18 150:11
**live** 26:17 27:10 27:12 29:22 30:18,19,21,24 31:2 32:9 33:17 34:9,17 34:22 36:15 45:23 48:3 49:19 51:4 53:23,24 64:21 74:14 79:6 85:15 86:2 128:4,7 152:1
**lived** 29:13,16 30:2,23 31:5 31:23
**living** 27:4 31:21 33:11 36:17,25 47:18 67:24 68:13 69:2,4 69:10
**located** 14:2
**LOCATION** 1:13
**lock** 131:18
**locked** 131:19
**Lockwood** 2:18 27:6,12 30:24 30:25 31:22 33:11 34:22 35:19 36:5 38:2 39:3,11 39:25 42:16 45:11 47:19 51:8 68:2,4 85:23 128:5
**long** 17:19 22:3 55:4 82:18 126:18 151:20
**longer** 27:20 28:19 36:17,25 37:23 44:21 68:13 137:25 155:3 172:2
**Longwood** 171:12
**look** 39:25 42:23 42:24 43:14,19 44:5,21 53:16 53:22 74:22 98:20 104:8 116:20 133:8 146:25
**looked** 41:14 42:13,21 43:6 43:13 45:5,11 46:16 52:6,9 52:11 56:8
**looking** 11:4 12:4,10 30:4 34:16 37:18 53:7,12,18 60:8 61:14 78:11,14,22,24 82:2 100:5 109:6 125:3 132:18 134:21 134:23 147:11 148:18 170:14
**looks** 40:7 42:12 43:5 45:9
**Lord** 10:25 55:5 71:5 84:21 130:16 133:18
**lose** 63:15
**losing** 83:14
**lost** 28:19,25 170:20 171:24
**lot** 40:6,21,24 74:19,24 98:7 98:13,13 111:11,17,18 117:11
**loud** 86:9 123:1 130:16,21 137:13 142:10 162:2
**low** 170:1
**Lucie** 19:2 29:9 29:14 30:1 48:16 52:2 60:6 66:21 73:22 75:6

129:21 133:7 155:19 157:12 159:10 173:17 173:20
**lying** 140:20 152:13,17

**M**

**M-A-R-Y** 68:23
**ma'am** 3:5
**mad** 63:6 66:5 72:16 100:6
**Madam** 174:15 174:17
**mail** 48:6 64:6 64:10,25 65:2 65:4 66:13 67:9,19,23 68:9,10 143:7
**mailbox** 48:6,7 64:10,11 65:1 65:5,8 67:9
**mailboxes** 68:11
**main** 163:16,17
**making** 28:19 37:5 53:22 97:9,12 171:23 179:4
**male** 154:25 155:12
**man** 19:9 31:11 34:16 41:20 44:4 53:15 55:4 60:2 61:9 61:25 62:6,10 62:13,16 63:2 63:15 65:22,25 66:1 69:7 72:17 74:7,13 74:25 75:4,17 76:4,11,14,19 79:24 80:18 84:22 87:6 90:4,11,18 95:5 97:16 98:16,20 99:18 100:22,23 101:1,2 102:1 104:1,5 107:11 107:19 108:11 108:24 109:14 109:19 111:10 112:17 114:25 116:23 120:6,7 123:25 125:11 125:11,12,17 128:15 131:17 133:8,25 134:4 136:13 138:15 139:6,15 140:6 140:8,18,22 143:13 145:10 148:8 152:4,6 152:12 153:23 164:15 167:8,8 169:14
**mango** 42:1
**manhandle** 110:1
**manipulate** 101:16
**manner** 35:3
**March** 169:7
**marked** 7:10,17 46:20 47:2
**markedly** 57:13
**married** 31:14
**Marshall** 48:18 52:1 58:2,7 66:22 70:21 71:1 77:6
**Marshall's** 77:7
**Marshalls** 51:23 57:18 70:24 71:22 87:14
**Mary** 13:19 48:10 68:21,23 69:11,11
**math** 22:18
**matter** 61:10 107:24 108:19 121:12 128:21 178:13
**mean** 8:20,22 10:4 12:13 23:24 41:25 42:1,22 51:16 62:2,7 63:2,14 76:11 77:3 84:2 87:6,12 88:4 109:7,10 109:11,22,24 110:20 117:13 117:15 121:23 135:8,13 147:21 167:19
**means** 8:5 110:8 154:5 156:2
**meant** 17:13
**Medicaid** 169:22,23 170:2,3,25 171:7,10
**medical** 8:14,19 12:1 156:14,16 156:18,21,23 157:14 159:12 159:21 170:7 170:19 171:12 171:19
**medication** 8:20 8:22 9:3,8 18:16
**medications** 8:17,25 9:7,16
**medicine** 9:2
**meeting** 44:11 112:13
**memorializing** 127:25
**mental** 168:24 169:12,16
**mentioned** 11:23 12:19 14:16,20,25 28:18 30:8,11 49:14,22 100:21 124:2
**mercy** 84:21
**merged** 18:25
**mess** 88:1 97:20 100:13,16 107:4
**messed** 58:15,18 59:13 61:22 66:9 86:23 99:22 104:13
**messing** 76:18
**met** 112:16,17 112:19 113:3
**metal** 82:1,2
**Miami** 2:4 60:10 178:5
**MIAMI-DADE** 176:4 177:4
**Middle** 30:16 68:25 69:23
**military** 52:5,10 73:16
**mind** 73:7 74:15 91:1 106:11
**Minding** 76:9
**mine** 30:17 35:12 69:1
**minutes** 126:2 135:1 136:5 148:25 150:19
**mischief** 76:13
**misconceptions** 71:21
**missed** 49:22
**missing** 172:23
**misspoke** 17:4
**mistaken** 114:22
**mom** 27:21 29:18 31:4,6,7 32:11,12,18 37:6,21 48:15 49:25 61:3,7 62:14 66:15,17 68:11 73:12 78:19,21 79:5 79:6 89:4,4 92:7 94:22 95:6 96:2 146:9,12
**moment** 25:22 37:25 95:11
**momma** 32:16 78:24 79:2 89:6,23,23 90:3,7,8,10 107:9 146:9,23 149:3
**month** 167:19
**monthly** 172:1
**months** 16:8 75:23
**moon** 36:1
**Moore** 114:9 116:8
**morning** 160:3 160:21
**Mosier** 116:20
**mother** 27:17,25 28:10 30:10 31:23,23 32:1 32:21 33:18 36:4,12,22 37:5,8,11 39:22 40:20 48:3,7,8 51:18 59:24 62:11,13 62:17,18 64:11 65:7,9,11,15 65:16 69:13,14 69:16,21 89:9 89:17 93:15 97:18 125:12 128:12,15,17 130:20 131:13 147:8 148:18 148:24 150:5
**mother's** 32:23 70:4 71:9
**motion** 113:20 113:21 118:15 119:22
**motions** 114:12
**mouth** 106:9

117:5 125:17 162:1
**move** 48:12 64:14 65:13 88:16 96:11,11 108:9 110:21 115:16,25 117:1,4,24 118:4 121:25 125:22 127:9 127:13 137:5,8 137:9,13,17 138:20 141:6 150:2 162:20 163:1
**moved** 141:14
**moving** 24:1 28:24 91:7 140:1
**MRI** 173:4,17
**MRIs** 171:2 173:5
**muddled** 137:16 137:18
**murder** 92:20
**must've** 17:4
**mute** 59:3,4

**N**

**N** 2:11
**name** 9:20,21 10:5,22,25 11:1,3,13 12:21,24 13:5 13:17 14:17,23 15:3 18:21 28:7 30:11,16 32:6,23 38:12 38:14,15,16,20 38:24 39:20 49:22,25 50:2 50:5,6,18,20 65:10 67:10 68:20,22,25 69:22 70:1 71:24 107:14 122:10,18 124:14 129:23 133:4 136:23 136:23 137:1 146:21 148:12 148:14 157:5 157:11,13,15 169:17 173:18
**named** 10:24 47:25
**names** 9:15 10:16,19 11:22 26:10 111:18 151:7
**narrative** 63:17 77:1 91:11
**narratives** 96:18
**narrow** 85:9 93:11
**nature** 172:10
**necessarily** 3:15
**need** 6:6,7 9:12 30:5 41:21 86:8 91:7 149:19 167:21 173:13,25
**neglect** 159:22
**neighbor** 47:25 49:8,16,22,23 51:15 64:9 73:14 100:8 122:17 126:17 126:17,19
**neighbor's** 50:6
**neighborhood** 38:15 49:21
**neighbors** 62:23 67:17 109:5
**Neither** 158:24
**never** 5:22 7:21 25:11 54:15,16 54:23 75:1,2 75:10,12,14 106:11 112:17 112:18,23 113:14 116:11 128:9
**new** 40:11
**news** 74:23 98:11
**night** 157:7,7 159:16 160:20
**normally** 56:19
**north** 14:2 73:11
**Notary** 1:20 176:14 180:17
**notes** 134:7 177:11
**notice** 1:21 30:7 178:18
**Novak** 86:24
**number** 160:8
**nurse** 18:3 157:4 157:13,22,25 158:5,7,8
**nuts** 123:15

**O**

**o'clock** 49:11 67:17 151:4 160:2,21,24 161:7
**O'Neal** 32:7,8 32:13,24 53:13 60:19 74:2,3 78:10,11,15 90:6 94:1 102:15,16 148:19
**oath** 7:22,25 8:4 8:5 20:20 26:15 101:9 118:21 176:1 178:11
**obfuscated** 137:18
**object** 19:16
**objected** 20:1 59:19
**objection** 21:6 21:10,16 22:5 55:11 59:15 127:2 154:3
**obligation** 23:22
**Obront** 2:2,5 4:16,23 5:1,7 5:10,18,25 7:7 7:14 9:1 10:21 11:4 12:10,16 12:24 13:1,5,8 13:10,12,19,21 14:21 15:14,17 17:3,10,12,16 19:16,24,25 21:6,9,14,18 21:21 22:5,17 24:19 25:8 26:22 28:12,21 29:16 34:4 35:1,8 38:17 38:21 41:5,16 43:20,23 44:6 44:10,17 46:6 46:9,22,25 47:3,11,15 55:11,18,21 59:15,18 64:2 66:23 77:22 78:1 81:20 82:6,10 88:7 88:13 94:10,16 94:24 101:11 103:6,10,14,24 105:10 106:11 109:16,21 110:2,7 113:23 115:2,12,21 117:22 118:1 119:17,19 120:3 122:11 123:5 125:8,24 127:2,15 131:25 132:3 132:11,17 133:12,21 134:2,6,10,13 134:19 135:6 135:14,18,25 136:10 138:2 138:12,22 139:24 141:2 142:8,12,21,25 145:6 153:4 154:3,14,19 155:5,8 156:1 158:2,4,17,23 162:8,13,18,22 165:12,17,21 166:15,18,23 167:5,18,21 168:2,6,14,18 170:9 172:3 173:8 174:3,5 174:10,15 178:4
**Obront's** 81:2
**obstruct** 137:22
**obvious** 154:4 165:25
**obviously** 63:19 154:8
**occurred** 47:10 49:12
**Ocean** 171:15
**October** 29:11
**offense** 23:23,24
**office** 1:9 11:11 56:5 81:3,5 178:14
**officer** 1:9 54:8 56:13 57:19,20 63:4 85:11,12 85:21 87:1 109:1 116:13 120:21,24 121:2,8,9,10 121:12,13,17 129:17 130:5 130:24 132:15 149:5,6,6,7 150:9,10,19,21 150:25 151:5,6 151:6,13,15,21 152:7,9,17,23

152:25,25 153:3,4,8,11 153:14,22 154:18 155:4 155:11,17,21 157:21,21 158:20 179:3
**officers** 58:4 70:17 74:20 139:8 150:23 152:5,6
**official** 6:3 176:9
**oh** 9:17 10:23,25 29:18 53:5 55:4,15 69:6 71:5 72:7 85:18 97:7 111:17 114:8 126:20 133:18 135:6 147:23 167:7
**okay** 3:14,23 4:14,25 5:20 6:9,11,22 7:1,5 7:13,14,24 8:3 8:10,12,14,17 9:7 10:8 11:19 14:1,6,16,25 15:7 16:5,9,24 17:16,18,25 18:12 19:3,10 20:12 21:1,4 21:17 22:3,12 22:15,18,25 23:12,15,24 24:14,24 25:17 25:23 26:9,13 27:8,14 28:2 29:3,10,13,21 29:25 30:4,6 31:1,5,8,12,18 31:25 32:3,8 33:7,14,23,23 34:5,21 35:15 35:23 36:5,11 36:16 37:2,17 37:20 38:5 39:2,6,14,18 40:23 41:25 42:5,9 43:11 43:15,22 44:12 44:13,17,19 45:1,14,24 46:2,5,22,25 47:5,15,18,21 47:24 48:20 49:5 50:10,17 50:24 51:2,6 51:21 52:6,14 54:17,25 55:9 56:3,11 57:3 57:11,17 58:9 58:14 59:2,7 59:11,21 60:23 64:24 65:6,19 67:1,6,14,21 68:14,24 69:9 69:18 70:8 71:18 72:13,19 73:4,17 74:8 74:11 76:16 78:8 79:19 81:9 82:12,15 83:2,4,25 84:5 86:5,19 87:11 87:18 88:16 89:22 91:18 92:23 93:14,20 93:23 94:8 95:13,23 97:15 99:15 100:24 101:24 102:4 102:12,18,21 104:18 105:24 106:7,14,16 107:25 108:14 109:10 110:2 110:19 111:2,6 112:3 113:2,10 113:19 114:2 114:11,15 115:16 116:2,7 117:10 118:10 119:7,24 120:18 121:1 121:10,14 122:2 124:1,7 124:22 125:9 125:20 126:1 126:18,21,24 128:4,8 129:2 129:9 130:13 130:24 131:4,8 132:4,8 133:5 133:9,20 136:10 137:7 138:11,19 139:4,10 140:21 141:12 141:16 142:24 144:4,20 145:13,23 146:15 147:12 147:18,21 148:7,21 149:11,22 150:9,18,25 151:10 153:2,8 153:11 154:19 155:14 156:10 158:12 159:3 159:20,23 160:1,5,17,23 161:10 163:11 164:2,5 165:1 165:10 166:15 166:21 169:3 169:18,25 170:14 171:5,9 171:15,18 172:6,22,25 173:8,15,23 174:9,14
**old** 25:4 32:12 32:20 33:4,7 62:13,19 68:11 81:16 90:24 148:10 149:7
**one-story** 36:21
**Oof** 130:16 153:19
**open** 85:3 88:2 89:15 94:4 95:23 111:9 116:9,10,11 147:3 156:11
**operation** 52:12
**opinion** 108:1
**opportunity** 6:18 23:21
**order** 174:20
**organ** 15:24
**organized** 43:2
**original** 178:17
**originally** 102:9
**outfits** 51:24 52:3
**outset** 7:7 166:9
**outside** 51:11 75:14 93:16
**outstanding** 54:4 58:5,6,13
**outta** 9:13 18:5 34:14
**overgrown** 41:2
**overnight** 35:18
**owned** 36:22
**owners** 40:12

**P**

**P-E-A-R-S-O-N** 129:20
**P.A** 2:7
**P.H** 129:17
**p.m** 1:15,15 174:25
**page** 2:17 129:16 179:3 180:1,10
**PAGE/LINE...** 179:6
**pages** 177:10 180:7
**paid** 171:18
**pain** 83:9
**paint** 37:24 40:4 45:8 47:5
**painted** 40:8 42:25 44:24
**painting** 40:11
**Palm** 60:11
**pants** 56:22 57:2 71:2
**paper** 54:5 87:8 122:11,12
**paperwork** 121:16
**Paragraph** 170:15 171:25 172:6
**paralyzed** 48:12 65:14 80:21 82:20 83:19 84:23
**paraplegic** 36:14,25 48:11 64:13 65:13 68:12
**pardon** 17:5 30:21
**part** 105:8 148:10 170:2,2 179:2
**parties** 177:15 178:18
**parties'** 177:16
**party** 178:17
**passed** 31:11
**Pat** 32:13
**Patricia** 32:24
**patrol** 148:22
**Paul** 66:20,20 78:18 89:5,19 96:25 129:6 130:19 131:15 131:19 133:3 146:20 149:5 152:19,20,20 155:20,21

**pay** 21:15 37:14 140:6 170:6,9 170:11
**payment** 37:7
**payments** 28:3 37:5,14
**Pearson** 129:17 129:22,24 130:5,19,24 132:9,9 133:1 133:2,2,3 146:21 147:16 148:22 149:5 152:23,25 153:3,5 157:19
**pending** 94:11
**people** 18:19 37:13,24 40:3 40:9 42:9,10 54:3,19 61:4 62:8,19 73:14 73:21 74:20 75:25 76:12 79:10 81:16 84:23 85:2 97:6 98:8 111:7,9,10,21 112:8,10 164:20 169:16
**Perfect** 7:15 46:22
**perfectly** 35:14
**period** 92:10 107:15,19,23 108:5
**periodically** 35:18 64:23
**permanent** 163:23 173:2
**perplexed** 132:19
**person** 74:25 98:9
**person's** 65:4
**personal** 164:17 164:20 165:3 166:13
**personally** 23:4 162:19
**phone** 25:3,4,4,5 25:8,12,19 26:3 51:18
**phonetic** 18:7
**phonetically** 13:13 50:11
**photo** 38:4 46:7
**photograph** 39:24
**photographs** 24:15,20,24,25 25:24
**photos** 38:6
**physical** 80:9 104:25 130:25 168:24 172:8
**physically** 80:8 80:14,15
**physician** 8:25 14:14 17:23 159:14
**pick** 64:14 95:2 97:20 139:7 140:15
**picked** 66:10 104:15 105:20 133:17 134:14 136:7 138:7,16 139:1,4,7 140:14 141:5,8 141:12,15,25 142:2,6 143:11 143:24 144:1 144:24
**picture** 2:18 42:21,22 43:25 47:5 51:19
**pictures** 25:3,13 25:18 26:5 43:14 51:18
**piece** 87:8
**Pierce** 1:2 14:3 27:6,13 47:19 66:20,20 78:19 81:11 89:5,20 96:25 129:6,22 131:15,19 133:4 146:20 151:6 152:2,19 152:20,20 155:20,21 157:21 159:10
**pill** 9:9 10:2,3
**pills** 9:22,22
**pipe** 40:17
**Pistol** 73:2
**pistols** 70:14
**place** 9:14 29:19 31:9 77:2 105:23 146:23 163:25
**placed** 93:23 94:14 118:24 131:17 133:2,5 148:21 164:9
**places** 60:1,12
**plain** 53:20,21 86:8
**plaintiff** 1:6 2:2 6:5 172:12
**plaintiff's** 7:10
**plea** 118:18,20 119:1,4,16
**plead** 118:13,14 118:14,16,18 118:25 119:8 119:25 120:13 120:19 121:20
**please** 111:8 113:1 122:1 170:16,18 178:11,13
**PLLC** 2:2 178:4
**PNC** 27:25 37:4 37:11
**pocket** 51:19 170:6 171:19
**point** 30:5 38:7 61:21 75:20 76:22 78:13 79:21 85:12 88:17 91:19,24 96:13,13,15 101:4 102:12 102:13 103:1 106:19 110:23 138:11 145:23 147:13 148:17
**pointed** 72:24
**pointing** 69:19
**police** 1:9 56:12 75:1,12 98:14 133:6
**Port** 173:16,20
**position** 98:18 98:22,24
**possession** 21:25 22:9,13 24:14 24:21
**possessions** 34:23
**possible** 8:10 28:17 58:23
**preacher** 140:22 140:24
**preexisting** 168:23
**premises** 150:24 151:5
**prepare** 24:2,5 24:11
**prepared** 24:7
**prescribed** 8:24 81:1
**present** 25:22 31:10 71:3 124:10 154:18 155:4
**president** 169:10
**press** 131:15
**pressed** 131:15
**pretty** 123:19
**previously** 15:11 24:8
**primarily** 6:17
**primary** 10:7,13 10:23 12:19 13:23 14:1,13 14:15 17:22
**printed** 46:19
**prior** 6:19 52:23 112:16 172:13
**prison** 18:5,16 76:3 167:8 169:8
**privileged** 23:16 162:17
**probably** 63:7,8 72:15 74:15,16 78:3,5 93:10 95:3 137:19 164:6
**probate** 28:5,9
**problem** 54:7
**proceed** 178:17
**process** 61:17 99:23
**proffer** 168:12
**profusely** 156:10
**promise** 23:15 110:13
**pronounce** 38:23
**pronouncing** 3:9
**proof** 52:1,3 70:22 77:8,10
**property** 40:13 41:12 50:25 51:1,3 73:11 73:13 92:1,4,7 92:8,10,14
**proportion** 34:15 54:1 74:9,12
**prove** 24:16
**provide** 128:18 128:20
**provided** 5:23

6:13 7:8 15:11
**provider** 159:13
**PROVIDES** 179:2
**Public** 1:20 176:14 180:17
**pull** 12:6 25:3,5 25:6,9,13,19 26:3,4 48:17 49:4
**pump** 70:15 73:2
**PURDY** 2:7
**purpose** 23:20
**pursuant** 1:21
**push** 66:9 83:16 104:13 105:8 105:13 107:1
**pushed** 66:8 94:21 97:17 104:4,5,12 105:17 106:21
**put** 8:3 18:18 37:8 38:6 39:20 40:19,20 48:9 58:6 63:3 75:12 78:17 84:7,10,16,19 90:1,3 95:13 96:24 97:1,4 97:16,21 99:6 104:22 107:4 117:5 119:14 129:7,8 131:18 133:3 141:20 143:6,8,19 144:7 146:1,5 146:6,11 149:9 150:15,16 158:8 159:16 160:23 161:25
**puts** 146:18

**Q**

**question** 3:20 5:8,25 19:23 20:1,18,20 35:12,13,17 55:19,22 88:8 88:14 91:6,23 91:24 93:2,5 94:10,11,25 112:25 117:20 118:1,2,6 125:9 127:1,16 132:1 134:25 135:4,22 136:2 137:11 138:4 138:23 139:24 141:3 142:2 143:4,17 151:17,18,24 151:25 156:2
**questions** 4:19 4:20 6:12 23:16,22,24 92:23 101:10 101:12,22 123:20 135:12 135:16 137:16 153:2 165:6,16 166:6,22 174:4 174:6
**quickly** 101:15 150:3 163:12
**quit** 117:19 143:17
**quite** 93:13 149:18

**R**

**R** 50:8
**R-A-Y-M-O-...** 50:7
**racist** 98:7
**Radiology** 171:6
**rage** 79:7 90:12
**railroading** 111:11
**raised** 29:7 32:11 106:20
**raising** 32:22
**ran** 104:14 105:19 133:16 133:20 138:15 139:6
**rank** 112:1
**rant** 135:10
**Ray** 47:25 50:1 50:6,7
**Raymond** 50:7,8 50:19
**read** 174:8 179:18 180:6
**reading** 96:17 178:16
**ready** 18:10 118:17
**really** 72:17 75:5,5 117:8,8 135:20
**rearrested** 160:1 160:10
**reason** 62:11 63:3 76:2 163:8 179:6
**reasons** 165:25 179:4
**recall** 8:6,9 9:21 10:4,16,19 11:1 14:17 21:24 28:7 32:3 48:22 56:8 121:14 159:12
**recalls** 154:10
**receive** 159:9
**received** 171:20
**recess** 125:25 126:3
**record** 6:9 8:13 21:10,19 24:3 28:22,23 46:13 59:3,9 63:3 66:23 75:1 77:22 102:7 103:6 104:7 105:10 107:20 113:1 134:22 135:3,8 138:25 142:8,13,22 143:2,10 168:12,17 173:7 174:10 177:10 178:24
**recorded** 3:15 6:6 44:11 76:25
**recorder** 41:20 65:25 74:7
**recording** 3:16 3:16
**records** 24:10
**RECROSS** 2:14
**red** 57:20
**Reddick** 38:11 38:18 122:9,16 122:17,18,18 122:19 123:22 124:8,11,14 127:8,22
**REDIRECT** 2:14
**refer** 7:12 15:25
**reference** 178:10
**referring** 38:1 59:14 129:18 172:18
**refuse** 165:11 166:21
**refused** 156:25 157:1,4,5,8,10
**refuses** 135:11
**refusing** 135:3 135:16,18,19 137:15 165:1,5 165:10,15 166:6
**regarding** 24:21 127:19
**Regional** 159:11 171:12
**regular** 56:10,14 56:21 57:19 58:4,12 153:22
**relative** 177:14 177:15
**relatively** 101:15
**relevance** 21:7
**relying** 6:16
**remember** 4:23 5:7 8:7 10:22 21:22 71:4 106:2 108:6,7 114:2 119:24 120:3,5,10,15 120:18 145:2 148:4
**remodeled** 40:8 44:25
**Remote** 1:13
**remotely** 176:6
**renting** 50:25
**repave** 40:12
**repeated** 85:16
**repeatedly** 102:14,22
**repeating** 20:4 102:6
**repetitive** 149:20
**rephrase** 35:2 35:14
**report** 116:20 132:9,10,18,20 132:22 149:9 160:6 177:7
**reported** 63:5
**reporter** 1:20 3:17 7:8 26:20 58:21 59:10 129:10 130:1 174:16,18 177:1,5,23 178:22
**reports** 24:4
**representation** 45:10

**represented** 114:8
**representing** 60:21
**request** 156:21 156:23 163:3
**requested** 177:9
**Research** 18:22 18:24
**residence** 62:3 151:1
**residing** 27:9
**resolved** 118:11
**respect** 62:18
**respectfully** 20:19
**response** 38:17
**responses** 6:17 7:1 93:12
**rest** 73:20 151:7
**restrained** 89:4
**restraints** 66:19 78:18 79:4 89:19 93:18
**result** 22:4 163:23 170:17 171:20
**resulted** 22:10
**review** 6:19 24:3 24:9,10 177:8
**reviewed** 6:22 7:3
**rid** 40:24
**rifle** 73:2
**rifles** 70:14
**right** 3:12 4:9,9 5:6,20,22 8:16 9:17 10:17 14:11,11,15 17:11 18:15,15 18:15 21:20 22:14,20 24:8 25:22 27:17 28:7,10,14 30:20 31:1 33:4,5 37:10 38:2,8 39:16 39:17 44:19,21 45:8,15,19,20 45:21 46:1 47:19 48:3,20 49:13 51:4,11 55:14 57:5,19 57:21 58:3 60:4 62:3,7,7 65:8 66:3,11 68:3,5,7 70:7 70:23 71:19 72:2 77:2,20 77:20 78:3,6 79:22 81:23 83:23 84:13,20 85:3,17,25 87:9,23 89:2 89:11,12 92:21 92:24 93:1 94:1 95:17,18 95:19,21 98:17 100:8,22 101:2 103:3,4,13,16 105:2,8,18 106:22 107:3 108:3,18,20 110:20 114:17 115:16,19,20 115:20 117:2 119:21 123:2 125:20 126:7 131:14,21 134:22 140:18 141:21 142:14 143:6,7,8,12 143:21 144:7 145:19 146:13 146:14 147:18 147:19 148:8,9 148:11 150:8 150:20 152:2 153:10 154:25 156:7,12,12 162:5 167:10 170:24 171:1,3 171:4
**River** 1:8 14:4,8 18:3,4 19:2,13 19:14 22:24 29:8,20,21,25 33:17,19 34:8 52:23 56:2,3 60:6 69:12 73:24 75:11 78:25 86:24 90:9 111:19 133:7 170:22
**road** 39:17 40:17 42:20 65:17 123:23 123:24 124:4 125:2 127:7 150:6
**rock** 40:19
**rodeo** 111:24
**roll** 39:19,21,21 66:9
**rolled** 65:18 97:17
**room** 103:19
**rude** 41:20 61:13 63:1 90:17 98:5 130:18 157:15
**RULE** 179:2
**rules** 5:24
**rumors** 99:3
**run** 16:19 66:10 72:1 95:1 97:20 136:6 138:9

**S**

**safe** 121:19
**sat** 148:23
**save** 152:3,3
**saw** 112:18 124:22 130:14 147:12
**saying** 4:6,8,18 20:22,23,24,25 24:17 34:25 39:2 41:5,9 43:3 67:4,6 73:22,23 74:16 80:12 83:15 89:8 91:9 102:14,18,19 106:10,24 108:4,7,25 109:3 110:15 111:5 121:24 132:16 141:11 143:24 145:4 152:13 154:13 166:12
**says** 12:11 160:6
**scapegoat** 98:21 98:23 99:7
**scared** 71:25 95:4
**scene** 129:3 130:6 156:15
**Scott** 38:12,19 122:9 124:14 124:16,20 126:10,11,14 127:21
**screen** 12:7 43:17,21,24 44:2 135:3 142:23
**seal** 176:9
**search** 54:2,4,6 54:6,9,11,14 54:15,19,20 55:1 58:11 86:8,9,11,13 87:2,9,14,16 87:21 88:9,20 92:19 93:5,25 94:2 106:5,18 111:4
**second** 79:14 127:3
**security** 164:3,7 164:8,14,24 165:7 166:3 167:1,11 169:11,13,17
**see** 11:5 12:16 12:17 13:14,23 15:14,17,19 16:8,21,21,23 18:10 20:9 26:15 27:25 30:5 36:1,2 38:3 42:21 43:18 44:2,3 44:13 45:4,16 45:19 51:22 54:8 65:12 77:20 79:8 81:22,22,23,24 95:7 96:2 97:19 103:18 104:8,10,11 107:9 113:11 123:7 125:20 135:7 142:23 147:23 156:3 157:6,20 158:9 159:17,18
**seeing** 16:6,10 18:6 157:15 159:15
**seen** 17:22 38:24 54:5,14,19 55:1 72:5 86:21 109:5 112:23,24 113:8,14 122:14 123:3,4 123:9 124:4,18 124:18 125:3 127:8 139:9
**sees** 44:17
**Selling** 21:25
**send** 158:25
**sense** 76:18 99:18 134:17 136:19
**sent** 173:9,19

**sentence** 116:12 120:10,16
**sentenced** 116:14 118:17 120:1
**separate** 179:3
**September** 176:10 177:19 178:6,16
**sergeant** 131:16 131:16 152:21 153:1 155:22
**served** 22:12 160:7
**service** 26:3 76:8 172:1
**services** 170:7
**session** 6:1
**set** 180:9
**Setting** 97:6
**seven** 71:6 73:18 76:4,7
**severe** 173:2
**shaking** 79:14
**Shamarak** 11:8 11:24,25 15:3
**Shamrak** 11:8 15:3,7,8,9 16:1
**share** 12:7 43:18
**she'd** 131:14
**SHEET** 179:1
**sheriff** 6:4 48:16 52:22 86:25
**sheriff's** 1:9 56:5,16,17 66:21 73:22,24 129:22 155:20 157:12
**shirt** 56:22 57:2 71:2 148:6
**shit** 99:12 125:10,11,12 125:13,14,17 140:3,5,6
**shoes** 62:6
**shoot** 72:3 79:8 79:11 86:25
**shooting** 79:10
**short** 125:25
**Shorthand** 177:1,23
**shot** 58:15,18 59:14,22 63:8 72:15 74:24 78:25 90:8
**shotgun** 73:2
**shotguns** 70:15
**should've** 63:5 75:3
**shoulder** 105:6
**shoulders** 139:12
**shove** 131:5
**show** 43:18,20 43:25 81:19,21 85:4 87:16,21 87:23,24 92:21 93:5 94:2 97:1 103:18 106:4 106:18 132:17
**showed** 26:13 51:17 84:6
**showing** 105:16
**shrubbage** 40:6 40:20 41:22,23 42:2
**shrubbery** 41:8
**sic** 9:23 10:24 11:8,8 48:1,1 50:9 57:20 66:20 99:2 140:24
**sickness** 172:9 172:11
**side** 42:18 143:12
**sides** 98:19
**sign** 119:3,4,6 119:10,14,21
**signature** 178:12
**signed** 119:1,5
**significant** 31:13
**signing** 178:16
**simple** 8:4 53:21
**simpler** 35:6
**simplistic** 35:3
**Sincerely** 178:19
**single** 31:16,19 108:7
**single-family** 36:6,20
**sir** 3:10,18,25 4:13,22 5:9 6:10,21,25 7:4 7:23 8:11 9:4 13:24 14:11 17:24 19:21 20:4 21:20 22:7 23:5,14 24:13,22 25:19 26:7,8,12 28:25 30:3 31:17 34:17 35:21,22 36:10 38:3,4 39:13 40:5 42:3 44:23 45:13 46:18 47:20 49:11 51:13 52:18 53:13,15 53:24 56:17,18 60:7 63:11 64:8 66:22 67:7,18,22 68:19 71:23 74:10 78:12 83:19 85:15 86:1,4 88:17 93:8 96:21,21 96:21 101:9 105:13 107:13 111:5,13 114:13 121:25 122:24 127:13 132:22 136:22 136:22,24 142:20 147:14 147:17,20 148:20 157:23 161:13 163:19
**sister** 13:18,21 15:5 25:2 36:3 48:10,12 61:7 64:19,21 68:9 69:14 81:8,10
**sister's** 68:20
**sit** 8:18 16:6 99:21 146:24 152:11,18 173:20
**sitting** 78:6 81:6 89:5 125:16 147:10 149:3,8 149:14
**six** 22:12,16 65:24 74:5 103:7,10,12,21 103:24,25 167:9
**skin** 62:9 147:23
**skip** 29:4
**slam** 95:2 139:7 140:15 141:16 141:18 143:19 163:17,23
**slammed** 105:20 134:14 136:7 138:8,16 139:1 140:14 141:15 141:19 142:4 143:11,15,25 144:2,24
**slapped** 141:25
**slow** 9:24 10:1
**smart** 93:4
**Social** 164:7,14 164:24 165:7 166:2 167:1,11 169:11,13,17
**sold** 28:4,9 37:4 37:7
**somebody** 38:7 40:2 44:23 55:2 59:14 61:6 72:1 86:21 87:4 92:13 108:15 108:16 109:25 139:7 143:19
**somewhat** 41:2 91:3
**son** 32:5,6 38:10 38:10 51:18 53:7 58:19 59:22 60:9,17 62:10 63:7,7 63:20 79:3,3 85:18,23 89:1 89:24 90:11 91:15,22 93:25 97:7 100:6 111:4 146:10 148:18
**soon** 111:25 174:12
**Sophia** 11:6,19 11:25 12:9 171:9 173:18
**sorry** 8:21 26:20 31:12 32:4 33:9 46:6,8 57:25 68:15,17 69:21 90:19 148:13 174:3
**sort** 168:24
**sorted** 19:4
**sought** 129:11
**Sounds** 13:12
**source** 163:17
**south** 2:3 73:11 178:4
**SOUTHERN** 1:1
**space** 105:7,17 106:19
**speak** 9:13 142:10 154:7 174:12

**speaking** 61:21 75:6 76:22 79:21
**specialist** 15:22 16:1
**specific** 159:14
**specifically** 106:2
**speculate** 63:24
**spell** 11:16,17 12:22,23 50:3 50:5,10 68:22
**spelling** 13:13
**spent** 160:17
**spoke** 115:21
**spouses** 31:14
**SS** 176:3 177:3 180:3
**SSI** 164:9 165:17 166:22 167:1,3,14 168:1 169:11
**St** 19:2 29:9,14 30:1 48:16 52:2 60:6 66:20 73:22 75:6 129:21 133:7 155:19 157:12 159:10 173:17,20
**stamps** 169:24
**stand** 113:20 114:12
**Standard** 174:22
**standing** 95:13 95:15,17 108:21 109:6 123:6,8,11,22 124:4 125:2 127:5
**stands** 146:18
**start** 7:20 30:10 70:1 83:8,9 99:5
**started** 11:13 17:6 18:6 83:21 105:2 165:17
**starts** 78:9
**state** 1:20 99:20 99:24 100:2 170:16 176:3 176:14 177:3 180:3,18
**stated** 19:6 20:21 24:1,9 73:25 84:13 88:20 103:1 114:16 153:17
**statement** 127:23,24 164:6 179:4
**statements** 127:18 128:18 128:20 129:2
**states** 1:1 169:10 170:15
**stating** 164:7
**stay** 30:20 31:4 33:20 35:18 38:14 46:3 49:24 50:19 53:14,15,19 60:6 62:4 111:19
**stayed** 32:18 146:4
**staying** 32:17 44:10 69:6
**steady** 61:2
**stenographic** 1:19 177:5,11 178:22
**stenographica...** 177:7
**step** 138:14 139:1 141:24
**steps** 136:20 137:4 138:6,12 138:15
**stick** 96:25 97:2 97:5 149:13
**sting** 52:12
**stipulate** 28:23
**stood** 146:22
**stop** 9:25 37:25 48:20 64:18,23 67:4 79:13 83:25 108:9 117:7 134:24 140:1 144:12
**straight** 39:15 39:16 83:10,11 108:4 123:19 128:2
**Straighten** 133:24
**streamline** 28:16
**street** 37:19 47:25 48:3 49:14,15,19,24 51:4,10,17 64:8 65:8 75:14 95:16 96:10
**strike** 32:4 127:1
**structure** 57:10
**stuck** 61:17
**stuff** 25:14 40:20 41:8 52:4 58:7 62:14 71:16 74:22,24 76:17 79:9 84:25 85:1 90:16,18 97:2 99:16 104:16 111:12 165:4 173:17
**subject** 55:3 165:24
**subscribed** 180:14
**substance** 179:2
**sue** 87:6
**sued** 23:1,3,6,10 23:11 98:15,16
**suffering** 172:8
**suggest** 178:13
**suit** 87:7
**suitable** 178:14
**Suite** 2:4,8 178:5
**Sunrise** 2:7
**supplement** 14:18 46:21
**supplemental** 164:3,8
**supposed** 101:2
**sure** 35:7,7 52:19 102:7 109:21 110:7 129:16
**surgery** 9:12 17:2,5,7,9 173:25 174:1
**surprise** 61:9
**suspect** 92:20
**suspend** 117:16 135:15 137:23
**sustained** 25:1 155:24 170:17 172:15
**SUV-type** 48:25
**SUVs** 48:24
**SWAT** 48:18
**Sweet** 62:16 75:20,23 114:16,20,22 114:24 115:9 115:14,15,18 115:22 116:3,5
**swell** 9:11
**swelling** 9:9,10 10:4
**swivel** 81:20
**sworn** 3:4 7:22 7:25 8:4 26:15 118:21 176:7 180:14

**T**

**tackles** 146:17
**take** 9:8,9,9,10 9:19,22,23 10:2,3 23:23 44:8 59:4 69:7 69:14 108:22 117:23 125:10 125:24 136:20 137:23 138:6 138:13 145:23 173:22 174:14
**taken** 1:19 8:18 24:25 178:10 178:15
**talk** 36:2 102:17 108:17 114:25 115:15,24 121:22 123:1 130:17,21 131:8 134:8,9 134:9 137:13 158:3 162:2
**talked** 5:7 86:8 115:23 124:7 148:24 165:22
**talking** 12:9 14:19 20:9 42:7,12,13 49:12 53:5,6 54:18 58:19 60:18 61:24 65:21 71:19 74:18,21 75:16 80:8 92:21 95:20 103:4 108:16 109:18 114:4 115:4,7 115:14 121:18 121:21 125:15 129:25 131:20 143:10 149:3 150:1,4 157:24 158:5 162:7 164:22
**tape** 41:20 65:25 74:7
**targeting** 100:3

**team** 48:18
**technical** 58:24
**telephone** 178:14
**tell** 9:19 21:11 29:6 35:13 38:22 53:17 59:17,20 62:24 64:4 66:17 73:1 74:17 78:16 79:10 88:21,25 89:2 91:2,16,25 95:3 98:6 99:9 99:18 100:9,14 101:8 107:6 109:14 119:13 122:13 125:22 131:14 135:23 136:8 137:9 139:17,22 140:2,19 144:12 152:7 152:11 165:22 167:16
**telling** 8:6 20:10 20:16 21:2 26:2 27:19 33:21 37:10,16 40:10 41:18 42:11 53:23 54:1,21 57:4 58:16 59:24 60:7,15 62:21 62:22 63:22 66:1 73:9 74:13,16 76:1 76:5 80:11 83:20,24 84:17 84:21 85:5,8 85:14 87:20 88:2 90:20,21 91:8,17 94:7 96:4 97:8 99:14,25 103:19 104:17 104:23 105:14 107:18 108:13 109:5 110:5,11 110:18 111:8 111:20 112:10 112:18 113:15 117:1,19 119:2 119:9 128:2 130:23 140:16 141:17 152:15 152:21 157:23 158:13 162:1
**tells** 58:3
**tempo** 137:20
**ten** 126:2
**term** 110:8
**terms** 8:4 20:7
**testified** 3:4 105:5 112:4,5 116:2 132:25 168:2,4,14,16
**testify** 8:9 63:25 113:16 116:7,9 116:10,14 117:2 118:6
**testifying** 8:5 142:19 143:23 154:9,17
**testimony** 5:23 88:19 111:2 118:10 128:8 141:22 142:20 144:14 155:3 161:20 163:16
**thank** 5:19,20 7:15 35:8 47:6 47:7 49:21 67:16 104:19 130:1,2 169:21 174:6,15,17,18 174:19
**themself** 92:15
**They'd** 75:17
**thing** 4:5 12:1 13:3 20:23 25:6,10,19 27:23 34:19 37:8 44:25 48:24 51:25 53:24 61:13 62:24 63:3 66:7 73:23 75:3 81:19,23 86:5,15 88:4 90:22 92:22 100:10 103:3,4 111:9 114:16 116:11,21,25 117:3 119:2,5 122:1 123:12 123:17 125:3,5 127:8 136:13 136:16 138:10 138:21 139:14 140:4,17,19,25 144:10 149:7 150:13,14 151:20 153:22 157:14 165:8 169:16 172:25 173:19,21
**things** 66:5 81:14,16 83:11 83:14 85:10 120:8 150:12 164:14,15,20
**think** 22:17 35:1 46:10 47:11 49:1 74:18 91:1,4 93:10 109:16 110:8 115:2 117:11 123:5 129:15 131:5 132:18 132:19 135:13 138:5 140:19 146:15 152:11 152:14 160:6
**thought** 92:2
**thousand** 122:25 137:12
**three** 16:8 46:10 46:12,20 80:22 82:19 84:22 142:9,13,22 144:1,2 173:5
**threw** 104:15
**throw** 112:2
**thrown** 137:21 143:4,5
**till** 160:21 161:8 161:18
**Tim** 86:24
**time** 1:15 26:24 27:18 31:2 32:9 33:10 35:12 37:12,20 38:8 39:10 40:14 47:22 48:21 49:6 55:1,4 60:1,12 67:4,4 69:2 78:14 89:22 90:13 93:15 111:15 112:24 113:8 130:8 132:6 134:16 136:21 139:18 139:22 144:13 150:22,23 151:2,5,8,12 151:20 153:18 154:21 157:17 160:7 168:8 169:9 172:9
**timeline** 161:2
**times** 61:1 65:24 74:6 122:25 134:1,20 137:12
**tinted** 71:15
**tired** 96:22 99:16 109:18
**today** 8:15,18 16:7 39:25 81:3,6 114:16 128:8
**today's** 82:25
**toilet** 83:10
**told** 5:25 16:25 18:4 20:2 22:11,23 33:8 33:17 35:21 43:10,13 44:16 58:11 62:15,15 64:9 72:21 75:4,20 79:7 85:20 87:16,21 88:10,12 90:8 90:12,14 92:6 94:2,3,19 96:16 100:6,7 100:10 101:7 101:18 102:1 104:4 106:3,3 106:8,11 111:7 111:9,14,16,17 111:19 112:5,8 112:10 113:9 114:15,21,22 114:24 116:3,5 116:15,18 118:22,22,23 118:23,24 119:21 122:9 123:16 124:13 125:7 127:4,9 128:15 129:7 131:2,17 132:5 133:16 134:4 134:16,24 136:4,13 140:18 141:1 143:7 149:9,21 150:15,16 156:9 157:2,6 160:12 166:4,9 166:25 168:7 168:25 169:20
**tomorrow** 13:15 13:24
**top** 48:2 49:16 50:21 61:3 145:16

**tore** 29:23
**torso** 141:18 143:5
**total** 10:9 170:20
**touch** 77:18
**touchy** 165:24 166:7,9
**Tower** 2:3
**track** 39:22 102:7
**trailer** 29:23
**training** 73:5
**transcribed** 3:20 178:12
**transcript** 177:8 177:9 178:11 178:17 179:18 180:7
**treat** 18:17
**treated** 18:13 19:6 20:15
**treating** 172:13
**treatment** 18:22 18:25 19:5 156:14,17,18 156:20,21,23 158:15,21 159:9 171:19
**tree** 40:19 42:1 48:2 49:16 50:21
**trees** 40:25 42:20
**tried** 25:12 26:3 34:11 104:13 105:8 107:8 145:25
**trouble** 18:3 19:11,13 75:11
**true** 177:10 179:21 180:8
**trunk** 150:11
**truth** 8:6 101:18 152:8
**truthfully** 8:10
**try** 4:24 23:19 25:6,9 43:17 50:10 75:15 88:7 107:11 146:3
**trying** 5:4 19:3 38:6 41:11,11 46:15 61:3,16 62:25 64:20,22 75:24 76:17,25 79:15 83:12,13 84:19 85:13 89:7 90:17,22 90:23 91:2,4 91:13 94:21 96:1 97:18 98:20 100:24 101:16,16 104:24 105:12 107:1 108:2,17 109:12,14,25 110:1,5,9,10 110:14,14 117:14 127:12 130:18 135:4 135:19 144:9 144:11,21 149:20,20 163:11 164:16 166:10
**turn** 78:1 109:17
**turned** 66:10 104:14 105:19 133:10,13 134:13 135:7 136:1,5 139:3
**TV** 69:17 74:23 139:9
**twice** 127:4 159:19
**two** 6:15 7:13 9:13 10:14,22 15:1 16:5 32:11 36:12 38:14 46:10 59:25 60:12 62:6 80:17 82:2,6 84:13 98:19 138:15 139:5,6 141:10 141:10,10,10 141:11,12,14 142:3 143:24 163:25 164:15 170:15
**type** 56:12 144:15

**U**

**U.S** 14:2 48:18 51:23 52:1 57:17 58:2,7 66:22 70:21,24 71:1,22 77:6,7 87:14
**uh-huh** 6:7 10:15 13:9,20 21:13 23:25 28:12 30:14 35:16 46:3 47:6 56:4 74:4 85:25 102:23 114:18
**uh-uh** 6:7 11:24 50:13 86:20,21
**undersigned** 176:5
**understand** 3:21 4:3,4,6,7 7:22 20:22 24:18 35:13 37:2 41:8,19 42:7 43:3 49:20 60:16 61:18 67:3 79:23 89:6 104:24 107:21 108:3 109:15 110:15 110:20 121:5 121:23 123:1 130:17,22 150:8,17 154:4 154:11 155:23 156:1 166:7
**understanding** 7:24 16:20 29:10 41:13 75:19
**uniform** 56:10 56:12,13,14,15 56:22 57:20
**uniforms** 57:12 70:18
**United** 1:1 169:10
**unmarked** 48:17 48:23 49:4 71:7,13,14,20
**unreasonable** 135:14
**unrelated** 172:14
**upset** 61:20 75:5 79:23 93:8
**use** 24:15 139:5

**V**

**Valentine's** 37:4
**Valle** 1:19 176:13 177:5 177:22 178:22
**van** 45:16,19,25
**vantage** 38:7
**various** 172:13 172:17
**vehicle** 133:6 148:22
**Vero** 11:9,24 13:4 14:8 18:8 18:14 19:14 28:6,8 32:12 32:15 36:3 39:20 53:7 56:2 61:9,11
**version** 77:1 117:13,14
**versus** 27:15
**vest** 52:1,3 58:3 71:1 77:8,10
**vests** 48:18 66:22 70:21,22
**video** 3:15,16 26:7,8 42:21 103:17
**videos** 26:6
**view** 61:21 76:22 79:21
**violent** 99:2,13
**visible** 155:25 156:2
**visit** 10:11 32:17 33:16,18 35:23 76:11
**visiting** 33:24 34:21
**vs** 1:7 178:7

**W**

**W** 86:7 169:9
**W-I-L-L-I-A-M** 67:15
**wage** 28:25
**wages** 28:19 170:20 171:24
**waist** 139:13
**wait** 12:8,8 79:13 88:13 94:11 127:15 138:22 141:2 161:18
**waived** 178:16
**walk** 39:17 47:8 47:9,21 68:12 80:18,23,23 81:14 83:11,13 87:5,9 92:13 108:15,16 149:4
**walked** 83:12 104:11,21 136:1,6 141:23 150:5 157:16
**walker** 80:19,20 80:24 81:13,14

81:15,22,23 82:2 85:7
**walking** 51:21 70:2 94:20 102:22 133:11 133:14
**walkway** 48:9 65:15
**wall** 134:23
**wallet** 11:2
**wanna** 107:17
**want** 7:20 17:19 26:25 28:16 34:13 54:20 63:9,16 67:3 72:6,7 92:11 92:12,25 93:3 93:9 94:6,9 102:7 108:2 126:1 131:8 135:14 138:3 140:9 143:16 162:10 163:12
**wanted** 26:22 47:4 95:8
**wants** 10:21 21:21 26:23 35:1 41:16 162:18 179:3
**warrant** 54:2,4 54:5,6,9,11,14 54:15,19 55:2 58:5,6,10,11 58:12 73:22 86:10,11,12,14 87:2,10,17,22 88:9,20,21,22 89:1 90:5 91:12,14,15,16 91:19,22,22 92:9,14,20 93:5 94:3 106:5,18 160:11
**Washington** 98:11
**wasn't** 28:3 32:10 33:13,13 33:15 38:10 49:3 52:14 69:11,12 109:21 110:7 131:14,18
**watch** 43:24 98:11
**watching** 69:17
**water** 9:9,21 10:2,3 80:4
**wave** 96:14
**way** 17:3 35:4,6 37:7 60:10,11 108:1 110:17 166:11
**we'll** 15:25 88:14 97:7
**we're** 60:18 78:2 135:19 146:15 166:18 174:6 174:20
**weapon** 70:9 72:10
**weapons** 70:12 72:20,24
**wear** 52:5 56:15 56:22
**wearing** 51:23 52:7 56:9,20 56:24,25 57:13 57:18 58:1 70:16,18 148:1 148:3,5
**Wednesday** 34:1 34:7
**weight** 112:2
**wellness** 11:10 12:2,12,15 18:14
**Wells** 37:12
**went** 19:12 26:3 27:19 48:1,5,7 48:8,10 60:5 61:8 62:10 64:5,9,10,11 65:7,9,11,11 65:12 67:8 69:19 70:13 73:12,13,14 79:7 90:12 130:9 137:5 156:19 160:19 162:4 173:16
**weren't** 37:14 84:19 118:21
**wheelchair** 81:7 81:12 82:12,16 82:18,22 83:5 83:17,22 84:1 84:4,8,11,16 84:20,22
**whipped** 65:16
**white** 38:13,14 38:15 49:3 62:20 71:14 74:20 87:3 98:7 99:10 153:6 173:11 173:12
**Whites** 99:4 111:11
**Whoo** 72:6 75:18 84:21
**wide** 88:2 94:4
**wider** 40:16
**wife** 31:20 108:21
**William** 36:24 67:11,12,13 68:18 69:4,6,7 69:15,17
**Wilson** 173:4
**windows** 71:15
**wish** 34:18 103:17 121:25
**witness** 3:3,5 4:22,25 5:6,9 5:16 9:3 10:23 11:7 12:14,23 12:25 13:2,7,9 13:11,14,17,20 13:23 14:22 15:16,20 17:8 17:11,15 20:2 21:8,13,17,20 21:25 22:7 24:17,22 25:9 26:25 29:18 34:5 38:8,11 38:19,22 41:7 41:18 43:22 44:8,15 46:18 46:23 47:16 55:12,20 58:23 59:17,21 64:7 77:24 78:4 81:19,22 82:8 85:3 88:10,16 94:19 95:1 103:8,12,16,25 105:12 109:17 109:24 110:4,9 112:9 113:17 115:20,23 117:24 118:3 119:18,20 120:5 122:5,7 122:12 123:8 124:1 125:10 125:20,22 126:25 127:4,6 128:11 129:11 130:2,25 131:4 132:2,5,16,21 133:16,23 134:3,8,11,16 134:24 135:23 136:4,12,22 137:1 138:9,14 139:16,22 142:10,15,18 143:2 145:9 151:14 153:6 153:15,16,20 153:21,24 154:2,5,6,15 154:23 155:1,7 155:9 156:4 157:2 158:1,3 158:7,24 162:11,20,25 165:19 166:2 166:16,24 167:7,19 168:4 168:7,16,25 170:11 172:4 173:10 174:19 176:9 179:3,4
**witnessed** 63:18 122:2,20,22,23 124:25 127:25
**witnesses** 30:8,9 112:3 124:10 126:8
**word** 53:20 97:24
**words** 106:1,6 117:5 161:25
**work** 29:4 50:1 66:20 129:21 151:15 152:20 155:20 157:22
**worked** 18:7
**working** 28:6
**works** 98:2 155:15,18,19
**world** 152:10
**would've** 63:8,8 72:15 159:6
**wouldn't** 34:18 75:16 96:3 125:18 143:8,9 159:18
**wrap** 163:11,15
**wrapped** 144:16 163:21
**write** 96:25 127:18,22,24 132:9 150:13
**wrong** 16:24 61:21 62:5,6,7 62:8,20 63:2

69:20 79:25 80:5 98:10 130:17 143:21 166:4 169:16
**wrote** 96:24 132:9 134:4 149:8

**X**

**X** 2:11
**x-ray** 173:17
**x-rays** 171:2 173:22

**Y**

**y'all** 66:18 79:3 89:24 95:3 97:24 130:17 130:18 146:10
**yard** 40:6,7 41:22 45:2,7 45:17,20 48:8 49:17,18 61:1 61:5 65:9,11 71:9 73:12 76:2,13 97:22 100:7,11 151:8
**yards** 83:18,18
**yeah** 3:13 12:14 13:2,11 14:15 14:22 15:8,17 16:3 18:17 22:23 25:9 26:22 33:8 35:8 36:19 39:12 40:7 42:8 43:23 44:15,20 46:14 46:14 47:15 49:1 51:9,9,24 53:1 55:7 58:23 59:18 60:20,22 70:15 70:25 73:20 74:7,10,10,10 74:17 77:10,17 78:5 81:15,24 82:4,9,17 85:20,20 86:25 86:25 88:23 92:17,19 95:12 95:22,22 96:12 97:14 99:2,2 102:19 103:16 103:23 104:22 105:25 109:16 110:2 113:23 114:21 115:7 117:22 119:20 122:13 125:24 127:2 128:7 129:19,21,24 131:25 133:21 134:6 135:6 138:2 139:3 142:25 144:19 145:22 146:20 147:1,2 148:15 148:16 152:18 152:21 155:13 156:11 157:4 159:25 160:15 160:19,25,25 161:1,4,7,9 166:25 167:1,9 168:14 171:4,8 172:21 173:24 174:5
**year** 55:14 161:18,23,24 162:4
**years** 22:12,16 28:8 32:12,20 33:7 55:7 62:13 75:24 76:4,7 80:22 82:20,22 84:23 90:24 126:20 152:11 167:9
**yelling** 60:25
**yellow** 37:21,21 38:1 39:3 40:5 40:9 42:15,17 42:23 44:19,24
**young** 11:12

**Z**

**0**

**00176** 128:23
**06** 67:25 68:1 167:8
**07** 31:11
**08** 57:21
**09** 166:3,25 167:16,20 168:20

**1**

**1** 2:17 7:16 14:2 177:10 180:7
**1,077** 171:10
**1,100** 171:16
**1.310** 179:2
**1:00** 1:15
**10/6/62** 29:12
**100** 2:3 100:16 124:3,5 127:5 127:6 172:1 178:4
**11** 32:12,20
**12** 32:12,20 74:23
**1216** 2:8
**13** 170:15 178:6 178:16
**13th** 176:10 177:19
**16** 171:25
**17** 172:6
**175** 177:10 180:7
**17th** 69:9 70:4
**18** 1:14 75:23 178:11 179:19
**18th** 34:3,6 82:25 84:2,3
**19** 42:14 67:20
**1987** 33:6
**19th** 34:3,4 47:10,12,13,14 47:15 53:8 85:21 87:13 95:14 100:4 101:19 102:5 112:22 113:4 113:10 155:25 159:16

**2**

**2** 2:18 7:17 30:5 124:15 126:9 129:15
**2:15** 160:4,22 161:9
**2:20** 160:4,22 161:8
**2:21-cv-14123** 1:3 178:8
**2:30** 161:5
**20** 34:2 148:25 150:19
**2001** 17:21,23 18:2 19:7,11 19:15 20:2,7 20:14 21:5,23 22:13,16 169:7
**2006** 18:6 22:16 167:14 168:9
**2008** 55:15,17 55:19,25 56:24 56:25 57:5,8
**2011** 76:3
**2016** 28:10
**2017** 25:1,5,25 27:4,5 31:8,8 31:21 33:10,25 35:20 37:3 39:10,11 40:1 40:23 41:1 42:14 45:12 47:10,14 53:8 54:13,25 55:9 55:25 57:14,15 57:24,25 67:20 69:9 70:5 83:7 83:8,21,23 85:21 87:13 95:14 100:4 101:19 102:5 112:22 113:4 113:11 155:25 159:7,13 160:10 161:17 161:22,23 162:25
**2017-CF** 128:21
**2017-CF-00176** 118:8,20 131:21
**2018** 36:18 68:13,14,18 84:3 161:23
**2021** 1:14 82:25 176:10 177:19 178:6,11,16 179:19 180:15
**20th** 47:12 159:6 159:13 161:22
**22,000** 170:23
**22,946.51** 170:23
**24** 159:24 160:18
**2455** 2:7
**25th** 173:19
**27,2023** 176:15
**272204** 176:14

**3**

**3** 2:14,18 46:7,9 47:1
**3:00** 161:6
**30** 134:25 136:4 148:25 150:19
**300** 48:24 49:1
**33** 33:5,7,8
**33131** 2:4 178:5
**33304** 2:8
**34951** 27:7,13

**3rd** 33:6

**4**

**4:15** 1:15 174:25
**4:30** 49:10 67:16 151:4
**4563** 171:13
**46** 160:7
**47** 2:18

**5**

**5** 11:5 12:5 49:10 67:16 151:4
**50** 124:3,5,5 127:5 133:25
**58** 90:24 152:10

**6**

**6** 12:11,17 46:3
**6:30** 160:24

**7**

**7** 2:17,18 160:24
**7,148** 171:6
**725** 14:2
**75** 29:19
**77** 30:22 51:7 67:24
**7703** 51:4,8
**7706** 27:12,16 30:24 36:14 46:2 48:7 64:12 65:3,5 69:3
**7802** 2:18 27:6 27:15 30:23 31:21 33:11 34:21 35:19 36:5 37:21 38:1 39:3,11 39:24 41:1 42:16 45:11 47:18 48:8,15 65:8 68:4 85:22

**8**

**80** 55:5
**800** 2:4 178:5
**80s** 55:5
**85** 55:6 62:13
**86** 55:6
**87** 55:6 86:21

**9**

**9** 160:2,20 161:7
**92** 86:22