IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Fort Pierce Division)

CASE NO. 21-CV-14123-KMM

JOHNNY EALY,

Plaintiff,

vs.

JOHN FINNEGAN, individually, and in his capacity as an Indian River County Sheriff's Office Police Officer,

Defendant.

______________________________________________

LOCATION: Remote Audio-Video Communication
Pursuant to Supreme Court of Florida
Administrative Order No. SCAO21-17

DATE: August 20, 2021

TIME: 10:00 am ET to 11:00 am ET

DEPOSITION OF JOHN FINNEGAN

Taken before Leila Harris, LCR, Stenographic Court Reporter, Notary Public State of Florida, pursuant to Notice of Taking Deposition in the above-styled cause.



APPEARANCES:

CURT DAVID OBRONT, ESQUIRE
Obront Corey, PLLC
100 South Biscayne Boulevard
Suite 800
Miami, Florida 33131-2017
Telephone:305-373-1040
Email:curt@obrontcorey.com, karlene@obrontcorey.com

Attorney for Plaintiff

ADRIANA MIHAELA JISA, ESQUIRE
Purdy Jolly Giuffreda Barranco & Jisa PA
2455 E Sunrise Boulevard
Suite 1216
Fort Lauderdale, Florida 33304-3115
Telephone:954-462-3200
Email:cecilia@purdylaw.com, adriana@purdylaw.com

Attorney for Defendant



INDEX OF WITNESS


JOHN FINNEGAN

| | |
|---|---|
| Examination By Mr. Obront | 4 |
| CERTIFICATE OF OATH | 51 |
| CERTIFICATE OF REPORTER | 52 |
| ERRATA SHEET | 53 |
| Read and Sign Letter | 54 |


**INDEX OF EXHIBITS**


| Exhibit No. | | PAGE |
|---|---|---|
| 1 | Photograph of a house with a chain-link fence | 8 |
| 2 | Answers to Interrogatories | 39 |




**JOHN FINNEGAN**

was called as a witness, and after having been first remotely duly sworn was deposed and testified as follows:

**EXAMINATION**

BY MR. OBRONT:

Q. Good morning. Can you please state your name for the record?

A. My first name is John, last name Finnegan, F-I-N-N-E-G-A-N.

Q. Good morning. Sergeant Finnegan, we are here today to take your deposition, as you are aware, in the Ealy case. Basically, I like -- would just like to ask you some background questions first.

Could you tell us a little bit about your employment history. I understand you're a sergeant now. If you would just kind of go back to -- yes, sir.

A. So after high school, I went into the military. I was in the Marine Corps for four years. Got out of the Marine Corps. Got hired at the sheriff's office. Worked as a deputy for two years.

Then I made detective. I was a

detective for eight years before I got promoted to sergeant. And then I've been a sergeant out here for the last two and a half.

Q. That's all with the Indian River County Sheriff's Department, sir?

A. Yes, sir.

Q. Thank you.

Now, directing your attention, Sergeant, to this case that happened back in 2017, and the exact date being, as far as my records, January 19, 2017. Can you tell us chronologically, sir, you know, what, if any, involvement you had with reference to Mr. Ealy on that particular date, sir?

A. As far as how the interaction became?

Q. Yes, sir.

When, if you can take me through it chronologically, if you could?

A. The tip came in. We were looking for a subject by the name of Christopher O'Neal. Tip came in from his girlfriend that he was staying down at his father's residence in Fort Pierce.

I reached out to the St. Lucie County TFOs, which is the task force officers for the U.S. Marshals, coordinated a plan to meet with



them. We met down on US 1. We sent solo TFO by to drive by the residence, try to figure out what kind of layout we are looking at.

From there, we responded to the residence.

Q. If I could stop you, I believe I know the answer, but so the record is the clear. When you're saying "the residence," sir, would it be fair to say you are talking about 7802 Lockwood Drive, Fort Pierce, Florida?

A. I don't have the residence in front of me, sir.

Q. If I hold this up -- I don't know if you can see it?

A. I can't see that.

Q. You can't see it. Okay?

A. I can see where it says my date of birth.

Q. Yeah.

A. I can see the date and time now, but I don't see the address.

Q. About now can, you see it?

A. I see the case number. I think you have got to go over to your left on the paper.

Q. Got it. Okay. My other left.



A. No. That's the wrong way.

Q. How about the other left here?

A. Go down a little bit.

MS. JISA: Do you want me to share the screen?

MR. OBRONT: If you could. Thank you.

*(Discussion off the record)*

THE WITNESS: I remember it was on Lockwood. I don't remember the physical address.

BY MR. OBRONT:

Q. I will represent to you, I have got 7802 Lockwood Drive, Fort Pierce --

MS. JISA: Do you see it?

THE WITNESS: Yep. Now I can see it.

A. That's the St. Lucie County Sheriff's Office report.

BY MR. OBRONT:

Q. Yes, sir.

A. I'm sure that's the correct address.

MR. OBRONT: Okay. So just for the record, we can take that off the screen now. Thank you.

Thank you, Counsel, for sharing that.

MS. JISA: No problem.



BY MR. OBRONT:

Q. So when you mentioned you had somebody drive by and you responded to that address, can you describe the address? In other words, what that address looked like, was it a residence, so on and so forth, if you could?

A. It was a single-family residence. There was -- there was two residences side by side that had a shared chain-link fence around them.

Q. Black fence?

A. I don't remember the color at all.

Q. Let me see if I get a photo.

A. I know -- if I remember correctly, it was a chain-link fence. I hate to say it, we are going back four years.

Q. This was 2017. That's correct, January 19.

MR. OBRONT: I will hold up what I will mark as Plaintiff's Exhibit 1 for purposes of the deposition.

*(Exhibit 1 was marked for identification)*

BY MR. OBRONT:

Q. This is that the black -- or the chain-link fence rather that --

A. Can you -- can you pick the picture up a little?
Q. I'm sorry. How about that?
A. I can't say yes or no. But I mean, that's probably it.
Q. Looks like it as far as you can recall?
A. I can't recall the color. I can't give a definitive answer.
Q. Other than color, that would seem correct?
A. Yes. It was that kind of chain-link fence, yes.
Q. Yes, sir. For the record, the Exhibit 1 seems to have a chain-link fence going horizontally across the driveway in front of a garage?
A. Yes, sir.
Q. So again, you said that that's a single-family home. And what would you do, sir, when you arrived there, and who were you there with?
I should have asked you that first. Who was part of that group or that team at that time?
A. I know it was myself, St. Lucie County,



Deputy Johnson. I believe it was a sergeant -- or lieutenant now, Pearson for St. Lucie. I want to say it was Deputy Marshal Brady, Sergeant Reeve with us.
I don't know. There was a handful of us.
Q. If I got it correctly, then, I believe you said it would be Officers Johnson, Pearson, Marshal Brady, and Sergeant Reese. Did I --
A. Reeve, Reeve, R-E-E-V-E.
Q. R-E-E-V-E, like as in Superman? Got it.
Anybody else that you recall or just the five of you?
A. No. I think there was -- I think there was one -- oh, man, Chuck -- I can look at my phone real quick. I can get you his last name.
Q. No worries. That's fine.
A. Where is my phone?
Deputy Singletary, S-I-N-G-L-E-T-A-R-Y, with St. Lucie County.
Q. It was you, along with the other five law enforcement officers that you named?
A. To the best of my recollection, yes, sir.



Q. And so tell me, then, when you pulled up in front of that residence with that chain-link fence, did you-all pull up together as a group?
Tell me about that, how you made the approach.
A. I can't recall exactly the approach on it. Normally, we would have two that would take position kind of on the outside of the area. In case the subject runs on foot, you kind of already have a hasty perimeter set up.
Q. All right.
A. And the remainder would actually go to the residence.
Q. Okay. Were you part of the group that went to the residence?
A. Yes, sir.
Q. Okay. And were you in your vehicle, or were you riding in someone else's vehicle that day, if you recall?
A. I don't remember.
Q. All right. And then you were in the first group to arrive. What did you see at the time you arrived, sir?
A. Just like I said, two houses, one fence surrounding it. We went to the target residence



where Mr. O'Neal was supposed to be.
Q. Do you know what information that you had regarding Mr. O'Neal at the time you got to that residence?
A. One of the marshals -- I can't tell you which one. One of the marshals received a phone call from his girlfriend who knew we were looking for him, wanted him to be, you know, captured safely without any kind of injury, had called the marshal, and basically told him that Mr. O'Neal was at his father's house down in Fort Pierce and gave us the address.
Q. Okay. So --
A. She had spoken to him just prior to calling the marshal and he was supposed to be down there.
Q. Okay. Now, when you arrived, did you see Mr. O'Neal -- how old is Mr. O'Neal, by the way, just approximately?
A. My age, roughly. I don't know. I don't have his date of birth in front of me.
Q. Approximately 35. I'm guessing you are about 35.
A. Ballpark. Somewhere in that ballpark.
Q. Did you see Mr. O'Neal when you arrived

at that property -- that residence?
A. No.
Q. Okay. So when you arrived, you pulled in front, what did you do? You exited the vehicle -- or you tell me.
A. We existed the vehicle. We made approach into the front of the residence. I set up a position on the southeast side of the garage. Another marshal went over to the southwest. The -- you know, you basically surround the residence.
Q. Okay. So if I am looking at the residence from the street, from where you pulled up, what -- what direction would I be looking?
A. I mean, actual corner direction, I don't know. If you are looking at the residence, if you use that as a north boundary, that's how I would reference it.
Q. You are talking in front of the chain-link like fence, looking at the house, what direction are you facing? Does that make sense?
A. Without me having a map in front of me to see which way that road runs, I couldn't tell you that -- I don't work for Fort Pierce.
So if you were talking here, I would be



able to tell which way I'm looking. Fort Pierce, the roads go by names, whereas up here, all of ours are pretty much, avenues, courts, drives.
I know ours. I don't know theirs.
Q. I'm not going to use north, east, south, or west. You mentioned somebody took a position at northeast and somebody took a position in the southeast. That was what triggered me, trying to figure out direction --
A. I'm just saying -- I am using it as, if you're looking at the residence, in you're looking at a north view --
Q. Okay.
A. A marshal took the southeast side of the residence. Another marshal took the southwest side. So you basically put four points around the house.
Q. Got it. So there were four positions.
Now, were you outside the fence that we saw in Exhibit 1, or were you inside the fence?
A. No. We are inside the fence, up against the residence.
Q. Okay. So you entered the fence. Did you jump over the fence? Do you remember?
A. No. The gate was open. The gate was



open.
Q. You walked through the gate of the fence?
A. Yes, sir.
Q. Okay. And so where were you on the property? Were you in the driveway or were you --
A. Where I would have been positioned is pretty much on the driveway at the edge of the house.
Q. Okay. And what did you observe when you entered the gate into the driveway area of the house?
A. There was a male subject off to the east of us. I'm using east as a general direction, not as an actual direction --
Q. East meaning -- I'm sorry to interrupt. You when say "east," do you mean towards the house?
A. If you looking at the house, to the right of the house.
Q. To the right of the house?
A. Where that second house was on that property. There were two houses that were side by side.
Q. Yeah, behind the fence?



A. Yep.
Q. Right. So did you later learn that was his brother's house who was a paraplegic?
Did you ever learn who was the owner of the other house?
A. If I did, I don't recall it. I -- I didn't ask who that house belonged to, I don't think.
Q. All right. But does -- so I see what you are saying. When you -- do you mean towards the other house, behind the same fence? Now that made sense.
A. Okay.
Q. Gotcha.
And so he came from the direction of the other house?
A. Correct.
Q. Reference your position, which was in the driveway?
A. Yes.
Q. Okay. And then tell me what happened, if you could, chronologically.
A. I don't know. He just -- you could tell he was agitated. He came -- starts charging over the yard in an aggressive manner. He was

cursing and screaming. Get the fuck off my property. What the fuck do you think you're doing. Just being real nasty, so I inter- -- stepped between him and the house at the edge of the driveway to stop him. I was trying to explain what I was -- we were doing there, and he had --
Q. Okay. I'm sorry. So -- so the first interaction, he was trying to -- saying get the eff out of here. Get off my property and words to that effect, and then he was walking, I guess, towards the -- the garage. Then you got sort of between him and the garage.
And what happened at that point? What happened when you get in between him and the garage? What happened next?
A. As I am trying to explain what we are doing, he has got a handful of mail or magazines or -- he has a handful of something in his hand, and he, like, raises his hand, puts it in my face and -- and pretty much, like -- I don't remember exactly what he said, but it was something to the effect of, I don't give a damn what you are doing here. Get off my property.
Q. All right. And what did you say when he put up the mail or papers that he had in his



hand and -- you know, and asked you get -- get the heck off his property or whatever? What was your response to that?
A. I grabbed his elbow and pulled his hand away from my face. Told him -- I said, we are not leaving. We are trying to find this person.
As soon as I tried to explain we are looking for O'Neal, he literally took his hand, and he just shoved me to try to push past me and started bolting towards the garage door.
Q. Okay. This happened pretty quickly, would you say, like, this whole encounter?
A. Yeah.
Q. Like a second-or-two-type thing?
A. I mean, I didn't count seconds on it, but it was quick.
MS. JISA: Object to the form.
BY MR. OBRONT:
Q. Yeah. So it was quickly. Just you grabbed his elbow and told him you are not leaving, and then he kind of pushed off of you and started walking towards the open garage door into the garage?
A. No. He didn't push off of me.
Q. He didn't push off of you?



A. He pushed me.
Q. You --
MS. JISA: Okay. Hold --
BY MR. OBRONT:
Q. First you grabbed his left elbow, if I get it correctly.
Do you remember how you grabbed his left elbow?
THE WITNESS: Go ahead, Adriana.
MR. OBRONT: What?
MS. JISA: No. I wanted to say that you guys are speaking over each other, and we are not going to have clean record, so you --
BY MR. OBRONT:
Q. I'll slow it down then.
So just to go through the chronology, he was to the east, where the other house is. He was saying, get the heck or eff off my property. After that, you got in between him and the garage and said, we are not leaving.
He had mail or papers in his left hand and was holding them toward your face. Then you said you grabbed his -- his elbow, and then I was asking you how you grabbed his elbow. I think that's where we left off.



Can you describe how you grabbed his elbow?
THE WITNESS: You okay, Adriana?
MS. JISA: Yeah. Go ahead.
A. I just reached up about right here where his arm is. I just grabbed his arm and pulled it out of my face.
BY MR. OBRONT:
Q. For the record, you were grabbing your elbow underneath your elbow, grasping it and pulling it, okay. So with your right arm, you grabbed his left elbow.
A. No. It probably would have been my left hand.
Q. Your left -- your left hand?
A. Probably. I'm right-handed. I shoot right-handed, so I try to do everything with my left hand.
Q. I see. Okay.
You're trained in military combat, obviously. You were a Marine?
A. Yes, sir.
Q. Okay. So you grabbed it because you felt his hand was getting too close to your face, and so you -- you grabbed his elbow to pull it

away from your face area where he was waving papers. Is that what happened?
A. No. It wasn't too close to my face. He literally put the mail in my face, like pushed it into my face.
Q. So yeah, how close to your face was he waving the papers, would you say? Was it a foot? Was it inches? How -- what was the closeness?
A. It knocked my hat off my head. It was there.
Q. So your hat was knocked off your head by the papers?
A. I wear a hat every day. I'm a hat guy.
Q. Yeah, but saying -- are you saying he knocked the hat off your head with the papers?
A. Yes.
Q. Now, are you 100 percent sure that he knocked the hat off your head with the papers --
A. I am 100 percent sure that when he put the papers up, it came close enough to where it hit the hat. It didn't hit me, but it was --
Q. Okay --
A. -- that close to where it hit the hat.
Q. Okay. So then you're not saying he knocked the hat off your head with papers -- with



the papers?
A. Knocked it up; knocked it off.
Q. Knocked it up.
Would you -- in other words, you would like to change it to, knocked it up, rather than knocked it off?
MS. JISA: Form --
BY MR. OBRONT:
Q. Well, initially, you said --
No. No. I'm going to rephrase it.
MS. JISA: Okay.
BY MR. OBRONT:
Q. Initially, you said, he knocked the hat off your head, correct? Do you remember that a second ago?
A. I know you can't see because this -- because it's an audio.
When the paper is hit, it knocked it up to where it came off of my head where it wasn't sitting the way my hat sits.
Does that make sense?
Q. So you are saying that the papers had contact with the front flap of your hat, and they made it move upwards, but did not knock it off of your head. Is that what you are saying?



A. The hat did not come all the way off my head. The papers hit the brim of the hat and pushed it upward.
Q. Okay. Then he was -- he was facing you at that time?
A. Yes. We were face to face.
Q. And then isn't -- at that point isn't it true at that point, he walked towards the garage? He was going in the house?
A. No.
Q. He wasn't walking into the garage?
A. No. We are still trying to have a conversation at that time.
Q. Okay. So just go through the chronology. He told you to get off the property. You told him no, and you got in between him and the garage. Then he was waving papers that touched your hat, again telling you to get off the property. At that point, you grabbed his elbow, and what happened at that point?
A. You have the chronology all messed up.
Q. Then you correct whatever I just said that is messed up.
A. He approached aggressively, screaming at us. I interjected with -- between him and the



house in the driveway. I tried to explain to him why we were there. He raised his hand with the papers, put them in my face, hit the brim of my hat and said -- again, this is not a quote, but something along the lines of, I don't care why you are here. Get off my property.
I grabbed his elbow because his hands were still up here, pulled his arm down. I said, We are not going anywhere. We are looking for Mr. O'Neal. We received information he is here.
From that point is when he didn't just walk by me, he pushed me and tried to walk through me to get to the interior door of the garage.
Q. So again, this is what transpired in that brief time period. I think you said it was quick. You didn't have a watch, but it was -- it was quick, like a second or two?
MS. JISA: Form.
BY MR. OBRONT:
Q. What that roughly --
A. I am not going to put a time frame on it. I don't know.
Q. But the first contact that you had, other than the papers, was when you grabbed his elbow. Would that be a fair statement?

A. Not trying to sound condescending, but I guess, it is your opinion what contact would be. I mean, physical contact or contact --

(Simultaneous Speakers)

A. -- for us contact is as soon as we make contact with anybody. Doesn't matter what kind of contact.

BY MR. OBRONT:

Q. Yeah. Good point. Physical contact. Yes, sir.

A. First physical contact would be his throwing the papers up, and intent or no intent behind it, put the papers in my face. Yes.

Q. Okay. Then the next physical contact was you grabbed his elbow?

A. Yes.

Q. Then you pulled his arm away from your face?

A. Correct.

Q. Then at that point, you say he pushed you. How exactly did he push you?

A. He, like, straight put his hand into my vest and pushed me backwards.

Q. What -- which hand did he use?

A. Facing toward the road. It would have



been his right hand.

Q. Okay. And after he pushed you with his hand, what happened after that?

A. He started the darting toward the door.

Q. The garage door?

A. Interior garage door.

Q. Okay. And were you outside the garage prior to that? Were your inside the open garage door?

A. I would say, like, within the threshold of garage itself.

Q. Okay. What did you do when he started walking towards the door into the house? What did you at that point?

A. When he pushed me, I got -- when I got knocked backwards and came off balance, he went to go around me. I reached over, grabbed him, and then from there, I pretty much bear hugged him, essentially, brought him to the ground.

Q. Okay. So you grabbed him from behind if he's walking -- going towards the door, I would imagine -- or you tell me. You have him in a bear hug --

(Simultaneous Speakers.)



BY MR. OBRONT:

Q. Well, you were to his rear? You were in front of him --

A. When he pushed me, I was in front of him.

Q. No. I am talking about when he was walking away toward the door to the house?

A. He never really got to walk away.

Q. How many steps did he get to take?

A. A step or two.

Q. All right. Then after he took that step away towards the door of the house, he at that point, is at least slightly in front of you.

Would that be a fair statement?

A. I wouldn't think it would be. Like I said, when he pushed me, he pushed me backward, which would have given me a step or two to regain my balance. I don't think he would have been past me at all. I think it would have been more like a side hug.

Q. So, you think you grabbed him from the side, as opposed to from his rear?

A. Yeah. I would say, it was a side or a quarter hug. I wouldn't say it was a rear hug.

Q. Okay. When you say, a quarter, that



would place you where?

A. Towards, like, the buttocks area.

Q. Okay. So the -- the side rear for lack of a better term?

A. Yeah.

Q. Okay. Then do you recall throwing him down to the ground?

A. No.

Q. Do you recall lifting him in the bear hug?

A. No. I recall being off balance when I grabbed him and us going to the ground. I didn't grab him and slam. It was more of a tackle, essentially.

Q. Okay. You didn't lift him at all when you bear hugged him?

A. I don't know. I'm 6 foot 5. He is not that tall. I might have lifted him. I don't know.

Q. After you might have lifted him, did you take him down to the ground?

A. Yes.

Q. How did you do that? Do you recall?

A. Took him to the ground.

Q. Could you be more specific on the body

mechanism you used for the method you used to take him to the ground?
A. The easiest way I can explain it, if you watch football, when they tackle somebody, they kind of go to the ground with them. I don't know how to --
Q. For the record, you were putting -- you were kind of putting your arms in an upward and semicircular motion --
A. If I may -- if I may, have a couple of rifles here. I had to kind of come up to get around the magazine. Otherwise, I would have hit it, but it was literally like -- I don't know, a football tackle. I don't know how else to explain it. I mean, it was me taking somebody to the ground.
Q. All right. And do you recall him cutting his elbow and knee after he hit the ground?
A. I remember a scrape on the elbow. I don't remember the knee.
Q. Do you recall if this scrape on the elbow was bleeding?
A. Yes, scrapes bleed. Yes.
Q. Do you recall the scrape on the knee bleeding?
A. I don't recall there being a scrape on the knee. I'm not saying there wasn't. I just don't recall.
Q. Okay. And then what happened after that?
A. He was secured and handcuffed and walked over to sit at the end of the driveway.
Q. And did you have any further interaction with him at that point?
A. At that time, no.
Q. Then at a subsequent time?
A. A short time later, yes.
Q. Okay. Tell us about that. What interaction did you have?
A. You wanted me to go chronologically, so wouldn't you rather know the rest of the story first?
Q. Well, what are we skipping?
A. The whole interaction with his mother or whoever the lady that is that lived in the residence that came outside.
Q. Okay. Tell us about that. We will come to the interaction with him.
A. So there was a female. I think it was





Ealy's mother, O'Neal's grandmother, but I could be mistaken on the relation, who heard, the obvious commotion out in the garage. She came outside.
She gave us permission to go search the residence which, we did. After we secured everything and we sat down and talk to her, initially she tried to say that she hadn't talked to her grandson in several days. But once I explained that we were there because he was wanted for attempted murder, her whole demeanor changed with us, and she became very -- what is the word? I don't want to say cooperative because she still hit some facts, but she was a lot more understanding of our purpose.
She changed her story and said he was there that morning -- or she said he was the day before visiting that he left with his girlfriend and another female.
Q. Did you have a warrant to search the house?
A. No. We don't need it.
Q. So you had no warrant to search the house then; is that correct?
A. Correct.



Q. Did you have your guns drawn?
A. To search to house?
Q. No. When you were on the property.
A. I would hope so. I can't answer that question for sure. I would hope I did.
Q. Did you have your guns drawn when you entered the property initially through the gate?
A. That's what I was talking about. I would hope we did.
Q. Yeah. Okay. So your guns where drawn. Mr. Ealy -- my client, Mr. Ealy, tells you to, you know, get off the property. You have already described that encounter with him. You weren't going to listen to his request.
Do you remember the guns being pointed at his mother?
A. Maybe when she first emerged from the interior of the house, possibly. It wouldn't have stayed on her, though.
Q. And did you recall having any adverse-type conversation with her between you and her in terms of, you know, aggressive-type conversation between --
A. No.
Q. -- the two of you?

A. No. She was nice to us the whole time.
Q. And you were nice to her?
A. Yeah. Once we had the house secured, we could actually sit and talk, not have to worry somebody coming out the door and shooting at us. Yeah.
Q. Initially, there might have been some aggressive communication between you and his mom?
A. No.
MS. JISA: Form.
BY MR. OBRONT:
Q. No. There never was? Never any curse words or anything like that?
A. No. I don't recall cursing at her at all.
Q. Okay. Any other witnesses besides the law enforcement officers that you mentioned that were in or about the area of the home that you can recall?
A. Witnesses to the incident itself, no.
Q. Then you said you searced the house. You saw that the person that you were looking for wasn't there. The mom told you he hadn't been there since the day before.
What -- chronologically, am I missing



something, or what was the next thing that happened?
A. So far, you are right.
Q. Then what happened after that?
A. Then I made contact with Mr. Ealy again.
Q. At this point, he is in custody. He is handcuffed?
A. Correct.
Q. Now, did he commit any crime when you encountered him, he was asking you to leave the house and get the eff off the property when he was at the house next door, approaching from the property adjacent to the -- this property --
(Simultaneous Speakers)
BY MR. OBRONT:
Q. Yeah. When he was cursing and telling you to get off the property, get out of his house, leave, get the eff out of here, all those things, you said he said when you initially got there at -- you know, he was walking over.
At that point, in your opinion, had he committed a crime? Was he going to be arrested? Did he do something illegal?
A. Up the point in time when the



confrontation happened, no, it was a freedom of speech.
Q. Okay. All right. So what was the reason he was arrested?
A. Because once he got into the point where he actually took me off the duties that we were there for, that's obstruction. And then once he pushed me, that's battery.
Q. Okay. So when you said he took you off the duties you were there for, could you elaborate on how he took you off your duties?
A. Yes, because I had to neglect the other marshals that were to look for a person who was wanted for attempted murder. So he is interfering. He's objecting us from being able to do our duties to serve a warrant on a person we received creditable tip information on. He caused me to have to deter all my focus from that to him.
Q. So you're saying a "warrant." That's why maybe I'm a little confused. Did you say there was an arrest warrant that was issued?
A. Yes. We had an arrest warrant. He's wanted for attempted murder.
Q. Okay. So a judge had signed the warrant for his -- Christopher O'Neal's arrested?



A. Yes.
Q. Okay. You were there to serve an arrest warrant on Christopher O'Neal?
A. Yes.
Q. And you had a tip that he was in the house?
A. Yes.
Q. And so it is your testimony, then, that you could simply just break into the house whether or not you had consent or permission by Mr. Ealy who lived there?
MS. JISA: Form.
A. The "break" into a house is a far stretch of words, isn't it?
BY MR. OBRONT:
Q. Mr. Ealy lived at the house, correct? That was his residence. He lived there for years, right?
A. Do we know that at the time? No.
Q. He told you to get off my property. You told he --
(Simultaneous Speakers)
BY MR. OBRONT:
Q. Well, his house was behind the same safe fence, which is his paraplegic brother's

house. But in any event, he told you, Get off my property, didn't he?
A. Yep.
Q. Okay. It was his property, wasn't it?
A. Determined later, yes.
Q. All right. So are you telling me that if somebody tells you to get off their property, and get the heck out of here or whatever the exact words were, that that's obstruction of justice and a crime?
I think that's what you just said. I'm just clarifying so that I'm understanding it.
A. You are trying to put words into it that don't exist, but I expect that.
No. I am telling you that the minute he decided to pick his hand up, put the mail in my face and no longer listened to my explanation of why we were, because we had a lawful reason for being there, and he caused all of my attention to come what we were legally allowed to be there for to do, that's verbatim.
Q. So that was the obstruction when he put the mail in your face?
A. Causing my attention to go from our duties to him, yes.



Q. Okay. So at that point, he's now under arrest?
A. Could have been, yes. I wasn't going to go that route. I was going to just kind of get him off the property and deal with him afterward, but then when he decided to take the next elevational step and pushed me, there was no more steps.
Q. That's after you grabbed his elbow, isn't it?
A. Uh-huh.
Q. That's a yes, right?
A. Yes.
(Simultaneous Speakers)
BY MR. OBRONT:
Q. Now, you gave some interrogatory responses to interrogatories that were served in this case. Do you recall that?
A. No.
Q. That's the sworn statement that you give with counsel as to exactly what happened in this case.
A. I'm not following.
Q. Defendant Finnegan's Sworn Answers to Interrogatories that were signed by you under



oath?
A. I know you keep trying to hold it up to where you can read, but it's -- I can only see the word "Interrogatory."
Q. Yeah. I'm just showing you the caption, the Interrogatories.
A. I have never seen that --
Q. Yeah.
MR. OBRONT: We will -- it's part of the court file. We will mark this as Exhibit 2.
*(Exhibit 2 was marked for identification)*
BY MR. OBRONT:
Q. Do you remember in your answers to interrogatories -- first of all, do you recall giving a sworn response to a interrogatory with your counsel that is representing you in this case under oath?
A. Is that -- is the interrogatory -- is that the paperwork that was sent back a month or so ago?
Q. Yep.
A. Yeah, I briefly --
MS. JISA: Go ahead and finish then --



A. I briefly remember doing it, so.
(Simultaneous Speakers)
BY MR. OBRONT:
Q. So also you had done a report in this case as well, police report, incident report?
A. Adriana was trying to say something.
MS. JISA: Thank you.
Can you share whatever it is that you are attaching as an exhibit because, otherwise, the witness cannot follow along. Obviously, he doesn't have that paperwork with him in the car, so is there something you want him to look at or answer from --
MR. OBRONT: No. No. There's nothing I want him to look at.
MS. JISA: Okay. Well, you know, your basis for impeachment, if that's what you are trying to do, you --
MR. OBRONT: Do you have an objection? It's form.
MS. JISA: Yeah. I have an objection to --
BY MR. OBRONT:
Q. Sir, you have made a police report in this case as well?

A. Yes.
Q. And you're careful when you do police reports to put all of the important facts regarding the incident; in this case, battery on a law enforcement officer into the report.
Is that the fair statement?
A. Yeah.
Q. Isn't it a fact, sir, that nowhere in your incident report do you ever say that the papers touched your hat, moved your hat, or even came in contact with your hat, period?
A. No. It is not a vital fact.
Q. Okay. Now, you know, four years later, after giving sworn Answers to Interrogatories, which by the way, don't mention anything about papers coming into contact with the hat -- after doing a police report shortly after the incident, which say nothing about any physical contact of the papers or mail in his hand, you are now four years later saying, oh, I remember the papers touched my hat, and moved it.
Is that your testimony, sir?
MS. JISA: Form.
A. Do you pronounce your last name Obront?



BY MR. OBRONT:
Q. Yes.
A. Mr. Obront, the fact of the papers touched my hat was not the elevational charge of what I was going to go after him for.
You would have never heard me say it had you not asked, Can you reference how close the papers came to your face? I would not charge somebody over a petty crime like that. I'm not that kind of way.
So if you hadn't asked for the direction of the question to be answered on how close the papers were to my face, you would have never heard the words come out of my mouth. I'm not a petty cop. I don't believe in petty crimes.
So you asked the question. I gave you an answer of a relative fact on how to tell you how close the papers came to my face.
Q. So just a back up, then. You are recalling that the papers came in contact with your hat and moved your hat slightly fours years this incident, even though it is not documented in your report or in your sworn interrogatories?
A. Absolutely.
Q. And you are saying that the reason you



grabbed his elbow, as you put it, was the papers touched your hat; is that --
A. No. No.
Q. -- is that what you're saying?
No?
A. You have the papers didn't touch my hat. When he put his hand in my face, I would have grabbed his arm to move it out of my face because when I can't see what is being done because my view is blocked by papers, I am now at risk.
For all I know, his other hand could have been making a haymaker towards me. I'm taught very well on how to defend myself, just like if I have somebody aggressively walking up, I don't have to wait for any interaction before I give him a palm hailed straight to their chest to him out of my way.
I know the legal limits of what I'm allowed to do. I grabbed his arm as a response to his action so that I had full view of what my front angle of him would have been.
Q. Okay. So just to clarify, then. You're not saying the reason you grabbed his elbow was because the papers touched your hat; is that a



fair statement?
A. No. I was just using that to give you a reference of how close the papers were to my face.
Q. Okay. I think you already stated you would have grabbed his elbow irrespective of whether or not there was contact with your hat by a papers; fair enough?
A. Yes.
Q. Okay. Now, I think we left off in the chronology that he was handcuffed, and you did have a -- more interaction with him.
That's my understanding. Correct me if I'm wrong. Is that correct? I think that's where we left off.
A. Yeah. I told you she did come off and say he was there and -- yeah.
Q. Then what about with Mr. Ealy? What, if any, further interaction, if any, did you have with him?
A. It was -- for the best-case scenario, for the situation that was in hand, it was -- I'm drawing a blank on the word I'm trying to think of today. I'm sorry.
It would have been a normal

conversation between you and I, if we had a difference of opinion on something. It wasn't an argument. We weren't yelling at each other. It was just a difference of opinion.

I don't know what the word is. It wasn't confrontational. He apologized and said that he didn't mean for me to get pushed, which I don't understand. But that he wanted to know why we were there.

Then he pretty much asked if there is anything he could do to not go to jail. I mean --

Q. Did he say that, you know, he was pushing off of you to go into the house after you grabbed his elbow or something to that effect, if you recall?

A. He -- yeah. He basically said, he was trying to get through me to get back to his house.

Q. All right. And any other interaction with him other than that?

A. No. I mean, like I said, for the situation total at hand, it ended pretty well, in my opinion, on him and I. But...

Q. Okay. If I might have a moment to go through my notes. I think I may be done.

*(Recess)*



BY MR. OBRONT:

Q. With represent to use of force in arrests, you are trained, of course, by the Department within those guidelines; is that a fair statement?

A. Yes.

Q. And I believe the guidelines are under 4010.30. Does that ring a bill in terms of the guidelines?

A. Yes, sir.

Q. So I guess we could all agree this would be characterized as non- -- the use of nonlethal force?

A. Yes.

Q. Yeah. Do you feel it was necessary to put him in a bear hug and tackle down to the ground, as you put it in your words? Do you think that could have been done with a lesser degree of force without causing him to have the abrasions and hit the ground, so on, so forth?

In other words, to use a lesser degree of force to effect an arrest for this case?

MS. JISA: Form.

A. I have never done this in a civil case, but can you give me an example of what a lesser



force would have been?

BY MR. OBRONT:

Q. Sir, stop, and put your hands in the air. You're under arrest. Something to that effect. See if he complies.

If there was several officers there with their guns drawn, you know, sir, stop, you are under arrest. It could be a variety of ways I could think of.

A. Sure. But he's made it perfectly clear that our requests for him to stay back, to leave us be. Those were already disregarded. Verbal was no longer in place.

He elevated it from a passive to an aggressive elevation of force when he put his hands and pushed me out of the way. Now, are there alternatives? Absolutely.

I could have tazed him. It was well within my means. The problem with tazing somebody is you can't control their fall. So that's all I would have needed was to taze him. He winds up hitting his head, splits it open.

Now, I have not only a tazering report that I have to do; now, I have to get him medical attention. He has split his head open. He has



got stitches.

I could have pepper sprayed him. That could have affected everybody in the garage. It is an un- -- unnecessary exposure to myself, him, and the other four cops that were on scene.

No, I used the least amount of force necessary. Had it not been for the fact he pushed me and caused me to be off balance, we may not have had to go down the way we did.

Q. How about just grabbing his arm and, you know, having --

A. I had already done that -- I already had done that the first time when he put his hand in my face. He --

Q. No, I'm -- I'm saying as he was walking away.

A. I had already done that the first time he put his hand in my face. I grabbed his arm, and that just led him to go to an aggressive passing. It was no longer verbal. It was now a physical resistance.

So I grabbed his arm, and then what, he throws a haymaker at me? My job is to defuse the situation with the least amount of force necessary to intend to not injure anybody. I think I did a

pretty good job at that. My force was very reasonable and very minimal.

Q. Okay. So I guess the short answer then is: You don't feel there could have been any less physical force that you could have utilized to defuse this particular situation?

A. No.

Q. That's not your answer?

A. No. My answer is what I said. I used the minimal force necessary to completely eliminate any further threat.

Q. Not -- that was my question.

There was not a more minimal force alternative than the one you used. That's my question. It's just the same question asked another way. So I believe we are both basically saying the same thing.

MS. JISA: Form.

A. I don't like the way you are putting it because you're trying to make it sound as if there wasn't. Of course, there is. There's always a lesser means, but not to get the job done.

You need to do it where it is safe for everybody involved. So again, I used the minimum force that was necessary to end a hostile



situation that was progressing to get worse, period.

MR. OBRONT: Okay. If I could just have one more moment to look through notes. I think this time, I'm actually done.

Thank you very much. I have no further questions.

And Sergeant, thank you for coming.

THE WITNESS: Thank you, Mr. Obront. I appreciate it.

MS. JISA: No questions, and we will read.

If it orders, we will order.

*(The deposition was concluded at 11:00 a.m.)*



**CERTIFICATE OF OATH**

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE)

I, the undersigned authority, certify that JOHN FINNEGAN personally appeared before me and was remotely duly sworn on August of 20, 2021.

WITNESS my hand and official seal this September of 21, 2021.

Leila Z. Harris, Stenographic Court Reporter
Notary Public - State of Florida
Commission No: HH 144004
My Commission Expires: September 13, 2025



**CERTIFICATE OF REPORTER**

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE)

I, Leila Z. Harris, LCR, Stenographic Court Reporter, certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness; that the witness did not waive reading and signing.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.

Leila Z. Harris, LCR
Stenographic Court Reporter

Please attach to the 8/20/21 deposition of JOHN FINNEGAN in the case of EALY vs. FINNEGAN.

INSTRUCTIONS: Please read the transcript of your deposition and make note on this page of any changes. Do not mark on the transcript itself. Please sign and date this sheet.

ERRATA SHEET

PAGE LINE ERROR OR AMENDMENT REASON

____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________
____ ____ ________________________________

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

_____________________________________
DATE JOHN FINNEGAN

Reporter LZH



Jeannie Reporting
28 W. Flagler Street, Suite 610
Miami, Florida 33130
(305) 577-1705

September 22, 2021

Sgt. John Finnegan
C/O ADRIANA MIHAELA JISA, ESQUIRE
Purdy Jolly Giuffreda Barranco & Jisa PA
2455 E Sunrise Boulevard
Suite 1216
Fort Lauderdale, Florida 33304-3115
Telephone:954-462-3200
Email:cecilia@purdylaw.com, adriana@purdylaw.com

RE: Ealy v Finnegan

Dear St. Finnegan

Attached please find a complimentary copy of your deposition which was taken in the above-styled cause on 8/20/21. Also attached is an Errata Sheet to be completed by you when reading your copy of the deposition. Sign below to waive review of the transcript.

After you have completed the Errata Sheet, please return it in the enclosed envelope for inclusion in the original transcript. It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules; however, there is no Florida Statute to this regard.

The original of this transcript has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties for inclusion in the transcript.

Sincerely,



Leila Z. Harris, Stenographic Court Reporter

cc: Mr. Obront, Esquire



Waiver:

I, _________________, hereby waive the reading & signing of my deposition transcript.

___________________________ ______________
Deponent Signature
Date

**BY MR. OBRONT:** **[25]** 4/6 7/11 7/18 8/1 8/23 18/18 19/4 19/14 20/8 22/8 22/12 24/19 25/8 26/25 33/11 34/16 36/15 36/23 38/15 39/14 40/3 40/23 41/25 46/1 47/2
**MR. OBRONT:** **[8]** 7/6 7/21 8/18 19/10 39/9 40/14 40/19 50/3
**MS. JISA:** **[20]** 7/4 7/14 7/25 18/17 19/3 19/11 20/4 22/7 22/11 24/18 33/10 36/12 39/25 40/7 40/16 40/21 41/23 46/23 49/18 50/11
**THE WITNESS:** **[5]** 7/8 7/15 19/9 20/3 50/9

## 1

**100 [3]** 2/4 21/17 21/19
**1040 [1]** 2/5
**10:00 [1]** 1/16
**11:00 [2]** 1/16 50/14
**1216 [2]** 2/12 54/7
**13 [1]** 51/14
**144004 [1]** 51/13
**17 [1]** 1/13
**1705 [1]** 54/2
**19 [2]** 5/11 8/17

## 2

**20 [2]** 1/15 51/6
**2017 [4]** 2/5 5/9 5/11 8/16
**2021 [4]** 1/15 51/6 51/9 54/3
**2025 [1]** 51/14
**21 [3]** 51/9 53/1 54/12
**21-CV-14123-KMM [1]** 1/3
**22 [1]** 54/3
**2455 [2]** 2/12 54/6
**28 [1]** 54/1

## 3

**30 [1]** 54/16
**305 [1]** 54/2
**3115 [2]** 2/13 54/7
**3200 [2]** 2/13 54/8
**33130 [1]** 54/2
**33131-2017 [1]** 2/5
**33304-3115 [2]** 2/13 54/7
**35 [2]** 12/22 12/23

## 4

**4010.30 [1]** 46/8

## 5

**577-1705 [1]** 54/2

## 6

**610 [1]** 54/1

## 7

**7802 [2]** 6/9 7/13

## 8

**8/20/21 [2]** 53/1 54/12
**800 [1]** 2/4

## A

**a.m [1]** 50/15
**about [17]** 4/16 6/9 6/22 7/2 9/3 11/4 12/23 20/5 27/6 30/14 30/23 32/8 33/18 41/15 41/18 44/18 48/10
**above [2]** 1/21 54/12
**above-styled [2]** 1/21 54/12
**abrasions [1]** 46/19
**Absolutely [2]** 42/24 47/17
**across [1]** 9/15
**action [3]** 43/21 52/14 52/15
**actual [2]** 13/15 15/15
**actually [4]** 11/12 33/4 35/6 50/5
**address [7]** 6/21 7/10 7/20 8/3 8/4 8/5 12/12
**adjacent [1]** 34/14
**Administrative [1]** 1/13
**adriana [7]** 2/11 2/14 19/9 20/3 40/6 54/5 54/8
**adverse [1]** 32/21
**adverse-type [1]** 32/21
**affected [1]** 48/3
**afterward [1]** 38/5
**against [1]** 14/22
**age [1]** 12/20
**aggressive [5]** 16/25 32/22 33/8 47/15 48/19
**aggressive-type [1]** 32/22
**aggressively [2]** 23/24 43/15
**agitated [1]** 16/24
**ago [2]** 22/15 39/22
**agree [1]** 46/11
**ahead [3]** 19/9 20/4 39/25
**air [1]** 47/4

A
allowed [2] 37/20 43/20
along [3] 10/22 24/5 40/10
already [7] 11/9 32/12 44/5 47/12 48/12 48/12 48/17
alternative [1] 49/14
alternatives [1] 47/17
AMENDMENT [1] 53/6
amount [2] 48/6 48/24
angle [1] 43/22
answer [8] 6/7 9/8 32/4 40/13 42/17 49/3 49/8 49/9
answered [1] 42/12
answers [4] 3/14 38/24 39/15 41/14
anybody [3] 10/13 25/6 48/25
anywhere [1] 24/9
apologized [1] 45/6
APPEARANCES [1] 1/23
appeared [1] 51/5
appreciate [1] 50/10
approach [3] 11/5 11/6 13/7
approached [1] 23/24
approaching [1] 34/13
approximately [2] 12/19 12/22
area [5] 11/8 15/11 21/1 28/2 33/18
argument [1] 45/3
arm [10] 20/6 20/6 20/11 24/8 25/17 43/8 43/20 48/10 48/18 48/22
arms [1] 29/8
around [4] 8/9 14/16 26/17 29/12
arrest [7] 35/21 35/22 36/3 38/2 46/22 47/4 47/8
arrested [3] 34/23 35/4 35/25
arrests [1] 46/3
arrive [1] 11/22
arrived [5] 9/20 11/23 12/17 12/25 13/3
ask [2] 4/14 16/7
asked [7] 9/22 18/1 42/7 42/11 42/16 45/10 49/15
asking [2] 19/24 34/11
attach [1] 53/1
attached [2] 54/11 54/12
attaching [1] 40/9
attempted [3] 31/11 35/14 35/23
attention [4] 5/8 37/19 37/24 47/25
attorney [4] 2/8 2/16 52/11 52/13
audio [2] 1/11 22/17
Audio-Video [1] 1/11
August [2] 1/15 51/6
authority [1] 51/4
authorized [1] 52/5
avenues [1] 14/3
away [7] 18/5 21/1 25/17 27/7 27/8 27/12 48/16

B
back [7] 4/18 5/9 8/15 39/21 42/19 45/17 47/11
background [1] 4/14
backward [1] 27/16
backwards [2] 25/23 26/16
balance [4] 26/16 27/18 28/11 48/8
ballpark [2] 12/24 12/24
Barranco [2] 2/11 54/6
basically [6] 4/13 12/10 13/10 14/16 45/16 49/16
basis [1] 40/17
battery [2] 35/8 41/4
bear [5] 26/18 26/22 28/9 28/16 46/16
behind [5] 15/25 16/11 25/13 26/20 36/24
being [8] 5/10 17/3 28/11 30/2 32/15 35/15 37/19 43/9
believe [6] 6/6 10/1 10/7 42/15 46/7 49/16
belonged [1] 16/7
below [1] 54/13
besides [1] 33/16
best [2] 10/24 44/21
best-case [1] 44/21
better [1] 28/4
between [10] 17/4 17/12 17/14 19/19 23/16 23/25 32/21 32/23 33/8 45/1
bill [1] 46/8

## B


**birth [2]** 6/18 12/21
**Biscayne [1]** 2/4
**bit [2]** 4/16 7/3
**black [2]** 8/10 8/24
**blank [1]** 44/23
**bleed [1]** 29/24
**bleeding [2]** 29/23 30/1
**blocked [1]** 43/10
**body [1]** 28/25
**bolting [1]** 18/10
**both [1]** 49/16
**Boulevard [3]** 2/4 2/12 54/6
**boundary [1]** 13/17
**Brady [2]** 10/3 10/9
**break [2]** 36/9 36/13
**brief [1]** 24/15
**briefly [2]** 39/24 40/1
**brim [2]** 23/2 24/3
**brother's [2]** 16/3 36/25
**brought [1]** 26/19
**buttocks [1]** 28/2


## C


**C/O [1]** 54/5
**call [1]** 12/7
**called [2]** 4/2 12/9
**calling [1]** 12/15
**cannot [1]** 40/10
**capacity [1]** 1/7
**caption [1]** 39/6
**captured [1]** 12/8
**car [1]** 40/12
**care [1]** 24/5
**careful [1]** 41/2
**case [15]** 1/3 4/13 5/9 6/23 11/9 38/18 38/22 39/18 40/5 40/25 41/4 44/21 46/22 46/24 53/1
**cause [2]** 1/21 54/12
**caused [3]** 35/17 37/19 48/8
**causing [2]** 37/24 46/19
**cc [1]** 54/25
**CERTIFICATE [2]** 50/18 51/16
**certify [3]** 51/4 52/5 52/10
**chain [8]** 3/13 8/9 8/14 8/25 9/11 9/14 11/2 13/20
**chain-link [8]** 3/13 8/9 8/14 8/25 9/11 9/14 11/2 13/20
**change [1]** 22/5
**changed [2]** 31/11 31/16
**changes [2]** 53/3 53/20
**characterized [1]** 46/12
**charge [2]** 42/4 42/8
**charging [1]** 16/24
**chest [1]** 43/17
**Christopher [3]** 5/20 35/25 36/3
**chronologically [5]** 5/12 5/18 16/22 30/16 33/25
**chronology [4]** 19/16 23/15 23/21 44/11
**Chuck [1]** 10/16
**civil [1]** 46/24
**clarify [1]** 43/23
**clarifying [1]** 37/12
**clean [1]** 19/13
**clear [2]** 6/7 47/10
**client [1]** 32/11
**close [9]** 20/24 21/3 21/6 21/20 21/23 42/7 42/13 42/18 44/3
**closeness [1]** 21/8
**color [3]** 8/11 9/7 9/9
**combat [1]** 20/20
**come [6]** 23/1 29/11 30/24 37/20 42/14 44/16
**coming [3]** 33/5 41/16 50/8
**Commission [2]** 51/13 51/14
**commit [1]** 34/10
**committed [1]** 34/23
**commotion [1]** 31/3
**communication [2]** 1/11 33/8
**completed [3]** 54/13 54/14 54/16
**completely [1]** 49/10
**complies [1]** 47/5
**complimentary [1]** 54/11
**concluded [1]** 50/14
**condescending [1]** 25/1
**confrontation [1]** 35/1
**confrontational [1]** 45/6
**confused [1]** 35/20
**connected [1]** 52/13
**consent [1]** 36/10
**considered [1]** 54/17
**contact [17]** 22/23 24/23 25/2 25/3 25/3 25/5 25/6 25/7 25/9 25/11 25/14 34/5 41/11 41/16 41/18 42/20 44/7

## C


**control [1]** 47/20
**conversation [4]** 23/13 32/21 32/23 45/1
**cooperative [1]** 31/13
**coordinated [1]** 5/25
**cop [1]** 42/15
**cops [1]** 48/5
**copy [2]** 54/11 54/13
**Corey [1]** 2/3
**corner [1]** 13/15
**Corps [2]** 4/21 4/22
**correct [14]** 7/20 8/16 9/10 16/17 22/14 23/22 25/19 31/24 31/25 34/9 36/16 44/13 44/14 53/19
**correctly [3]** 8/13 10/7 19/6
**counsel [5]** 7/24 38/21 39/18 52/11 52/13
**count [1]** 18/15
**County [8]** 1/7 5/4 5/23 7/16 9/25 10/21 51/3 52/3
**couple [1]** 29/10
**course [2]** 46/3 49/21
**court [8]** 1/1 1/12 1/19 39/10 51/12 52/4 52/18 54/24
**courts [1]** 14/3
**creditable [1]** 35/17
**crime [4]** 34/10 34/23 37/10 42/9
**crimes [1]** 42/15
**curse [1]** 33/12
**cursing [3]** 17/1 33/14 34/17
**CURT [1]** 2/3
**custody [1]** 34/7
**cutting [1]** 29/18
**CV [1]** 1/3


## D


**DADE [2]** 51/3 52/3
**damn [1]** 17/22
**darting [1]** 26/4
**date [9]** 1/15 5/10 5/14 6/17 6/20 12/21 53/4 53/22 55/6
**DAVID [1]** 2/3
**day [4]** 11/19 21/13 31/17 33/24
**days [2]** 31/9 54/16
**deal [1]** 38/5
**Dear [1]** 54/10
**decided [2]** 37/16 38/6
**declare [1]** 53/19
**defend [1]** 43/14
**Defendant [3]** 1/9 2/16 38/24
**definitive [1]** 9/8
**defuse [2]** 48/23 49/6
**degree [2]** 46/18 46/21
**demeanor [1]** 31/11
**Department [2]** 5/5 46/4
**Deponent [1]** 55/5
**deposed [1]** 4/3
**deposition [12]** 1/17 1/20 4/12 8/20 50/14 52/6 53/1 53/3 53/19 54/12 54/13 55/3
**deputy [4]** 4/23 10/1 10/3 10/20
**describe [2]** 8/4 20/1
**described [1]** 32/13
**detective [2]** 4/25 5/1
**deter [1]** 35/18
**Determined [1]** 37/5
**did [41]** 10/9 11/3 11/22 12/17 12/25 13/4 14/23 15/10 16/2 16/4 16/6 17/24 22/24 23/1 25/21 25/24 26/12 26/13 27/9 28/20 28/23 30/9 30/15 31/6 31/20 32/1 32/5 32/6 32/9 32/20 34/10 34/24 35/20 44/11 44/16 44/19 45/12 48/9 48/25 52/5 52/9
**difference [2]** 45/2 45/4
**directing [1]** 5/8
**direction [8]** 13/14 13/15 13/21 14/9 15/15 15/15 16/15 42/12
**Discussion [1]** 7/7
**disregarded [1]** 47/12
**DISTRICT [2]** 1/1 1/1
**Division [1]** 1/2
**documented [1]** 42/22
**doesn't [2]** 25/6 40/11
**door [13]** 18/10 18/22 24/13 26/4 26/5 26/6 26/9 26/13 26/21 27/7 27/12 33/5 34/13
**down [12]** 5/22 6/1 7/3 12/11 12/15 19/15 24/8 28/7 28/21 31/7 46/16 48/9
**drawing [1]** 44/23
**drawn [4]** 32/1 32/6 32/10 47/7

**D**

**drive [4]** 6/2 6/10 7/13 8/3
**drives [1]** 14/3
**driveway [8]** 9/15 15/6 15/8 15/11 16/19 17/5 24/1 30/8
**duly [2]** 4/3 51/6
**duties [5]** 35/6 35/10 35/11 35/16 37/25

**E**

**each [2]** 19/12 45/3
**EALY [11]** 1/4 4/13 5/13 32/11 32/11 34/5 36/10 36/16 44/18 53/1 54/9
**Ealy's [1]** 31/1
**easiest [1]** 29/3
**east [6]** 14/5 15/14 15/14 15/16 15/17 19/17
**edge [2]** 15/8 17/4
**eff [4]** 17/9 19/18 34/12 34/19
**effect [5]** 17/10 17/22 45/14 46/22 47/5
**eight [1]** 5/1
**elaborate [1]** 35/10
**elbow [23]** 18/4 18/20 19/5 19/8 19/23 19/24 20/2 20/10 20/10 20/12 20/25 23/19 24/7 24/25 25/15 29/18 29/20 29/23 38/9 43/1 43/24 44/6 45/14
**elevated [1]** 47/14
**elevation [1]** 47/15
**elevational [2]** 38/7 42/4
**eliminate [1]** 49/11
**else [2]** 10/13 29/14
**else's [1]** 11/18
**Email:cecilia [2]** 2/14 54/8
**Email:curt [1]** 2/6
**emerged [1]** 32/17
**employee [2]** 52/11 52/12
**employment [1]** 4/17
**enclosed [1]** 54/15
**encounter [2]** 18/12 32/13
**encountered [1]** 34/11
**end [2]** 30/8 49/25
**ended [1]** 45/21
**enforcement [3]** 10/23 33/17 41/5
**enough [2]** 21/20 44/8
**entered [4]** 14/23 15/11 32/7 53/20
**envelope [1]** 54/15
**errata [4]** 53/5 54/13 54/14 54/19
**ERROR [1]** 53/6
**ESQUIRE [4]** 2/3 2/11 54/5 54/25
**essentially [2]** 26/19 28/14
**ET [2]** 1/16 1/16
**even [2]** 41/10 42/22
**event [1]** 37/1
**ever [2]** 16/4 41/9
**every [1]** 21/13
**everybody [2]** 48/3 49/24
**everything [2]** 20/17 31/7
**exact [2]** 5/10 37/8
**exactly [4]** 11/6 17/21 25/21 38/21
**EXAMINATION [1]** 4/5
**example [1]** 46/25
**exhibit [8]** 3/12 8/19 8/21 9/13 14/20 39/10 39/12 40/9
**EXHIBITS [1]** 3/11
**exist [1]** 37/14
**existed [1]** 13/6
**exited [1]** 13/4
**expect [1]** 37/14
**Expires [1]** 51/14
**explain [6]** 17/5 17/16 18/7 24/1 29/3 29/14
**explained [1]** 31/10
**explanation [1]** 37/17
**exposure [1]** 48/4

**F**

**face [25]** 17/19 18/5 19/22 20/7 20/24 21/1 21/3 21/4 21/5 21/6 23/6 23/6 24/3 25/13 25/18 37/17 37/23 42/8 42/13 42/18 43/7 43/8 44/4 48/14 48/18
**facing [3]** 13/21 23/4 25/25
**fact [5]** 41/8 41/12 42/3 42/17 48/7
**facts [2]** 31/14 41/3
**fair [7]** 6/9 24/25 27/14 41/6 44/1 44/8 46/4
**fall [1]** 47/20
**family [2]** 8/7 9/19
**far [5]** 5/10 5/15 9/6 34/3 36/13
**father's [2]** 5/22 12/11
**Federal [1]** 54/17
**feel [2]** 46/15 49/4

## F

**felt [1]** 20/24
**female [2]** 30/25 31/19
**fence [19]** 3/13 8/9 8/10 8/14 8/25 9/12 9/14 11/3 11/24 13/20 14/19 14/20 14/21 14/23 14/24 15/3 15/25 16/11 36/25
**figure [2]** 6/2 14/9
**file [1]** 39/10
**financially [1]** 52/14
**find [2]** 18/6 54/11
**fine [1]** 10/18
**finish [1]** 39/25
**FINNEGAN [13]** 1/7 1/17 3/2 4/1 4/10 4/11 51/5 53/1 53/1 53/22 54/5 54/9 54/10
**Finnegan's [1]** 38/24
**first [14]** 4/3 4/9 4/15 9/22 11/22 17/7 19/5 24/23 25/11 30/18 32/17 39/16 48/13 48/17
**five [2]** 10/14 10/22
**Flagler [1]** 54/1
**flap [1]** 22/23
**FLORIDA [12]** 1/1 1/12 1/19 2/5 2/13 6/10 51/2 51/13 52/2 54/2 54/7 54/17
**focus [1]** 35/18
**follow [1]** 40/10
**following [1]** 38/23
**follows [1]** 4/4
**foot [3]** 11/9 21/7 28/17
**football [2]** 29/4 29/14
**force [14]** 5/24 46/2 46/13 46/19 46/22 47/1 47/15 48/6 48/24 49/1 49/5 49/10 49/13 49/25
**foregoing [1]** 52/6
**form [10]** 18/17 22/7 24/18 33/10 36/12 40/20 41/23 46/23 49/18 53/20
**Fort [9]** 1/2 2/13 5/22 6/10 7/13 12/11 13/24 14/1 54/7
**forth [2]** 8/6 46/20
**forwarded [2]** 54/19 54/19
**four [7]** 4/21 8/15 14/16 14/18 41/13 41/19 48/5
**fours [1]** 42/21
**frame [1]** 24/21
**freedom [1]** 35/1
**front [13]** 6/11 9/15 11/2 12/21 13/4 13/7 13/19 13/22 22/23 27/3 27/4 27/13 43/22
**fuck [2]** 17/1 17/2
**full [1]** 43/21

## G

**garage [20]** 9/16 13/8 17/11 17/12 17/15 18/10 18/22 18/23 19/19 23/9 23/11 23/17 24/13 26/5 26/6 26/7 26/8 26/11 31/3 48/3
**gate [5]** 14/25 14/25 15/2 15/11 32/7
**general [1]** 15/14
**getting [1]** 20/24
**girlfriend [3]** 5/21 12/7 31/18
**Giuffreda [2]** 2/11 54/6
**given [2]** 27/17 52/8
**giving [2]** 39/17 41/14
**good [4]** 4/7 4/11 25/9 49/1
**got [20]** 4/22 4/22 5/1 6/24 6/25 7/12 10/7 10/11 12/3 14/18 17/11 17/17 19/19 23/16 26/15 26/15 27/8 34/20 35/5 48/1
**Gotcha [1]** 16/14
**grab [1]** 28/13
**grabbed [28]** 18/4 18/20 19/5 19/7 19/23 19/24 20/1 20/6 20/12 20/23 20/25 23/19 24/7 24/24 25/15 26/17 26/20 27/21 28/12 38/9 43/1 43/8 43/20 43/24 44/6 45/14 48/18 48/22
**grabbing [2]** 20/9 48/10
**grandmother [1]** 31/1
**grandson [1]** 31/9
**grasping [1]** 20/10
**ground [11]** 26/19 28/7 28/12 28/21 28/24 29/2 29/5 29/16 29/19 46/17 46/20
**group [4]** 9/23 11/3 11/14 11/22
**guess [4]** 17/10 25/2 46/11 49/3
**guessing [1]** 12/22
**guidelines [3]** 46/4 46/7 46/9

## G

**guns [5]** 32/1 32/6 32/10 32/15 47/7
**guy [1]** 21/13
**guys [1]** 19/12

## H

**hadn't [3]** 31/8 33/23 42/11
**hailed [1]** 43/17
**half [1]** 5/3
**hand [24]** 17/18 17/19 18/1 18/4 18/8 19/21 20/14 20/15 20/18 20/24 24/2 25/22 25/24 26/1 26/3 37/16 41/19 43/7 43/12 44/22 45/21 48/13 48/18 51/8
**handcuffed [3]** 30/7 34/8 44/11
**handed [2]** 20/16 20/17
**handful [3]** 10/5 17/17 17/18
**hands [3]** 24/7 47/3 47/16
**happened [14]** 5/9 16/21 17/13 17/14 17/15 18/11 21/2 23/20 26/3 30/5 34/2 34/4 35/1 38/21
**Harris [5]** 1/18 51/12 52/4 52/18 54/24
**hasty [1]** 11/10
**hat [28]** 21/9 21/11 21/13 21/13 21/15 21/18 21/21 21/23 21/25 22/13 22/20 22/23 23/1 23/2 23/18 24/4 41/10 41/10 41/11 41/16 41/21 42/4 42/21 42/21 43/2 43/7 43/25 44/7
**hate [1]** 8/14
**having [4]** 4/2 13/22 32/20 48/11
**haymaker [2]** 43/13 48/23
**he's [5]** 26/21 35/15 35/22 38/1 47/10
**head [11]** 21/9 21/11 21/15 21/18 21/25 22/14 22/19 22/25 23/2 47/22 47/25
**heard [3]** 31/2 42/6 42/14
**heck [3]** 18/2 19/18 37/8
**her [9]** 31/7 31/9 31/11 31/16 32/19 32/21 32/22 33/2 33/14
**here [15]** 4/12 5/2 7/2 13/25 14/2 17/9 17/23 20/5 24/6 24/8 24/10 29/11 34/19 37/8 53/20
**hereby [1]** 55/3
**HH [1]** 51/13
**high [1]** 4/20
**hired [1]** 4/22
**his [75]**
**history [1]** 4/17
**hit [10]** 21/21 21/21 21/23 22/18 23/2 24/3 29/12 29/18 31/14 46/20
**hitting [1]** 47/22
**hold [4]** 6/13 8/18 19/3 39/2
**holding [1]** 19/22
**home [2]** 9/19 33/18
**hope [3]** 32/4 32/5 32/9
**horizontally [1]** 9/15
**hostile [1]** 49/25
**house [40]** 3/13 12/11 13/20 14/17 15/9 15/12 15/18 15/19 15/20 15/21 15/22 16/3 16/5 16/7 16/11 16/16 17/4 19/17 23/9 24/1 26/13 27/7 27/12 31/21 31/24 32/2 32/18 33/3 33/21 34/12 34/13 34/18 36/6 36/9 36/13 36/16 36/24 37/1 45/13 45/17
**houses [2]** 11/24 15/23
**however [1]** 54/17
**hug [6]** 26/23 27/20 27/24 27/24 28/10 46/16
**hugged [2]** 26/18 28/16
**huh [1]** 38/11

## I

**I'll [1]** 19/15
**I'm [30]** 7/20 9/3 12/22 14/1 14/5 14/10 15/14 15/16 17/7 20/16 21/13 22/10 28/17 30/3 35/20 37/11 37/12 38/23 39/5 42/9 42/14 43/13 43/19 44/14 44/22 44/23 44/24 48/15 48/15 50/5
**I've [1]** 5/2

## I

**identification [2]** 8/22 39/13
**illegal [1]** 34/24
**imagine [1]** 26/22
**impeachment [1]** 40/17
**important [1]** 41/3
**inches [1]** 21/8
**incident [6]** 33/20 40/5 41/4 41/9 41/17 42/22
**inclusion [2]** 54/15 54/20
**INDEX [2]** 2/20 3/11
**Indian [2]** 1/7 5/4
**individually [1]** 1/7
**information [3]** 12/2 24/10 35/17
**initially [6]** 22/9 22/13 31/8 32/7 33/7 34/20
**injure [1]** 48/25
**injury [1]** 12/9
**inside [3]** 14/20 14/21 26/8
**INSTRUCTIONS [1]** 53/2
**intend [1]** 48/25
**intent [2]** 25/12 25/12
**inter [1]** 17/3
**interaction [10]** 5/15 17/8 30/10 30/15 30/20 30/24 43/16 44/12 44/19 45/18
**interested [1]** 52/14
**interfering [1]** 35/15
**interior [3]** 24/13 26/6 32/18
**interjected [1]** 23/25
**interrogatories [7]** 3/14 38/17 38/25 39/6 39/16 41/14 42/23
**interrogatory [4]** 38/16 39/4 39/17 39/20
**interrupt [1]** 15/16
**involved [1]** 49/24
**involvement [1]** 5/13
**irrespective [1]** 44/6
**is [61]**
**isn't [5]** 23/7 23/7 36/14 38/10 41/8
**issued [1]** 35/21
**it's [5]** 22/17 39/3 39/9 40/20 49/15
**itself [3]** 26/11 33/20 53/3

## J

**jail [1]** 45/11
**January [2]** 5/11 8/17
**January 19 [2]** 5/11 8/17
**Jeannie [1]** 53/25
**JISA [4]** 2/11 2/11 54/5 54/6
**job [3]** 48/23 49/1 49/22
**JOHN [9]** 1/7 1/17 3/2 3/20 4/9 51/5 53/1 53/22 54/5
**JOHNNY [1]** 1/4
**Johnson [2]** 10/1 10/8
**Jolly [2]** 2/11 54/6
**judge [1]** 35/24
**jump [1]** 14/24
**justice [1]** 37/9

## K

**karlene [1]** 2/6
**keep [1]** 39/2
**kind [13]** 4/18 6/3 9/11 11/8 11/9 12/9 18/21 25/6 29/5 29/8 29/11 38/4 42/10
**KMM [1]** 1/3
**knee [4]** 29/18 29/21 29/25 30/3
**knock [1]** 22/24
**knocked [13]** 21/9 21/11 21/15 21/18 21/25 22/2 22/2 22/3 22/5 22/6 22/13 22/18 26/16

## L

**lack [1]** 28/3
**lady [1]** 30/21
**last [4]** 4/9 5/3 10/17 41/24
**later [5]** 16/2 30/13 37/5 41/13 41/20
**Lauderdale [2]** 2/13 54/7
**law [3]** 10/23 33/17 41/5
**lawful [1]** 37/18
**layout [1]** 6/3
**LCR [3]** 1/18 52/4 52/18
**learn [2]** 16/2 16/4
**least [3]** 27/13 48/6 48/24
**leave [3]** 34/11 34/19 47/11
**leaving [3]** 18/6 18/21 19/20
**led [1]** 48/19
**left [15]** 6/24 6/25 7/2 19/5 19/8 19/21 19/25 20/12 20/14 20/15 20/15 20/18 31/18

## L


**left... [2]** 44/10 44/15
**legal [1]** 43/19
**legally [1]** 37/20
**Leila [5]** 1/18 51/12 52/4 52/18 54/24
**less [1]** 49/4
**lesser [4]** 46/18 46/21 46/25 49/22
**Let [1]** 8/12
**letter [1]** 54/17
**lieutenant [1]** 10/2
**lift [1]** 28/15
**lifted [2]** 28/18 28/20
**lifting [1]** 28/9
**limits [1]** 43/19
**LINE [1]** 53/6
**lines [1]** 24/5
**link [8]** 3/13 8/9 8/14 8/25 9/11 9/14 11/2 13/20
**listen [1]** 32/14
**listened [1]** 37/17
**literally [3]** 18/8 21/4 29/13
**little [4]** 4/16 7/3 9/2 35/20
**lived [4]** 30/21 36/11 36/16 36/17
**LOCATION [1]** 1/11
**Lockwood [3]** 6/9 7/9 7/13
**longer [3]** 37/17 47/13 48/20
**looked [1]** 8/5
**looking [14]** 5/19 6/3 12/7 13/12 13/14 13/16 13/20 14/1 14/11 14/11 15/19 18/8 24/9 33/22
**Looks [1]** 9/6
**lot [1]** 31/14
**Lucie [5]** 5/23 7/16 9/25 10/2 10/21
**LZH [1]** 53/24


## M


**magazine [1]** 29/12
**magazines [1]** 17/17
**mail [7]** 17/17 17/25 19/21 21/4 37/16 37/23 41/19
**making [1]** 43/13
**male [1]** 15/13
**man [1]** 10/16
**manner [1]** 16/25
**map [1]** 13/22
**Marine [3]** 4/21 4/22 20/21
**mark [3]** 8/19 39/10 53/3
**marked [2]** 8/21 39/12
**marshal [7]** 10/3 10/9 12/10 12/15 13/9 14/14 14/15
**marshals [4]** 5/25 12/5 12/6 35/13
**matter [1]** 25/6
**may [4]** 29/10 29/10 45/24 48/8
**mean [10]** 9/4 13/15 15/17 16/10 18/15 25/3 29/15 45/7 45/11 45/20
**meaning [1]** 15/16
**means [2]** 47/19 49/22
**mechanism [1]** 29/1
**medical [1]** 47/24
**meet [1]** 5/25
**mention [1]** 41/15
**mentioned [3]** 8/2 14/6 33/17
**messed [2]** 23/21 23/23
**met [1]** 6/1
**method [1]** 29/1
**Miami [4]** 2/5 51/3 52/3 54/2
**MIAMI-DADE [2]** 51/3 52/3
**might [4]** 28/18 28/20 33/7 45/23
**MIHAELA [2]** 2/11 54/5
**military [2]** 4/21 20/20
**minimal [3]** 49/2 49/10 49/13
**minimum [1]** 49/24
**minute [1]** 37/15
**missing [1]** 33/25
**mistaken [1]** 31/2
**mom [2]** 33/8 33/23
**moment [2]** 45/23 50/4
**month [1]** 39/21
**morning [3]** 4/7 4/11 31/17
**mother [3]** 30/20 31/1 32/16
**motion [1]** 29/9
**mouth [1]** 42/14
**move [2]** 22/24 43/8
**moved [3]** 41/10 41/21 42/21
**Mr [6]** 12/3 32/11 32/11 42/3 50/9 54/25
**Mr. [11]** 5/13 12/1 12/10 12/18 12/18 12/25 24/10 34/5 36/10 36/16 44/18
**Mr. Ealy [5]** 5/13 34/5

## M

**Mr. Ealy... [3]** 36/10 36/16 44/18
**Mr. O'Neal [6]** 12/1 12/10 12/18 12/18 12/25 24/10
**murder [3]** 31/11 35/14 35/23
**myself [3]** 9/25 43/14 48/4

## N

**name [6]** 4/8 4/9 4/9 5/20 10/17 41/24
**named [1]** 10/23
**names [1]** 14/2
**nasty [1]** 17/3
**necessary [5]** 46/15 48/7 48/24 49/10 49/25
**needed [1]** 47/21
**neglect [1]** 35/12
**never [7]** 27/8 33/12 33/12 39/7 42/6 42/14 46/24
**nice [2]** 33/1 33/2
**non [1]** 46/12
**nonlethal [1]** 46/13
**normal [1]** 44/25
**Normally [1]** 11/7
**north [3]** 13/17 14/5 14/12
**northeast [1]** 14/7
**not [39]** 14/5 15/15 18/5 18/20 19/13 19/20 21/24 22/24 23/1 24/4 24/9 24/21 25/1 28/17 30/3 33/4 36/10 38/23 41/12 42/4 42/7 42/8 42/9 42/15 42/22 43/24 44/7 45/11 47/23 48/7 48/8 48/25 49/8 49/12 49/13 49/22 52/9 52/10 53/3
**Notary [2]** 1/19 51/13
**note [1]** 53/3
**notes [2]** 45/24 50/4
**nothing [2]** 40/14 41/18
**Notice [1]** 1/20
**now [22]** 4/18 5/8 6/20 6/22 7/15 7/22 10/2 12/17 14/19 16/11 21/17 34/10 38/1 38/16 41/13 41/19 43/10 44/10 47/16 47/23 47/24 48/20
**nowhere [1]** 41/8
**number [1]** 6/23

## O

**O'Neal [10]** 5/20 12/1 12/3 12/10 12/18 12/18 12/25 18/8 24/10 36/3
**O'Neal's [2]** 31/1 35/25
**oath [3]** 39/1 39/19 51/1
**Object [1]** 18/17
**objecting [1]** 35/15
**objection [2]** 40/19 40/21
**OBRONT [6]** 2/3 2/3 41/24 42/3 50/9 54/25
**obrontcorey.com [2]** 2/6 2/6
**observe [1]** 15/10
**obstruction [3]** 35/7 37/9 37/22
**obvious [1]** 31/3
**obviously [2]** 20/21 40/11
**office [3]** 1/8 4/23 7/17
**officer [2]** 1/8 41/5
**officers [5]** 5/24 10/8 10/23 33/17 47/6
**official [1]** 51/8
**oh [2]** 10/16 41/20
**okay [55]** 6/16 6/25 7/21 11/14 11/17 12/13 12/17 13/3 13/12 14/13 14/23 15/5 15/10 16/13 16/21 17/7 18/11 19/3 20/3 20/11 20/19 20/23 21/22 21/24 22/11 23/4 23/14 25/14 26/2 26/7 26/12 26/20 27/25 28/3 28/6 28/15 30/5 30/14 30/23 32/10 33/16 35/3 35/9 35/24 36/2 37/4 38/1 40/16 41/13 43/23 44/5 44/10 45/23 49/3 50/3
**old [1]** 12/18
**once [5]** 31/9 33/3 35/5 35/7 54/19
**one [7]** 10/16 11/24 12/5 12/6 12/6 49/14 50/4
**only [2]** 39/3 47/23
**open [6]** 14/25 15/1 18/22 26/8 47/22 47/25
**opinion [5]** 25/2 34/22 45/2 45/4 45/22
**opposed [1]** 27/22
**order [2]** 1/13 50/13
**ordering [2]** 54/19

## O

**ordering... [1]** 54/19
**orders [1]** 50/13
**original [2]** 54/15 54/18
**otherwise [2]** 29/12 40/10
**ours [2]** 14/3 14/4
**out [16]** 4/22 5/2 5/23 6/2 14/9 17/9 20/7 31/3 33/5 34/18 34/19 37/8 42/14 43/8 43/18 47/16
**outside [5]** 11/8 14/19 26/7 30/22 31/4
**owner [1]** 16/4

## P

**PA [2]** 2/11 54/6
**page [3]** 3/12 53/3 53/6
**palm [1]** 43/17
**paper [2]** 6/24 22/18
**papers [32]** 17/25 19/21 21/2 21/7 21/12 21/15 21/18 21/20 21/25 22/1 22/22 23/2 23/17 24/3 24/24 25/12 25/13 41/10 41/16 41/19 41/20 42/3 42/8 42/13 42/18 42/20 43/1 43/6 43/10 43/25 44/3 44/8
**paperwork [2]** 39/21 40/11
**paraplegic [2]** 16/3 36/25
**part [3]** 9/23 11/14 39/9
**particular [2]** 5/14 49/6
**parties [2]** 52/12 54/20
**parties' [1]** 52/13
**party [1]** 54/19
**passing [1]** 48/20
**passive [1]** 47/14
**past [2]** 18/9 27/18
**Pearson [2]** 10/2 10/8
**penalties [1]** 53/19
**pepper [1]** 48/2
**percent [2]** 21/17 21/19
**perfectly [1]** 47/10
**perimeter [1]** 11/10
**period [3]** 24/15 41/11 50/2
**perjury [1]** 53/19
**permission [2]** 31/5 36/10
**person [4]** 18/6 33/22 35/13 35/16
**personally [1]** 51/5
**petty [3]** 42/9 42/15 42/15
**phone [3]** 10/17 10/19 12/6
**photo [1]** 8/12
**Photograph [1]** 3/13
**physical [8]** 7/9 25/3 25/9 25/11 25/14 41/18 48/21 49/5
**pick [2]** 9/1 37/16
**picture [1]** 9/1
**Pierce [7]** 1/2 5/22 6/10 7/13 12/11 13/24 14/1
**place [2]** 28/1 47/13
**Plaintiff [2]** 1/5 2/8
**Plaintiff's [1]** 8/19
**plan [1]** 5/25
**please [6]** 4/7 52/19 53/2 53/4 54/11 54/15
**PLLC [1]** 2/3
**point [16]** 17/13 23/7 23/8 23/19 23/20 24/11 25/9 25/20 26/14 27/13 30/10 34/7 34/22 34/25 35/5 38/1
**pointed [1]** 32/15
**points [1]** 14/16
**police [5]** 1/8 40/5 40/24 41/2 41/17
**position [5]** 11/8 13/8 14/7 14/7 16/18
**positioned [1]** 15/7
**positions [1]** 14/18
**possibly [1]** 32/18
**pretty [8]** 14/3 15/8 17/20 18/11 26/18 45/10 45/21 49/1
**prior [2]** 12/14 26/8
**probably [3]** 9/5 20/13 20/16
**problem [2]** 7/25 47/19
**progressing [1]** 50/1
**promoted [1]** 5/1
**pronounce [1]** 41/24
**property [23]** 13/1 15/6 15/23 17/2 17/9 17/23 18/2 19/18 23/15 23/19 24/6 32/3 32/7 32/12 34/12 34/14 34/14 34/18 36/20 37/2 37/4 37/7 38/5
**Public [2]** 1/19 51/13
**pull [2]** 11/3 20/25
**pulled [7]** 11/1 13/3 13/13 18/4 20/7 24/8 25/17

## P

**pulling [1]** 20/11
**Purdy [2]** 2/11 54/6
**purdylaw.com [4]** 2/14 2/14 54/8 54/8
**purpose [1]** 31/15
**purposes [1]** 8/19
**pursuant [2]** 1/12 1/20
**push [4]** 18/9 18/24 18/25 25/21
**pushed [17]** 18/21 19/1 21/4 23/3 24/12 25/20 25/23 26/2 26/15 27/4 27/16 27/16 35/8 38/7 45/7 47/16 48/7
**pushing [1]** 45/13
**put [20]** 14/16 17/25 21/4 21/19 24/3 24/21 25/13 25/22 37/13 37/16 37/22 41/3 43/1 43/7 46/16 46/17 47/3 47/15 48/13 48/18
**puts [1]** 17/19
**putting [3]** 29/7 29/8 49/19

## Q

**quarter [2]** 27/24 27/25
**question [6]** 32/5 42/12 42/16 49/12 49/15 49/15
**questions [3]** 4/15 50/7 50/11
**quick [4]** 10/17 18/16 24/16 24/17
**quickly [2]** 18/11 18/19
**quote [1]** 24/4

## R

**R-E-E-V-E [2]** 10/10 10/11
**raised [1]** 24/2
**raises [1]** 17/19
**rather [3]** 8/25 22/5 30/17
**RE [1]** 54/9
**reached [3]** 5/23 20/5 26/17
**read [4]** 39/3 50/12 53/2 53/19
**reading [3]** 52/9 54/13 55/3
**real [2]** 10/17 17/3
**really [1]** 27/8
**rear [4]** 27/2 27/22 27/24 28/3
**reason [5]** 35/4 37/18 42/25 43/24 53/6
**reasonable [2]** 49/2 54/17
**recall [21]** 9/6 9/7 10/13 11/6 11/19 16/6 28/6 28/9 28/11 28/23 29/17 29/22 29/25 30/2 30/4 32/20 33/14 33/19 38/18 39/16 45/15
**recalling [1]** 42/20
**receipt [1]** 54/16
**received [4]** 12/6 24/10 35/17 54/19
**Recess [1]** 45/25
**recollection [1]** 10/24
**record [9]** 4/8 6/7 7/7 7/22 9/13 19/13 20/9 29/7 52/7
**records [1]** 5/10
**Reese [1]** 10/9
**Reeve [3]** 10/3 10/10 10/10
**reference [5]** 5/13 13/18 16/18 42/7 44/3
**regain [1]** 27/17
**regard [1]** 54/18
**regarding [2]** 12/3 41/4
**relation [1]** 31/2
**relative [3]** 42/17 52/10 52/12
**remainder [1]** 11/12
**remember [15]** 7/8 7/9 8/11 8/13 11/20 14/24 17/20 19/7 22/14 29/20 29/21 32/15 39/15 40/1 41/20
**Remote [1]** 1/11
**remotely [2]** 4/3 51/6
**rephrase [1]** 22/10
**report [11]** 7/17 40/4 40/5 40/5 40/24 41/5 41/9 41/17 42/23 47/23 52/6
**Reporter [7]** 1/19 51/12 52/1 52/5 52/18 53/24 54/24
**Reporting [1]** 54/1
**reports [1]** 41/3
**represent [2]** 7/12 46/2
**representing [1]** 39/18
**request [1]** 32/14
**requests [1]** 47/11
**residence [23]** 5/22 6/2 6/5 6/8 6/11 8/5 8/7 11/2 11/13 11/15 11/25 12/4 13/1 13/7 13/11 13/13 13/16

**R**

**residence... [6]** 14/11 14/15 14/22 30/22 31/6 36/17
**residences [1]** 8/8
**resistance [1]** 48/21
**responded [2]** 6/4 8/3
**response [3]** 18/3 39/17 43/20
**responses [1]** 38/17
**rest [1]** 30/17
**return [1]** 54/15
**review [2]** 54/14 54/16
**riding [1]** 11/18
**rifles [1]** 29/11
**right [20]** 11/11 11/21 15/20 15/21 16/2 16/9 17/24 20/5 20/11 20/16 20/17 26/1 27/11 29/17 34/3 35/3 36/18 37/6 38/12 45/18
**right-handed [2]** 20/16 20/17
**ring [1]** 46/8
**risk [1]** 43/11
**River [2]** 1/7 5/4
**road [2]** 13/23 25/25
**roads [1]** 14/2
**roughly [2]** 12/20 24/20
**route [1]** 38/4
**Rules [1]** 54/17
**runs [2]** 11/9 13/23

**S**

**S-I-N-G-L-E-T-A-R-Y [1]** 10/20
**safe [2]** 36/25 49/23
**safely [1]** 12/9
**said [25]** 9/18 10/8 11/24 17/21 18/5 19/20 19/23 22/9 22/13 23/22 24/4 24/8 24/15 27/16 31/16 31/17 33/21 34/20 34/20 35/9 37/11 45/6 45/16 45/20 49/9
**same [4]** 16/11 36/24 49/15 49/17
**sat [1]** 31/7
**saw [2]** 14/20 33/22
**say [23]** 6/9 8/14 9/4 10/3 15/17 17/24 18/12 19/11 21/7 25/20 26/10 27/23 27/24 27/25 31/8 31/13 35/20 40/6 41/9 41/18 42/6 44/17 45/12
**saying [18]** 6/8 14/10 16/10 17/8 19/18 21/14 21/14 21/24 22/22 22/25 30/3 35/19 41/20 42/25 43/4 43/24 48/15 49/17
**says [1]** 6/17
**SCAO21 [1]** 1/13
**SCAO21-17 [1]** 1/13
**scenario [1]** 44/21
**scene [1]** 48/5
**school [1]** 4/20
**scrape [4]** 29/20 29/22 29/25 30/2
**scrapes [1]** 29/24
**screaming [2]** 17/1 23/24
**screen [2]** 7/5 7/22
**seal [1]** 51/8
**searced [1]** 33/21
**search [4]** 31/5 31/20 31/23 32/2
**second [4]** 15/22 18/14 22/15 24/17
**second-or-two-type [1]** 18/14
**seconds [1]** 18/15
**secured [3]** 30/7 31/6 33/3
**see [21]** 6/14 6/15 6/16 6/17 6/20 6/21 6/22 6/23 7/14 7/15 8/12 11/22 12/18 12/25 13/23 16/9 20/19 22/16 39/3 43/9 47/5
**seem [1]** 9/9
**seems [1]** 9/14
**seen [1]** 39/7
**semicircular [1]** 29/9
**sense [3]** 13/21 16/12 22/21
**sent [2]** 6/1 39/21
**September [3]** 51/9 51/14 54/3
**sergeant [9]** 4/11 4/18 5/2 5/2 5/9 10/1 10/3 10/9 50/8
**serve [2]** 35/16 36/2
**served [1]** 38/17
**set [2]** 11/10 13/7
**several [2]** 31/9 47/6
**Sgt [1]** 54/5
**share [2]** 7/4 40/8
**shared [1]** 8/9
**sharing [1]** 7/24
**sheet [4]** 53/4 53/5 54/13 54/14
**Sheriff [1]** 1/8
**sheriff's [3]** 4/23 5/5 7/16
**shoot [1]** 20/16

## S

**shooting [1]** 33/5
**short [2]** 30/13 49/3
**shortly [1]** 41/17
**shoved [1]** 18/9
**showing [1]** 39/5
**side [11]** 8/8 8/8 13/8 14/14 14/16 15/23 15/24 27/20 27/22 27/23 28/3
**sign [2]** 53/4 54/13
**Signature [1]** 55/5
**signed [2]** 35/24 38/25
**signing [2]** 52/9 55/3
**simply [1]** 36/9
**Simultaneous [6]** 25/4 26/24 34/15 36/22 38/14 40/2
**since [1]** 33/24
**Sincerely [1]** 54/21
**single [2]** 8/7 9/19
**single-family [2]** 8/7 9/19
**Singletary [1]** 10/20
**sir [24]** 4/19 5/5 5/6 5/12 5/14 5/16 6/8 6/12 7/19 9/13 9/17 9/19 10/25 11/16 11/23 15/4 20/22 25/10 40/24 41/8 41/22 46/10 47/3 47/7
**sit [2]** 30/8 33/4
**sits [1]** 22/20
**sitting [1]** 22/20
**situation [5]** 44/22 45/21 48/24 49/6 50/1
**skipping [1]** 30/19
**slam [1]** 28/13
**slightly [2]** 27/13 42/21
**slow [1]** 19/15
**solo [1]** 6/1
**some [4]** 4/14 31/14 33/7 38/16
**somebody [10]** 8/2 14/6 14/7 29/4 29/15 33/5 37/7 42/9 43/15 47/19
**someone [1]** 11/18
**something [10]** 17/18 17/21 24/5 34/1 34/24 40/6 40/12 45/2 45/14 47/4
**Somewhere [1]** 12/24
**soon [2]** 18/7 25/5
**sorry [4]** 9/3 15/16 17/7 44/24
**sort [1]** 17/11
**sound [2]** 25/1 49/20
**south [2]** 2/4 14/6
**southeast [3]** 13/8 14/8 14/14
**SOUTHERN [1]** 1/1
**southwest [2]** 13/9 14/15
**Speakers [6]** 25/4 26/24 34/15 36/22 38/14 40/2
**speaking [1]** 19/12
**specific [1]** 28/25
**speech [1]** 35/2
**split [1]** 47/25
**splits [1]** 47/22
**spoken [1]** 12/14
**sprayed [1]** 48/2
**St [6]** 5/23 7/16 9/25 10/2 10/21 54/10
**started [4]** 18/10 18/22 26/4 26/12
**starts [1]** 16/24
**state [5]** 1/19 4/7 51/2 51/13 52/2
**stated [1]** 44/5
**statement [6]** 24/25 27/14 38/20 41/6 44/1 46/5
**STATES [1]** 1/1
**Statute [1]** 54/17
**stay [1]** 47/11
**stayed [1]** 32/19
**staying [1]** 5/21
**Stenographic [5]** 1/18 51/12 52/4 52/18 54/24
**stenographically [1]** 52/6
**step [4]** 27/10 27/12 27/17 38/7
**stepped [1]** 17/4
**steps [2]** 27/9 38/8
**still [3]** 23/12 24/8 31/13
**stitches [1]** 48/1
**stop [4]** 6/6 17/5 47/3 47/7
**story [2]** 30/17 31/16
**straight [2]** 25/22 43/17
**street [2]** 13/13 54/1
**stretch [1]** 36/14
**styled [2]** 1/21 54/12
**subject [4]** 5/20 11/9 15/13 53/20
**subsequent [1]** 30/12
**substance [1]** 53/20
**suggested [1]** 54/16
**Suite [4]** 2/4 2/12 54/1 54/7
**Sunrise [2]** 2/12 54/6
**Superman [1]** 10/11
**supposed [2]** 12/1

## S

**supposed... [1]** 12/15
**Supreme [1]** 1/12
**sure [5]** 7/20 21/17 21/19 32/5 47/10
**surround [1]** 13/10
**surrounding [1]** 11/25
**sworn [7]** 4/3 38/20 38/24 39/17 41/14 42/23 51/6

## T

**tackle [4]** 28/13 29/4 29/14 46/16
**taken [2]** 1/18 54/12
**taking [2]** 1/20 29/15
**talk [2]** 31/7 33/4
**talked [1]** 31/8
**talking [5]** 6/9 13/19 13/25 27/6 32/8
**tall [1]** 28/18
**target [1]** 11/25
**task [1]** 5/24
**taught [1]** 43/14
**taze [1]** 47/21
**tazed [1]** 47/18
**tazering [1]** 47/23
**tazing [1]** 47/19
**team [1]** 9/23
**Telephone:305 [1]** 2/5
**Telephone:305-373-1040 [1]** 2/5
**Telephone:954 [2]** 2/13 54/8
**Telephone:954-462-3200 [2]** 2/13 54/8
**tell [14]** 4/16 5/11 11/1 11/4 12/5 13/5 13/23 14/1 16/21 16/24 26/22 30/14 30/23 42/17
**telling [4]** 23/18 34/17 37/6 37/15
**tells [2]** 32/11 37/7
**term [1]** 28/4
**terms [2]** 32/22 46/8
**testified [1]** 4/4
**testimony [3]** 36/8 41/22 52/8
**TFO [1]** 6/1
**TFOs [1]** 5/24
**thank [8]** 5/7 7/6 7/23 7/24 40/7 50/6 50/8 50/9
**that's [26]** 5/4 7/1 7/16 7/20 8/16 9/5 9/18 10/18 13/17 19/25 32/8 35/7 35/8 35/19 37/9 37/11 37/21 38/9 38/12 38/20 40/17 44/13 44/14 47/20 49/8 49/14
**their [4]** 37/7 43/17 47/7 47/20
**theirs [1]** 14/4
**there [48]** 6/4 8/8 8/8 9/20 9/20 10/5 10/15 10/15 12/16 14/18 15/13 15/23 17/6 21/10 24/2 26/18 30/2 30/3 30/25 31/10 31/17 33/7 33/12 33/23 33/24 34/20 35/7 35/10 35/21 36/2 36/11 36/17 37/19 37/20 38/7 40/12 44/7 44/17 45/9 45/10 47/6 47/6 47/17 49/4 49/13 49/20 49/21 54/17
**There's [2]** 40/14 49/21
**thing [3]** 18/14 34/1 49/17
**things [1]** 34/19
**think [22]** 6/23 10/15 10/15 16/8 17/2 19/24 24/15 27/15 27/18 27/19 27/21 30/25 37/11 44/5 44/10 44/14 44/23 45/24 46/17 47/9 48/25 50/5
**though [2]** 32/19 42/22
**threat [1]** 49/11
**threshold [1]** 26/10
**through [9]** 5/17 15/2 19/16 23/14 24/12 32/7 45/17 45/24 50/4
**throwing [2]** 25/12 28/6
**throws [1]** 48/23
**time [18]** 1/16 6/20 9/24 11/23 12/3 23/5 23/13 24/15 24/21 30/11 30/12 30/13 33/1 34/25 36/19 48/13 48/17 50/5
**tip [4]** 5/19 5/20 35/17 36/5
**today [2]** 4/12 44/24
**together [1]** 11/3
**told [10]** 12/10 18/5 18/20 23/15 23/16 33/23 36/20 36/21 37/1 44/16
**too [2]** 20/24 21/3
**took [10]** 14/6 14/7 14/14 14/15 18/8 27/11 28/24 35/6 35/9 35/11
**total [1]** 45/21
**touch [1]** 43/6

## T

**touched [6]** 23/18 41/10 41/21 42/4 43/2 43/25
**toward [4]** 19/22 25/25 26/4 27/7
**towards [11]** 15/17 16/10 17/11 18/10 18/22 23/8 26/13 26/21 27/12 28/2 43/13
**trained [2]** 20/20 46/3
**transcript [9]** 52/7 53/2 53/3 54/14 54/15 54/16 54/18 54/20 55/3
**transpired [1]** 24/14
**tried [4]** 18/7 24/1 24/12 31/8
**triggered [1]** 14/8
**true [3]** 23/8 52/7 53/19
**try [3]** 6/2 18/9 20/17
**trying [14]** 14/9 17/5 17/8 17/16 18/6 23/12 25/1 37/13 39/2 40/6 40/18 44/23 45/17 49/20
**two [11]** 4/23 5/3 8/8 11/7 11/24 15/23 18/14 24/17 27/10 27/17 32/25
**type [3]** 18/14 32/21 32/22

## U

**U.S [1]** 5/25
**Uh [1]** 38/11
**Uh-huh [1]** 38/11
**un [1]** 48/4
**under [8]** 38/1 38/25 39/19 46/7 47/4 47/8 53/19 54/17
**underneath [1]** 20/10
**undersigned [1]** 51/4
**understanding [3]** 31/15 37/12 44/13
**UNITED [1]** 1/1
**unnecessary [1]** 48/4
**up [28]** 6/13 8/18 9/1 11/2 11/3 11/10 13/8 13/14 14/2 14/21 17/25 20/5 21/20 22/2 22/3 22/5 22/18 23/21 23/23 24/8 25/12 29/11 34/25 37/16 39/2 42/19 43/15 47/21
**upward [2]** 23/3 29/8
**upwards [1]** 22/24
**us [18]** 4/16 5/11 6/1 10/4 10/6 12/12 15/14 23/25 25/5 28/12 30/14 30/23 31/5 31/12 33/1 33/5 35/15 47/12
**use [6]** 13/17 14/5 25/24 46/2 46/12 46/21
**used [6]** 29/1 29/1 48/6 49/9 49/14 49/24
**using [3]** 14/10 15/14 44/2
**utilized [1]** 49/5

## V

**variety [1]** 47/8
**vehicle [4]** 11/17 11/18 13/5 13/6
**verbal [2]** 47/12 48/20
**verbatim [1]** 37/21
**very [5]** 31/12 43/14 49/1 49/2 50/6
**vest [1]** 25/23
**Video [1]** 1/11
**view [3]** 14/12 43/10 43/21
**visiting [1]** 31/18
**vital [1]** 41/12
**vs [2]** 1/6 53/1

## W

**wait [1]** 43/16
**waive [3]** 52/9 54/14 55/3
**Waiver [1]** 55/1
**walk [3]** 24/12 24/12 27/8
**walked [3]** 15/2 23/8 30/8
**walking [9]** 17/10 18/22 23/11 26/13 26/21 27/7 34/21 43/15 48/15
**want [5]** 7/4 10/2 31/13 40/13 40/15
**wanted [7]** 12/8 19/11 30/16 31/10 35/14 35/23 45/8
**warrant [8]** 31/20 31/23 35/16 35/19 35/21 35/22 35/25 36/3
**was [137]**
**wasn't [10]** 21/3 22/19 23/11 30/3 33/23 37/4 38/3 45/2 45/6 49/21
**watch [2]** 24/16 29/4
**waving [3]** 21/1 21/7 23/17
**way [14]** 7/1 12/19 13/23 14/1 22/20 23/1 29/3 41/15 42/10

## W


**way... [5]** 43/18 47/16 48/9 49/16 49/19
**ways [1]** 47/8
**wear [1]** 21/13
**well [10]** 22/9 27/2 30/19 36/24 40/5 40/16 40/25 43/14 45/21 47/18
**weren't [2]** 32/13 45/3
**west [1]** 14/6
**what [62]**
**whatever [4]** 18/2 23/22 37/8 40/8
**when [44]** 5/17 6/7 8/2 9/20 11/1 12/17 12/25 13/3 15/10 15/17 16/10 17/14 17/24 21/19 22/18 24/11 24/24 26/12 26/15 26/15 27/4 27/6 27/16 27/25 28/11 28/15 29/4 32/3 32/6 32/17 34/10 34/12 34/17 34/20 34/25 35/9 37/22 38/6 41/2 43/7 43/9 47/15 48/13 54/13
**where [21]** 6/17 10/19 12/1 13/13 15/5 15/7 15/22 19/17 19/25 20/6 21/1 21/20 21/23 22/19 22/19 28/1 32/10 35/6 39/3 44/14 49/23
**whereas [1]** 14/2
**whether [2]** 36/9 44/7
**which [13]** 5/24 12/6 13/23 14/1 16/18 25/24 27/17 31/6 36/25 41/15 41/18 45/7 54/12
**who [9]** 9/20 9/23 12/7 16/3 16/4 16/7 31/2 35/13 36/11
**whoever [1]** 30/21
**whole [4]** 18/12 30/20 31/11 33/1
**why [5]** 24/2 24/5 35/20 37/18 45/8
**winds [1]** 47/21
**within [4]** 26/10 46/4 47/19 54/16
**without [3]** 12/9 13/22 46/19
**witness [6]** 3/1 4/2 40/10 51/8 52/8 52/8
**witnesses [2]** 33/16 33/20
**word [4]** 31/12 39/4 44/23 45/5
**words [10]** 8/4 17/9 22/4 33/13 36/14 37/9 37/13 42/14 46/17 46/21
**work [1]** 13/24
**Worked [1]** 4/23
**worries [1]** 10/18
**worry [1]** 33/4
**worse [1]** 50/1
**wrong [2]** 7/1 44/14


## Y


**yard [1]** 16/25
**yeah [23]** 6/19 15/25 18/13 18/19 20/4 21/6 21/14 25/9 27/23 28/5 32/10 33/3 33/6 34/17 39/5 39/8 39/24 40/21 41/7 44/16 44/17 45/16 46/15
**years [8]** 4/22 4/24 5/1 8/15 36/17 41/13 41/20 42/21
**yelling [1]** 45/3
**Yep [4]** 7/15 16/1 37/3 39/23
**you-all [1]** 11/3